**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FOUR WOMEN HEALTH SERVICES, LLC,

          Plaintiff,

v.

ABUNDANT HOPE PREGNANCY
RESOURCE CENTER INC., d/b/a
ATTLEBORO WOMEN'S HEALTH CENTER,
CATHERINE ROMAN, NICOLE CARGES,
and DARLENE HOWARD,

          Defendants.

Civil Action No.  24-12283

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Four Women Health Services, LLC ("Four Women") brings this action against Defendant Abundant Hope Pregnancy Resource Center Inc., d/b/a Attleboro Women's Health Center ("AWHC"), Catherine Roman, Nicole Carges, and Darlene Howard (collectively, "Defendants") to stop Defendants' unlawful practices of interfering with patients[1] seeking to obtain reproductive healthcare services at Four Women.  Defendants have breached Four Women's electronic platforms to access confidential patient-client communications and the personally identifying information therein.  Defendants then used the intercepted communications to contact Four Women patients directly for the purpose of preventing them from accessing lawful reproductive healthcare.

To prevent further harm to Four Women and its patients, Four Women requests that this Court issue a preliminary injunction as set forth in Four Women's Proposed Order, attached hereto as **Exhibit A**, requiring Defendants to cease and refrain from infiltrating Four Women's electronic

---

[1] As used herein, "patients" encompasses both existing and prospective Four Women patients.

platforms, intercepting communications between Four Women and its patients, and using unlawfully obtained information to contact such patients.   Four Women seeks preliminary injunctive relief in connection with three of the five claims it asserts against Defendants: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA") (Count I); (2) violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("Federal Wiretap Act") (Count II); and (3) violation of the Massachusetts wiretap statute, M.G.L. c. 272, § 99 ("Massachusetts Wiretap Act") (Count III).

Four Women also files herewith a Motion for Limited Expedited Discovery.  As explained in detail in Four Women's memorandum of law in support of that motion, expedited discovery is not necessary for the Court to resolve Four Women's motion for a preliminary injunction—no further discovery is needed to demonstrate that Defendants have accessed Four Women's electronic systems and unlawfully intercepted Four Women's communications.  But Four Women submits that narrow, targeted expedited discovery is necessary and appropriate both to ensure that any injunctive relief granted fully addresses the scope of Defendants' conduct and to permit Four Women to address and remedy any additional incidents compromising its patients' information.

## STATEMENT OF FACTS

### I.    The Parties

Founded in 1998, Four Women is a licensed clinic and ambulatory surgical center in Attleboro, Massachusetts that provides comprehensive gynecological care.  Complaint ("Compl.") ¶¶ 14, 23-24.  Four Women provides a range of reproductive healthcare services, including birth control services, ultrasounds, and abortion care, and serves primarily low-income communities. *Id.* ¶¶ 24-25.  It is one of only three reproductive healthcare clinics that provide abortion care in southeastern Massachusetts, and the only one offering surgical abortion services.  *Id.* ¶ 24.  Since April 2003, Four Women has maintained a fully licensed surgery center with experienced staff,

including licensed medical doctors, nurses, and medical assistants.  *Id.*

Directly next-door to Four Women is AWHC.  *Id.* ¶¶ 53-54.  AWHC is not a licensed medical facility.  *Id.* ¶ 26.  AWHC's mission is to prevent women from obtaining reproductive healthcare, especially abortion care.  *Id.* ¶ 4.  On its website, AWHC advertises that it provides "medical appointments" to women, such as pregnancy testing, ultrasounds, and diagnosing pregnancies.  *Id.* ¶¶ 25, 38.  AWHC, however, cannot lawfully provide ultrasounds, gynecological care, or any of the other medical services it advertises on its website.  *Id.* ¶¶ 6, 26.

AWHC's website, name, and physical proximity to Four Women mislead women seeking reproductive healthcare services to make appointments with AWHC, believing they are making appointments at Four Women.  *Id.* ¶¶ 55-57.  For example, when women contact AWHC seeking abortion services, they are not informed that AWHC does not provide abortions; they are instead given appointments at AWHC.  *Id.* ¶ 58.  When women inadvertently enter AWHC for their Four Women appointments, they are not informed that they are in the wrong place.  *Id.* ¶ 63.  They are instead led through intake and ultrasound procedures, under the pretense that the process is a necessary prerequisite for their Four Women appointment.  *Id.* ¶¶ 64-73.

AWHC's tactics to delay women seeking reproductive healthcare can have grave consequences.  AWHC directs women seeking abortions to first "confirm their pregnancy is viable" with an ultrasound.  *Id.* ¶ 44.  AWHC also falsely conveys that "confirming" a pregnancy is necessary because abortion is dangerous for women with ectopic pregnancies or sexually transmitted infections.  *Id.* ¶¶ 47-48.  These barriers are not rooted in medical necessity or supported by medical standards of care.  *Id.* ¶¶ 49-51.  Quite the opposite; their purpose and effect—delaying women seeking abortion care—not only puts a woman's ability to receive such care in jeopardy but also puts women in serious medical danger.  *Id.* ¶¶ 45, 49-51.

## II.     Four Women's Confidential Patient-Client Communications System

To make appointments to receive reproductive healthcare at Four Women, many patients schedule appointments online. Compl. ¶ 92. To that end, Four Women's website contains a widget through which patients can make appointments or send messages to Four Women staff. *Id.* ¶ 93. The widget is hosted by and connects to a platform managed by a third-party vendor, Klara Technologies, Inc. ("Klara"), which facilitates secure patient messaging. Affidavit of Robert Knapp ("Knapp Aff.") ¶¶ 17-18. When patients book appointments using Four Women's website, they do so using the Klara platform. *Id.* ¶¶ 19-20. When patients send electronic messages to Four Women, they do so using the Klara widget. *Id.* Four Women staff can respond using Four Women's Klara page, which is accessible via computer or mobile device by any user with access to a web browser and the login credentials. *Id.* ¶ 21; Compl. ¶ 96.

Appointment information—including the patient's name, phone number, and appointment type—is uploaded to Athenahealth, Inc. ("Athena") immediately after booking. Knapp Aff. ¶ 23. Athena is a third-party electronic health record system that Four Women uses to manage patient health records and information. *Id.* The Athena platform stores patient records, appointments, and information; Four Women's patient visitation schedule resides on the Athena platform. *Id.* ¶¶ 25, 27. Both Klara and Athena are cloud-based "software as a service" providers, meaning that their platforms host and manage the information stored in Four Women's account. *Id.* ¶¶ 18, 24.

## III.    AWHC's Repeated Hacking into Four Women's Confidential Patient-Client Communications Systems and Direct Contact with Four Women Patients

On multiple occasions over the past year, AWHC has called prospective Four Women patients directly on their cell phones either during or shortly after these patients were communicating with Four Women to schedule appointments. Compl. ¶ 7. Four Women provides the following four examples of such incidents.

1.     **Jane Doe 5**[2]

On or about 1:25 p.m. on October 30, 2023, Jane Doe 5 contacted Four Women via Klara seeking to schedule an ultrasound after testing positive on a home pregnancy test.  Declaration of Emily Nash ("Nash Decl.") Ex. A (Jane Doe 5 screen shot of Klara messages).  Through electronic messaging, facilitated by Klara, Four Women staff communicated with Jane Doe 5 about scheduling an appointment.  *Id.*  At 1:40 p.m., Four Women wrote: "We have appointments on Wednesday, Thursday or Friday this week."  *Id.* At 1:55 p.m., just fifteen minutes later, Jane Doe 5 responded: "I received a call from someone at your office and I scheduled an appointment for Thursday morning at 9:15."  *Id.*

Four Women had not called Jane Doe 5.  *Id.*  Four Women informed Jane Doe 5 that no one in its office had called her, and that Four Women does not see patients on Thursday mornings.  *Id.*  Jane Doe 5 sent Four Women the text confirmation she received for her Thursday morning appointment; it stated that the appointment was with AWHC.  *Id.*  Jane Doe 5 had never contacted or communicated with AWHC before October 30, 2023.  *Id.* (Jane Doe 5 stating she had only provided contact information on one other website: carafem.com); Compl. ¶ 107.

2.     **Jane Doe 6**

On or about May 1, 2024, at 9:05 a.m., Jane Doe 6 contacted Four Women to schedule an appointment.  Nash Decl. Ex. B (Jane Doe 6 screen shot of Klara messages).  Four Women responded via Klara by asking what method of abortion—medication or surgery—Jane Doe 6 sought.  *Id.*  At 9:08 a.m., Jane Doe 6 responded: "medication."  *Id.*  Jane Doe 6 and Four Women continued messaging via Klara to schedule that appointment for three days later.  *Id.*  At 10:09

---

[2] Four Women patients are referred to herein using pseudonyms.  *See Doe v. Bell Atl. Bus. Sys. Servs., Inc.*, 162 F.R.D. 418, 420 (D. Mass. 1995) (courts permit the utilization of pseudonyms for parties "in cases involving social stigmatization [or] real danger of physical harm . . . . Cases in which parties are allowed to proceed anonymously because of privacy interests often involve abortion.").

a.m., Four Women sent Jane Doe 6 a link on Klara that she could use to upload insurance information.  *Id.*

At 10:11 a.m., two minutes later, Jane Doe 6 received a call from the phone number (508) 455-0172, which is AWHC's phone number.  *See id.* Ex. C (Jane Doe 6 screen shot of call); *id.* Ex. D (Jane Doe 6 complaint form).  Jane Doe 6 answered the call.  *See id.* Ex. D.  During the call, AWHC indicated that it was the entity with which Jane Doe 6 had made an appointment.  *Id.* AWHC stated it had received her online request for an appointment and that she was required to undergo an ultrasound at AWHC prior to the medication abortion to verify the pregnancy and see if it was viable.  *Id.*

### 3.    Jane Doe 7

On or around August 31, 2023, Jane Doe 7 contacted Four Women to schedule an appointment for birth control.  *Id.* Ex. E (Jane Doe 7 screen shot of Klara messages).  Minutes after booking an appointment with Four Women, Jane Doe 7 received a call from AWHC.  *Id.*  During the call, AWHC personnel stated that it could not provide her with birth control and instead invited her to a diaper give-away.  *Id.*  AWHC deceived Jane Doe 7 to believe that she was speaking with Four Women and not AWHC.  *Id.*  At the end of the call, Jane Doe 7 believed that her appointment with Four Women had been canceled.  *Id.*

### 4.    Jane Doe 8

On or around May 6, 2024, Jane Doe 8 messaged Four Women using its online platform, operated by Klara, and made an appointment for a medication abortion.  *Id.* Ex. F (Jane Doe 8 screen shot of Klara messages).  On the day of her appointment, AWHC called Jane Doe 8 on her cell phone.  *Id.* Ex. G (Jane Doe 8 complaint form).  Jane Doe 8 had never previously contacted AWHC and does not know how AWHC obtained her contact information.  *Id.*

The experiences of Jane Does 5-8 indicate that AWHC is hacking into and obtaining

information from Four Women's Klara and/or Athena platforms.  *See* Knapp Aff. ¶ 28.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show that (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm if the injunction is not granted; (3) the balance of equities weighs in the plaintiff's favor; and (4) the injunction serves the public interest. *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, 794 F.3d 168, 171 (1st Cir. 2015). "The first of these four factors normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).  Here, all four factors weigh in favor of granting Four Women's motion for a preliminary injunction.

## IV.    Four Women Is Likely to Succeed on the Merits of Its Claims.

Four Women seeks preliminary injunctive relief in connection with three of the five claims it asserts against Defendants: (1) violation of the CFAA (Count I); (2) violation of the Federal Wiretap Act (Count II); and (3) violation of the Massachusetts Wiretap Act (Count III).

Four Women is likely to succeed on the merits of all three claims.  AWHC called each of the Jane Doe patients identified herein only after the patients had initiated communication with Four Women to make appointments for reproductive healthcare services.  This is not a coincidence.  There is no lawful mechanism by which AWHC could have obtained these patients' names and contact information as they were communicating with Four Women.  Rather, AWHC's pattern of outreach to Four Women patients could only be the result of AWHC's unauthorized access to Four Women's communication platforms and interception of its communications with patients, most likely through infiltration of Four Women's Klara or Athena accounts.  These facts satisfy each claim at issue.

1.    **AWHC's Interception of Four Women's Messages with Patients and Use of Information Therein Violates the CFAA.**

A defendant is liable under the CFAA if the defendant "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  Four Women brings its CFAA claim on the basis that AWHC's unauthorized access resulted in "the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of one or more individuals."[3]  18 U.S.C. §§ 1030(g) & 1030(c)(4)(A)(i)(II); *see Wofse v. Horn*, 523 F. Supp. 3d 122, 138 (D. Mass. 2021) (explaining that Subclause (II) does not require a showing of "damage or loss" and is not limited to economic damages).  AWHC's interception of Four Women's communications with the four Jane Does identified herein, likely through Four Women's accounts on its Klara or Athena platforms, satisfies each of these elements.

a)    **Defendants Accessed and Obtained Information from a Protected Computer.**

The CFAA defines "protected computer" as any computer "which is used in or affecting interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2)(B).  As courts in the First Circuit have recognized, "[a]ny computer with internet access is covered by the statute because the internet is an instrumentality of interstate commerce."  *T.H. Glennon Co. v. Monday*, No. 18-30120-WGY, 2020 U.S. Dist. LEXIS 45917, at *26 (D. Mass. Mar. 17, 2020) (internal quotation marks omitted); *see Philips Med. Sys. P.R. v. Alpha Biomedical & Diagnostic Corp.*,

---

[3] This memorandum focuses on Subclause (II) in support of its request for injunctive relief, but as Four Women has also asserted in its Complaint, AWHC's unauthorized access to Four Women's computer system also resulted in Four Women accruing costs responding to the offense and lost revenue and other consequential damages exceeding $5,000.  Compl. ¶ __; *see* 18 U.S.C. §§ 1030(g) & 1030(c)(4)(A)(i)(I).

C.A. No. 19-1488CCC, 2020 U.S. Dist. LEXIS 16351, at *7 (D.P.R. Jan. 29, 2020).[4]  Four Women's Klara and Athena databases exist on the "Cloud," an Internet-based network.  Knapp Aff. ¶¶ 18, 24.  That Internet connection allows Four Women's Klara and Athena databases to be accessed by Four Women's network-connected computers and phones.  *See id.*  Defendants' unauthorized access to Four Women's account on the Klara or Athena platforms constitutes access to a protected computer.  *See T.H. Glennon*, 2020 U.S. Dist. LEXIS 45917, at *32 (finding unauthorized access to Cloud-based database constituted access to a "protected computer").

> **b)** **Defendants Lacked Authorization to Access Four Women's Platforms.**

It is beyond doubt that Defendants were not authorized to access Four Women's Klara or Athena platforms.  Although the CFAA does not define "without authorization," courts interpret the term to mean lacking "permission to access the computer system."  *T.H. Glennon*, 2020 U.S. Dist. LEXIS 45917, at *27; *see also United States v. Thomas*, 877 F.3d 591, 598 (5th Cir. 2017); *Nosal*, 844 F.3d at 1028.  Here, there is no question that Defendants—who are neither employees nor patients—did not have authorization to access Four Women's confidential patient communications and records.  And this is particularly true given that AWHC's mission is to prevent women from obtaining abortion care and Four Women's whose mission is to ensure all women have access to high quality reproductive healthcare, including abortions.  *See* Compl. ¶¶ 4, 24.  Discovery is likely to elucidate how Defendants gained unauthorized access to Four Women's Klara or Athena accounts—whether through malware or misusing an existing Four Women employee's Klara or Athena account—but in either case, such access was "without authorization."

---

[4] This interpretation of the CFAA is also maintained by other Circuits.  *See, e.g.*, *United States v. Nosal*, 844 F.3d 1024, 1050-51 n.3 (9th Cir. 2016); *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007).

### c)  Defendants Intentionally Accessed Four Women's Platforms and Obtained Information.

Defendants intentionally accessed Four Women's Klara or Athena database and obtained information therefrom.  The CFAA "does not seek to punish those who inadvertently stumble into someone else's computer file or computer data."  *Phillips Med. Sys. P.R. v. GIS Partners Corp.*, 203 F. Supp. 3d 221, 232 (D.P.R. 2016) (internal quotation marks omitted).  Here, there is little doubt—and discovery is likely to corroborate—that AWHC did not "inadvertently stumble" into Four Women's Klara or Athena database.  Rather, the facts now in Four Women's possession demonstrate that Defendants accessed Four Women's Klara or Athena platform with the intent to gain the information necessary to thwart the efforts of prospective Four Women patients trying to make appointments at Four Women.

With each of the Jane Doe patients identified here, AWHC took quick action using its unlawfully obtained information.  For example, minutes after intercepting Jane Doe 5's message seeking an ultrasound appointment at Four Women, AWHC called Jane Doe 5 in an attempt to deceive Jane Doe 5 and misdirect her to AWHC for her appointment.  Nash Decl. Ex. A.  Likewise, within minutes of intercepting Jane Doe 6's efforts to schedule a medication abortion at Four Women, AWHC called Jane Doe 6, stating that it had received her online request for an appointment and directing her to visit AWHC first, before Four Women, for an ultrasound.  *Id.* Exs. B-D.  And, within minutes of intercepting Jane Doe 7's efforts to make an appointment with Four Women for birth control, AWHC called Jane Doe 7, purporting to cancel her birth control appointment and inviting her to a diaper give-away.  *Id.* Ex. E.  Finally, having intercepted Jane Doe 8's messages confirming the date of her appointment for a medication abortion, AWHC called Jane Doe 8 on that very same date.  *Id.* Exs. F & G.  These interceptions were not inadvertent.

  **d)**  **Defendants' Unauthorized Access Resulted in the Modification or Impairment, or Potential Modification or Impairment, of the Medical Examination, Diagnosis, Treatment, or Care of Multiple Women Seeking Reproductive Healthcare Services.**

Defendants' unauthorized access to Four Women's Klara or Athena database violates Subclause (II) of the CFAA, as it resulted in the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of multiple women seeking reproductive healthcare services. The CFAA does not define the terms in Subclause (II), but the cases addressing them "have interpreted the Subclause by the plain meaning of its terms." *Hains v. Adams*, No. 3:19-cv-504 (DJN), 2019 U.S. Dist. LEXIS 196113, at *23 (E.D. Va. Nov. 12, 2019). Here, the very purpose of AWHC's unauthorized access was to modify or impair the reproductive healthcare sought by Four Women patients.

AWHC's outreach to the Jane Doe patients, for example, involved attempts to misdirect patients so that they would fail to show up to their intended Four Women appointments. As Jane Doe 5 messaged Four Women via Klara to schedule an ultrasound, AWHC called her purporting to *be* Four Women, in an attempt to divert her efforts to make the intended appointment with Four Women. Nash Decl. Ex. A. Similarly, when AWHC called Jane Doe 7 just minutes after booking an appointment for birth control with Four Women, AWHC deceived Jane Doe 7 into believing that she was speaking with Four Women when AWHC stated that it could not provide her with birth control and invited her to a diaper give-away. *Id.* Ex. E. At the end of the call, Jane Doe 7 believed that her appointment with Four Women had been canceled. *Id.* In both cases, AWHC attempted to intervene and prevent the patient from receiving her intended medical care.

AWHC's repeated attempts to divert these women from getting the healthcare they sought has dangerous implications. For example, on the call with Jane Doe 6, AWHC stated that it had received Jane Doe 6's online request for an appointment, but that she was required to undergo an

ultrasound prior to the medication abortion to verify the pregnancy and see if it was "viable."  *Id.*
Ex. D.  Such statements contradict medical advice and reproductive healthcare standards of care:
there is no requirement that providers or patients determine the "viability" of a pregnancy before
commencing medication abortion.  Compl. ¶ 42.   Indeed, for certain pregnancies that are not
"viable," such as ectopic pregnancies, termination procedures are necessary, and failure to
terminate—or even delay in terminating—an ectopic pregnancy can cause grave, even fatal harm
to women.  *Id.* ¶¶ 49-51.

> ### 2.   AWHC's Interception of Four Women's Messages with Patients Violates the Federal Wiretap Act and the Massachusetts Wiretap Act.

The Federal Wiretap Act "creates a private right of action against one who 'intentionally
intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept'"
the contents of an electronic communication using a device.  *Blumofe v. Pharmatrak, Inc. (In re
Pharmatrak, Inc. Privacy Litig.)*, 329 F.3d 9, 18 (1st Cir. 2003) (quoting 18 U.S.C. § 2511(1)(a));
*see* 18 U.S.C. § 2520.   As the Massachusetts Supreme Judicial Court has explained, the
Massachusetts Wiretap Act "in major portion matches section for section the provisions of the
Federal statute regulating interception of wire and oral communications."  *O'Sullivan v. NYNEX
Corp.*, 426 Mass. 261, 264 n.5 (Mass. 1997) (quoting *Commonwealth v. Vitello*, 367 Mass. 224,
251 (1975)).  Massachusetts courts thus construe the Massachusetts statute in accordance with the
construction federal courts apply to the Federal Wiretap Act.  *Id.*  Accordingly, Plaintiff discusses
the two Wiretap statutes together here, noting any divergences as applicable.

Each interception by AWHC constitutes a separate wiretap violation.  As Jane Does 5-8
illustrate, AWHC intentionally intercepted patients' electronic communications with Four Women
for the purpose of obtaining names, phone numbers, and appointment requests, and ultimately to
contact the patient and prevent her from accessing reproductive healthcare at Four Women.

a)     The   Messages   Intercepted   by   Defendants   Were
       Communications Covered by the Wiretap Acts.

The electronic communications intercepted here are protected by both statutes.  The

Federal Wiretap Ac's definition of "electronic communication" is "broad" and "functional."

*Blumofe*, 329 F.3d at 18.  It includes "any transfer of signs, signals, writing, images, sounds, data,

or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic,

photoelectric, or photooptical system that affects interstate or foreign commerce."  18 U.S.C. §

2510(12).  "[T]he Massachusetts wiretap statute is as protective as the amended Federal wiretap

statute."  *Commonwealth v. Moody*, 466 Mass. 196, 207 (2013); *see* M.G.L. c. 272, § 99(B)(1)

(defining "wire communication").  Courts have construed both statutes as applying to text

messages.  *See, e.g.*, *United States v. Jones*, 451 F. Supp. 2d 71, 75 (D.D.C. 2006) (Federal Wiretap

Act); *Commonwealth v. Moody*, 993 N.E.2d 715, 723 (Mass. 2013) (Massachusetts Wiretap Act).

Indeed, a wide range of Internet-based interactions fall within the definition, including the

completion of online forms, *see Blumofe*, 329 F.3d at 18, and "mouse movements, clicks,

keystrokes and other browsing activity," *Alves v. BJ's Wholesale Club, Inc.*, No. 22-2509-BLS1,

2023 Mass. Super. LEXIS 59, at *5 (June 21, 2023).  The communications between Four Women

and its patients—including patient submission of personal information and messages exchanged

thereafter—easily meet these definitions.

b)     Defendants Intercepted Four Women's Communications with
       Its Patients.

AWHC intercepted Four Women's communications as defined by both the Federal and the

Massachusetts Wiretap Acts.  To constitute an "intercept" under the Federal Wiretap Act, the

acquisition of a communication must be contemporaneous with its transmission.  *See Boudreau v.

Lussier*, 901 F.3d 65, 77 (1st Cir. 2018).  To constitute an "interception" pursuant to the

Massachusetts Wiretap Act, that interception need not be contemporaneous, but it must be "(1)

secretly made and (2) without prior authority by all parties." *Curtatone v. Barstool Sports, Inc.*, 169 N.E.3d 480, 483 (Mass. 2021). Defendants' interception of Four Women's communications was both contemporaneous and secret.

First, the timing of AWHC's outreach to prospective Four Women patients reveals that AWHC intercepted Four Women's electronic communications contemporaneously. For example, AWHC called Jane Doe 5 as she was in the middle of messaging Four Women to make her ultrasound appointment. Nash Decl. Ex. A. AWHC called her before her appointment was even made. *See id.* On the phone, it offered Jane Doe 5 an appointment on one of the three days identified by Four Women via Klara less than 15 minutes prior. *See id.* Jane Doe 5 had never previously contacted or communicated with AWHC. Compl. ¶ 107. Having access to her messages with Four Women was the only means by which AWHC could have obtained her contact information and known she was pursuing reproductive healthcare services that day. *See id.* Likewise, AWHC called Jane Doe 6 within minutes of her making an appointment for a medication abortion and just two minutes after Four Women sent her a message via Klara. Nash Decl. Ex. B & C. The proximity in time between Four Women's communications with Jane Does 5 and 6 and AWHC's outreach to those patients demonstrates that the interception of the communications occurred in real time.

Second, there can be no doubt Defendants' interception of Four Women's electronic communications was secretly made. Four Women had no knowledge of the interceptions until it heard from multiple patients who said that they had been contacted by AWHC and that AWHC had knowledge of the appointments they had recently made with Four Women. Indeed, Four Women seeks expedited discovery to understand exactly how the interceptions occurred. Additionally, as described *supra*, in Section IV(1)(b) in connection with the CFAA claim,

Defendants accessed Four Women's Klara or Athena database without authorization. Discovery is likely to show that Defendants gained unauthorized access to an existing Four Women employee's Klara or Athena account and used that access to unlawfully obtain and misuse information about Four Women patients.

### c)   Defendants' Interception of Four Women's Communications with Its Patients Was Intentional.

In this context, intentionality is generally defined by what it is not: An interception under the Federal Wiretap Act is *not* intentional "if it is the product of inadvertence or mistake." *Blumofe*, 329 F.3d at 23. Courts are more likely to find that an interception is intentional when "it serves a party's self-interest to engage in such conduct." *Id.* Here, as described *supra*, in Section IV(1)(c) in connection with the CFAA claim, there is little doubt—and discovery is likely to corroborate—that AWHC intentionally intercepted Four Women's electronic communications to serve its self-interest, i.e., its mission of preventing women from obtaining reproductive healthcare services, especially abortion care. Compl. ¶ 4.

### d)   Defendants Intercepted the Content of Four Women's Communications with Its Patients.

Defendants intercepted the "content" of Four Women's electronic communications with its patients. The Federal Wiretap Act defines "content" as any information containing the "substance, purport, or meaning" of the communication. 18 U.S.C. § 2510(8). "This definition encompasses personally identifiable information such as a party's name, date of birth, and medical condition." *Blumofe*, 329 F.3d at 18. Similarly, the Massachusetts Wiretap Act defines "contents" broadly as "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." M.G.L. ch. 272, § 99(B)(5); *Rich v. Rich*, 28 Mass. L. Rep. 553 (Super. Ct. 2011) ("[T]he term 'contents' of a communication is defined broadly.").

Here, the facts in Four Women's possession demonstrate that AWHC obtained such information, including but not limited to the names, medical conditions, and phone numbers of prospective Four Women patients, through the communications it intercepted. The facts also show that AWHC acquired the substance of the conversations between Four Women and their patients, such as the patients' scheduling of appointments with Four Women, including the date, time, and nature of such appointments. For example, in their calls with Jane Does 5, 6, and 7, Defendants indicated that they knew details about the appointment the patient had recently requested from Four Women, including the nature and/or the date of the appointment. Discovery is likely to corroborate this evidence already in Four Women's possession.

**e)**      **The Device Used by Defendants Is Covered by the Wiretap Acts.**

The Federal Wiretap Act defines an "electronic, mechanical, or other device" as any device or apparatus that can be used to intercept a wire, oral, or electronic communication. 18 U.S.C. § 2510(5). The Massachusetts Wiretap Act defines "intercepting device" similarly broadly. M.G.L. ch. 272, § 99(B)(3) ("any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication"). Massachusetts courts have also concluded that software code falls under the definition of "an intercepting device." *See Doe v. Bos. Med. Ctr. Corp.*, No. 2384CV00326-BLS-1, 2023 Mass. Super. LEXIS 674, at *9 (Sep. 14, 2023) ("[W]here cellphone, tablet, and computer applications and programs, and their interfacing with the internet, all rely on software for their operation, its use is practically implicit in any modern electronic communication.").

The facts indicate—and discovery is likely to corroborate—that Defendants gained access to Four Women's Klara or Athena account using a computer or mobile device connected to the Internet. *See* Knapp Aff. ¶ 28. Such a computer or mobile device, as well as the Klara or Athena platform used thereon, fit squarely under these statutory definitions for device and intercepting

16

device.  *Id.* ¶¶ 18, 24 (describing both Klara and Athena as cloud-based "software as a service" providers).

V.   **Four Women Is Likely to Suffer Irreparable Harm in the Absence of a Preliminary Injunction.**

Absent the requested preliminary injunction, Four Women is likely to suffer irreparable harm in three key respects—to the privacy of Four Women and its patients; to Four Women's business and its ability to serve its patients; and to Four Women's reputation.

*First*, AWHC's interception of Four Women's communications compromises the privacy of Four Women and, more critically, its patients.  As courts in the First Circuit have explained, "[i]nvasion of privacy, like injury to reputation, inflicts damage which is both difficult to quantify and impossible to compensate fully with money damages." *Williams v. Poulos*, 801 F. Supp. 867, 874 (D. Me. 1992).  Indeed, the wiretapping statutes were enacted "to protect the privacy of wire, oral and electronic communications," *id.* (citing *Gelbard v. United States*, 408 U.S. 41, 48 (1972)), and "to ensure that unjustified and overly broad intrusions on rights of privacy were avoided," *Moody*, 993 N.E.2d at 719.  Moreover, in the healthcare context, privacy is paramount.  As a licensed healthcare provider, Four Women has a duty to safeguard its patients' confidential personal and medical information.  Defendants' hacking into Four Women's confidential patient-client communications system to access that confidential information is a gross invasion of Four Women's privacy and the privacy of the patients that must be stopped.  In the same vein, Four Women's requested injunction will require AWHC to refrain from contacting the Jane Does identified in the Complaint, preventing further harassment of those women.

*Second*, AWHC's misuse of the intercepted communications jeopardizes Four Women's business and its ability to serve its patients.  Defendants have used the information they obtained via unauthorized access to Four Women's confidential patient-client communications system to

prevent patients from attending the appointments they scheduled with Four Women—in some cases by hijacking the potential appointment, and in other cases by leading patients to believe their existing appointment with Four Women had been cancelled.  *See, e.g.*, Nash Decl. Exs. A (Jane Doe 5 screen shot of Klara messages) & D (Jane Doe 6 complaint form).  Defendants' conduct has interfered with Four Women's operation of its business and its mission to ensure that all women have access to high quality reproductive healthcare, including abortion care.  *See* Compl. ¶ 24; *Cf. BTU Ventures*, 2009 U.S. Dist. LEXIS 148814, at *4 ("Defendant's unauthorized possession of Plaintiffs' proprietary information . . . seriously jeopardizes Plaintiffs' good will and bargaining position, and damages would most likely not redress any resulting harm should Defendant release this information to Plaintiffs' competitors.").

*Third*, AWHC's misuse of the intercepted communications threatens Four Women's reputation.  On multiple occasions, AWHC conveyed to Four Women patients that it *was* Four Women, damaging Four Women's reputation as a fully licensed surgery center with experienced medical staff that provides a range of reproductive healthcare services, including abortion care— the antithesis of AWHC.  "By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996).

Finally, Four Women is only aware of the incidents outlined in the Complaint from women who ultimately make it to Four Women for appointments and inform Four Women of AWHC's actions.  Four Women reasonably believes there are women for whom AWHC's conduct has prevented their access to Four Women altogether, further indication of harm absent an injunction.

**VI.    The Harm to Four Women Outweighs Any Harm That Granting the Requested Injunction Would Inflict on Defendants.**

The irreparable harm that Four Women will suffer if the Court does not issue an injunction greatly outweighs any harm to Defendants if the Court does issue an injunction.  If the requested injunction is not issued, Defendants will continue to infiltrate Four Women's confidential patient-client communications system, enabling them to further misuse that information.  *See Phillips Med. Sys. P.R.*, 203 F. Supp. 3d at 239 (finding, in connection with CFAA claim, that where defendants were not entitled to access information owned by plaintiff, balance of equites tipped in favor of granting injunction).  Notably, the requested injunction does not seek to prevent AWHC from continuing its services (although it is unlicensed—an issue raised in this lawsuit but not specifically at issue in this motion); it simply must refrain from intercepting communications to which it is not entitled and from misusing that information.

**VII.   The Public Interest Will Be Served by Granting the Requested Injunction.**

Finally, this factor, too tips in Four Women's favor.  The requested injunction will ensure that the public interest in protecting Massachusetts citizens against invasions of their privacy and misuse of their confidential information is upheld.  *See Williams*, 801 F. Supp. at 875 ("There is strong public interest in protecting the privacy and security of communications in a society so heavily dependent on inf[o]rmation."); *Moody*, 993 N.E.2d at 718 (discussing Congress's "overriding need [in enacting the Federal Wiretap Act] to safeguard the privacy of innocent persons") (cleaned up).  In the healthcare context, patient privacy is paramount—a policy point that is reflected in both federal and state laws protecting such privacy.

The requested injunction will also ensure that Massachusetts citizens are not deprived of their constitutional and statutory right to access reproductive health care services.  M.G.L. ch. 12, § 11I 1/2 ("Access to reproductive health care services . . . is a right secured by the constitution

and laws of the commonwealth.").  Defendants' use of technology to interfere with Four Women's business operations has both the purpose and effect of delaying if not altogether preventing women from accessing the reproductive healthcare they seek.  Defendants' conduct thus not only interferes with Four Women's ability to provide the reproductive healthcare secured by the Massachusetts constitution, but also countless women seeking this care.

## CONCLUSION

For the foregoing reasons, Four Women respectfully requests that this Court grant its motion for a preliminary injunction and order Defendants to cease and refrain from infiltrating Four Women's electronic platforms, intercepting communications between Four Women and its patients, and using unlawfully obtained information to contact such patients.

DATED:  September 5, 2024          **Four Women Health Services, LLC,**

By its attorneys,


/s/ *Matthew Patton*
Matthew D. Patton (BBO No. 703798)
Law Office of Nicholas F. Ortiz, P.C.
One Boston Place, Suite 2600
Boston, MA 02108
(617) 338-9400
mdp@mass-legal.com

/s/ *Emily Nash*
Martha Coakley (BBO # 87300)
Emily J. Nash (BBO #696460)
Caroline Holliday (BBO #707301)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
mcoakley@foleyhoag.com
enash@foleyhoag.com

Brenna Rosen (*pro hac vice forthcoming*)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
brosen@foleyhoag.com

## CERTIFICATE OF SERVICE

I, Matthew Patton, hereby certify that on September 5, 2024, I served the within document on Defendants at the following addresses:

Abundant Hope Pregnancy Resource Center Inc., d/b/a Attleboro Women's Health Center
152 Emory St. Unit 4
Attleboro, Massachusetts 02703

Catherine Roman
52 Rocky Knoll Road
North Attleboro, Massachusetts 02760

Nicole Carges
39 Raymond Tatro Ln.
North Attleboro, Massachusetts 02760

Darlene Howard
21 Williams Street
Mansfield, Massachusetts 02048

*/s/ Matthew Patton*
Matthew Patton