# Exhibit A to Pre-Conference Status Report



155 Seaport Boulevard
Boston, MA 02210-2600

617-832-1000 main
617-832-7000 fax

Emily J. Nash
6178323067 direct
enash@foleyhoag.com

December 6, 2024

## Via Certified Mail

Choose Life Marketing, LLC
2401 Bernadette Dr., Suite 115B
Columbia, MO 65203

> Re:   <u>Four Women Health Services, LLC v. Abundant Hope Pregnancy Resource Center Inc. d/b/a Attleboro Women's Health Center, Catherine Roman, Nicole Carges, Darlene Howard, and Choose Life Marketing, LLC, 1:24-cv-12283-JEK</u>

Dear Sir or Madam:

The Firm represents Four Women Health Services, LLC ("Four Women") in the above-captioned matter against Abundant Hope Pregnancy Resource Center, Inc., d/b/a Attleboro Women's Health Center et al., pending in the U.S. District Court for the District of Massachusetts.   You have been named as a Defendant in Four Women's proposed Amended Complaint.

The enclosed Motion for Leave to File the Amended Complaint has not yet been filed with the Court.  We are serving you with Four Women's Motion today, 14 days in advance of filing pursuant to U.S. District Court for the District of Massachusetts Local Rule 15.1.

Accordingly, enclosed please find the following:

- Plaintiff's Motion for Leave to File Amended Complaint, with Amended Complaint and Jury Demand, and

- Memorandum of Law in Support of Plaintiff's Motion for Leave to File Amended Complaint.

Please contact me if you have any questions.

Page 2

Sincerely,

*/s/ Emily J. Nash*

Emily J. Nash

Enclosures

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FOUR WOMEN HEALTH SERVICES, LLC

              Plaintiff,

    v.

ABUNDANT HOPE PREGNANCY
RESOURCE CENTER INC. d/b/a ATTLEBORO
WOMEN'S HEALTH CENTER, CATHERINE
ROMAN, NICOLE CARGES, and DARLENE
HOWARD,

              Defendants.

Civil Action No.: 1:24-cv-12283-JEK

### PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

The Plaintiff in this matter respectfully moves the Court pursuant to Fed. R. Civ. P. 15(A)(2) and Local Rule 15 to amend its complaint and file the Amended Complaint and Jury Demand attached hereto as Exhibit A. Rule 15(A)(2) provides that a party "may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

Here, the Defendants have not provided their written consent. Therefore, the Plaintiff seeks leave to amend its Complaint to add a new claim and add a new defendant.

WHEREFORE, Plaintiff respectfully request that the Court enter an order granting Plaintiff leave to amend its complaint and to file its Amended Complaint and Jury Demand attached hereto as Exhibit A.

DATED:  December 4, 2024

**Four Women Health Services, LLC,**

By its attorneys,


/s/ *Matthew Patton*
Matthew D. Patton (BBO No. 703798)
Law Office of Nicholas F. Ortiz, P.C.
One Boston Place, Suite 2600
Boston, MA 02108
(617) 338-9400
mdp@mass-legal.com

/s/ *Emily Nash*
Martha Coakley (BBO #87300)
Emily J. Nash (BBO #696460)
Caroline Holliday (BBO #707301)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
mcoakley@foleyhoag.com
enash@foleyhoag.com


Brenna Rosen (*pro hac vice*)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
brosen@foleyhoag.com

## CERTIFICATE OF CONFERRAL

I, Matthew Patton, hereby certify that, pursuant to Local Rule 7.1, Plaintiff's counsel corresponded with counsel for Defendants in order to narrow the issues raised by this motion. The parties were not able to reach agreement on the issues raised.

/s/ Matthew Patton
Matthew Patton

## CERTIFICATE OF SERVICE PURSUANT TO LOCAL RULE 15.1

I, Matthew Patton, hereby certify that pursuant to Local Rule 15.1(b) this motion was served upon Choose Life Marketing, the proposed added party, on December 4, 2024, 14 days prior to when this motion was filed.

/s/ Matthew Patton
Matthew Patton

## CERTIFICATE OF SERVICE

I, Matthew Patton, hereby certify that on December 4, 2024, I caused this motion to be served on counsel for Defendants by email.  Today I caused the motion to be served on counsel for Defendants via ECF service.

/s/ Matthew Patton
Matthew Patton

Exhibit A to Plaintiff's Motion for
Leave to File Amended Complaint

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

| | |
|---|---|
| FOUR WOMEN HEALTH SERVICES, LLC, | |
| Plaintiff, | |
| v. | Civil Action No.: 1:24-cv-12283-JEK |
| ABUNDANT HOPE PREGNANCY RESOURCE CENTER INC. d/b/a ATTLEBORO WOMEN'S HEALTH CENTER, CATHERINE ROMAN, NICOLE CARGES, DARLENE HOWARD, and CHOOSE LIFE MARKETING, LLC, | |
| Defendants. | |

<div align="center">

**AMENDED COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

</div>

1.      Plaintiff Four Women Health Services, LLC ("Four Women") brings this action against Defendant Abundant Hope Pregnancy Resource Center Inc. d/b/a Attleboro Women's Health Center ("Abundant Hope"), Catherine Roman, Nicole Carges, Darlene Howard, and Choose Life Marketing, LLC ("Choose Life Marketing") (collectively, "Defendants") to halt Defendants' unlawful practices of interfering with and deceiving women seeking to obtain reproductive healthcare services at Four Women.

2.      "Access to reproductive health care services . . . is a right secured by the constitution and laws of the commonwealth." M.G.L. ch. 12, § 11I 1/2. Defendants actively manipulate the lawful reproductive healthcare marketplace to deprive women of this right.

3.      Four Women is a licensed healthcare clinic in Attleboro, Massachusetts that provides reproductive healthcare, including abortion care, to its patients.

4.      Abundant Hope is an organization whose mission is to prevent women from

<div align="center">

1

</div>

obtaining reproductive healthcare services, especially abortion care.

5.      Abundant Hope specifically works to interfere with Four Women's business. Working with the other Defendants, Abundant Hope has developed a scheme of false advertising and deception to steer women away from Four Women.

6.      In 2018, Abundant Hope relocated and opened its doors across the parking lot from Four Women, putting the anodyne name "Attleboro Women's Health Center" on its door.

7.       Abundant Hope states that Attleboro Women's Health Center is its "medical" arm. In fact, "Attleboro Women's Health Center" is not a separate corporate entity from Abundant Hope, nor is it a licensed medical provider.

8.      Although Abundant Hope and "Attleboro Women's Health Center" do not have separate physical locations, Abundant Hope has created a separate website for its so-called "medical" arm, awhc.net (the "AWHC Website").

9.      The AWHC Website serves as the basis for a false advertising scheme intended to divert women searching online for abortion care in the region from Four Women.

10.      Abundant Hope employs a for-profit marketing agency, Choose Life Marketing, to carry out this effort.  Choose Life Marketing, which shares Abundant Hope's central mission to reach abortion-minded women and prevent them from obtaining the abortion care they seek, writes the content for the AWHC Website and buys and places Google advertisements on its behalf.

11.      The AWHC Website and advertisements rely on false and misleading statements designed to deceive women seeking abortion care and other reproductive healthcare services.

12.      For example, the AWHC Website falsely purports to provide free medical appointments and medical tests, when neither Abundant Hope nor its "Attleboro Women's Health Center" arm is a licensed medical facility that can lawfully provide "medical" services; it publishes

2

falsities about pregnancy and abortion designed to delay and dissuade women seeking abortion care; and it deceives women into believing that Abundant Hope provides abortion care, which it does not.

13.     Choose Life Marketing propagates these misrepresentations through Google advertisements that prompt women searching for abortion care to "schedule an appointment" with "Attleboro Women's Health Center."

14.     Four Women has learned of multiple cases in which Defendants' conduct and misrepresentations have misled and diverted patients attempting to receive services at Four Women.

15.     Many women have unknowingly provided their contact information to Abundant Hope through the AWHC Website or Choose Life Marketing's Google advertisement scheme under the false belief that doing so would enable them to obtain the abortion care they seek.

16.     Abundant Hope calls these women using the contact information obtained under false pretenses.  Once on the phone, Abundant Hope often continues its deception, masquerading as Four Women to hijack the potential appointment or suggesting it is affiliated with Four Women, instructing the woman to receive an ultrasound at its office before her Four Women procedure.

17.     Abundant Hope's physical location further deceives women arriving onsite.  Right next door to Four Women, Abundant Hope positions "Attleboro Women's Health Center" as Four Women's competitor and interferes with women arriving for their Four Women appointments.

18.     Once inside, Abundant Hope often coerces women who enter to prevent or delay their departure, including by falsely instructing them they must receive certain care there (such as ultrasounds) prior to their Four Women appointments.

19.     Abundant Hope's conduct frustrates women seeking care from Four Women, by

3

delaying them from receiving the care they seek by a few hours to several days or by dissuading them through deception to abandon their efforts to seek any care at all at Four Women.

20.    When it comes to reproductive healthcare, several days of delay may make all the difference in a woman's health or the care she can safely receive.  Four Women can project that many women have been deterred or blocked from receiving care at Four Women, and Abundant Hope has placed many women at risk through its illegal, incorrect, and dangerous medical advice.

21.    Four Women brings this action to prevent Defendants from continuing to interfere with its patients' access to lawful reproductive healthcare at its facility through these unlawful means.

## PARTIES

22.    Plaintiff Four Women is a Massachusetts limited liability company organized under the laws of Massachusetts and with a principal place of business in Attleboro, Massachusetts.

23.    Defendant Abundant Hope is a nonprofit corporation organized under the laws of Massachusetts in 2010 under the name the Attleboro Women's Center Incorporated.  On January 25, 2011, the Attleboro Women's Center Incorporated changed its name to Abundant Hope.  It maintains a principal place of business in Attleboro, Massachusetts, and does certain business under the name Attleboro Women's Health Center.  Attleboro Women's Health Center is not a separate corporate entity from Abundant Hope.

24.    Defendant Catherine Roman is the President of Abundant Hope and resides in North Attleboro, Massachusetts 02760.

25.    Defendant Nicole Carges is the Treasurer of Abundant Hope and resides in North Attleboro, Massachusetts 02760.

26.    Defendant Darlene Howard is the Executive Director of Abundant Hope and resides

4

in Mansfield, Massachusetts 02048.

27.    At all relevant times Defendants Roman, Carges, and Howard have controlled and directed the actions of Abundant Hope.

28.    Defendant Choose Life Marketing is a for-profit organization organized under the laws of Missouri in 2019.  It maintains a principal place of business in Columbia, Missouri.

## JURISDICTION

29.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this action includes a claim arising under the laws of the United States, specifically the Lanham Act, 15 U.S.C. § 1125, *et seq.*  The Court has supplemental jurisdiction over the state law claim herein pursuant to 28 U.S.C. § 1367 because the claim is so related to the federal claim for which this Court has original jurisdiction that they form part of the same controversy.

30.    This Court has personal jurisdiction over Abundant Hope and the individual defendants because Abundant Hope has a principal place of business in the Commonwealth of Massachusetts and Defendants Roman, Carges, and Howard reside and are domiciled in the Commonwealth of Massachusetts.

31.    This Court has personal jurisdiction over Choose Life Marketing because it does business in Massachusetts and because this matter arises from Choose Life Marketing's creation and distribution of advertising that makes false and misleading claims that are targeted toward women seeking reproductive healthcare in Massachusetts and caused injury to Four Women in Massachusetts.

32.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(1) and (2) because Abundant Hope and the individual defendants reside in the District of Massachusetts and the

events giving rise to the claims in this action occurred in substantial part within this District.

## FACTS

### I.    Four Women Provides Legal Reproductive Healthcare to Women Who Seek It.

33.    Four Women is licensed with the Massachusetts Department of Public Health as a clinic and ambulatory surgical center that provides comprehensive gynecological care.

34.    Founded in 1998 to ensure that all women have access to high quality reproductive healthcare, Four Women serves communities that often lack access to care—especially low-income communities.

35.    Four Women operates a fully licensed clinic and healthcare provider for these communities at 150 Emory Street in Attleboro, Massachusetts.

36.    It is one of only three reproductive healthcare clinics that provide abortion care in southeastern Massachusetts, and the only one offering surgical abortion services.  Since April 2003, Four Women has maintained a fully licensed surgery center with experienced staff, including licensed medical doctors, nurses, and medical assistants.

37.    Four Women provides a range of reproductive healthcare services, including birth control information and prescriptions, ultrasounds and pregnancy diagnoses, abortion care, and more.  As Four Women is a for-profit entity, they charge for their services, accepting health insurance and/or direct payments from patients.

38.    Four Women primarily serves patients that reside in the Commonwealth, but, given its location about ten miles from the Rhode Island border, it also serves many women from Rhode Island seeking reproductive healthcare services.

### II.    Abundant Hope Is Not a Licensed Medical Facility in the Commonwealth.

39.    Abundant Hope is a "pregnancy resource center" founded in 2010 to reach women

in Massachusetts and Rhode Island.[1]

40.    Abundant Hope is organized as a nonprofit and purports to provide medical services to patients at no cost.  The individual defendants play a leadership role in developing and executing Abundant Hope's mission as well as fundraising.

41.    Abundant Hope has not been licensed by the Massachusetts Department of Public Health as a clinic or healthcare provider.

42.    In 2018, Abundant Hope moved its office to 152 Emory Street, in Attleboro, Massachusetts, under the name "Attleboro Women's Health Center."

43.    Abundant Hope states that Attleboro Women's Health Center is its "medical" arm through which it provides "medical" services.

44.    Abundant Hope maintains a website, ahprc.org (the "Abundant Hope Website").

45.    The AWHC Website is a separate website that Abundant Hope maintains for Attleboro Women's Health Center.

46.    Despite maintaining separate websites, the distinction between Abundant Hope and Attleboro Women's Health Center is a fiction.

47.    Attleboro Women's Health Center is not a legal entity and has not been incorporated or registered in the Commonwealth.

48.    Any and all employees who are apparently affiliated with Attleboro Women's Health Center are in fact employed by Abundant Hope.

49.    Abundant Hope's operations are solely based at the 152 Emory Street location.

50.    The Abundant Hope Website boasts about the number of "medical" services and

---

[1] "About," Abundant Hope Pregnancy Resource Center, https://www.ahprc.org/about/ (last visited Nov. 25, 2024).

tests it provided in 2023.[2]

51.     The only activity Abundant Hope offers outside of the "medical" services purportedly provided through Attleboro Women's Health Center are monthly diaper banks and abortion recovery bible study, provided under Abundant Hope's name.[3]

52.     Using the "Attleboro Women's Health Center" name, Abundant Hope purports to provide ambulatory medical services, including diagnosing pregnancies and performing ultrasounds.

53.     "Ambulatory medical services are services providing diagnosis or treatment of a health condition and include procedures such as diagnosing pregnancies, performing ultrasounds and other clinical procedures."[4]

54.     Providing diagnosis regarding viability and location of the fetus without the assistance of a licensed doctor or Advanced Practice Registered Nurse is a violation of Massachusetts regulations pertaining to the practice of medicine and nursing.

55.     Abundant Hope does not have a licensed doctor or Advanced Practice Registered Nurse that works on premises.

56.     Upon information and belief, Abundant Hope staff that is not licensed to diagnose a pregnancy conveys a diagnosis to clients prior to the participation of any medical personnel licensed to do so.

---

[2] *Id.*
[3] "Events," Abundant Hope Pregnancy Resource Center, https://www.ahprc.org/events/ (last visited Nov. 25, 2024).
[4] *Reminder to Licensees Regarding Licensure Obligations and Providing Standard of Care*, Robert Goldstein, MD, PhD, Commissioner, Department of Public Health, Executive Office of Health and Human Services for the Commonwealth of Massachusetts, 1 (Jan. 3, 2024), *available at* https://www.mass.gov/doc/reminder-to-licensees-regarding-licensure-obligations-and-providing-standard-of-care-january-3-2024/download (citing M.G.L. c. 111, § 51).

57.    Upon information and belief, to the extent Abundant Hope has ever employed or worked with licensed medical personnel, their review of ultrasound images has always postdated client appointments, sometimes by several weeks or months.

58.    Massachusetts law requires clinics, which include "any entity, however organized, whether conducted for profit or not for profit, that is advertised, announced, established, or maintained for the purpose of providing ambulatory medical . . . services," to be licensed by the Department of Public Health.[5]

59.    Abundant Hope is not and has never been licensed by the Massachusetts Department of Public Health to provide medical care.

**III.    Abundant Hope Partners with Choose Life Marketing to Reach Women Online.**

60.    Abundant Hope works with a third-party vendor, Choose Life Marketing, to create and maintain the AWHC Website and to buy and place Google advertisements promoting "Attleboro Women's Health Center" to women seeking abortion care.

61.    Choose Life Marketing is a for-profit marketing agency based in Missouri that provides marketing services and strategies specifically targeting "abortion-minded women."[6]

62.    Choose Life Marketing boasts that it is "the leader in pregnancy center marketing because [it] get[s] results. [Its] data-driven solutions bring in more website traffic and direct more abortion-minded to your center and the services you offer."[7]

63.    According to Abundant Hope's Form 990s from recent years, Abundant Hope

---

[5] *Id.*
[6]    *See* "Serving    the    Pro-Life    Community,"    Choose    Life    Marketing, https://www.chooselifemarketing.com/who-we-are/our-mission/ (last visited Nov. 11, 2024).
[7]    *See* "Serving    Pregnancy    Centers    Worldwide,"    Choose    Life    Marketing, https://www.chooselifemarketing.com/who-we-serve/pregnancy-center-marketing/ (last visited Nov. 11, 2024).

invests substantially in marketing and promotion, including by paying Choose Life Marketing.

64.    In 2022, Abundant Hope spent $38,846 on "Marketing and [P]romotion," nearly 17% of its total functional expenses of $232,403.[8]  According to Abundant Hope, this paid advertising targets women seeking medical services, and not women seeking assistance with their babies (in need of diapers, formula, etc.).  Upon information and belief, these "Marketing and Promotion" expenses were paid to Choose Life Marketing and Google.

65.    In 2023, Abundant Hope paid substantial sums to Choose Life Marketing and Google in connection with marketing and promotion.[9]

66.    Choose Life Marketing's digital marketing services include paid search, search engine optimization ("SEO"), "microtargeting," and "geofencing" tactics.

67.    Choose Life Marketing advertises its paid search services as a "method of reaching a targeted audience by serving keyword-specific ads."  It claims that its strategists create advertisements that appear "in the first few search engine results when women in your area are looking for information on abortion or unplanned pregnancy," with the goal of using "conversion-optimized landing pages to successfully guide women to click on your ad and make an appointment."[10]

68.    Choose Life Marketing describes SEO as "the process of ensuring [an] organization's website organically ranks high on Google" search results to reach a "target

---

[8] 2022 Form 990 for Abundant Hope Pregnancy Resource Center Inc.
[9] 2023 Form 990 for Abundant Hope Pregnancy Resource Center Inc.
[10] *See* "Paid Search Strategy for Pregnancy Centers & Pro-Life Organizations," Choose Life Marketing,   https://www.chooselifemarketing.com/services/digital-marketing/paid-search/   (last visited Nov. 26, 2024).

audience" and "drive more traffic" to an organization's website.[11]  Choose Life Marketing uses SEO to reach the "[t]housands of women across the globe [who] search for abortion and pregnancy-related keywords online every day."

69.    Choose Life Marketing uses "microtargeting" to specifically target "young women, single mothers, and low-income families" based on their digital footprints and online data.[12]

70.    Choose Life Marketing uses geofencing to create a geographical boundary around an area so that when a woman enters that area, a targeted advertisement is sent to her.  It describes "geofencing" as "great for reaching women visiting websites to try to learn more about how to get an abortion."[13]

71.    Choose Life Marketing boasts that, as an example, it has used geofencing to "reach women who may be sitting in the Planned Parenthood waiting room with advertisements that cause them to consider an alternative to abortion."[14]

72.    On information and belief, Choose Life Marketing has employed these techniques on Abundant Hope's behalf to reach women seeking abortion care services.

73.    Choose Life Marketing is also involved in drafting the content of the advertising communications for "Attleboro Women's Health Center."

74.    Specifically, Choose Life Marketing created the language for both the AWHC

---

[11]    *See* "Pro-Life Search Engine Optimization (SEO)," Choose Life Marketing, https://www.chooselifemarketing.com/services/digital-marketing/seo/ (last visited Nov. 18, 2024).

[12]    *See* "NextGen Micro-Targeting," Choose Life Marketing, https://www.chooselifemarketing.com/services/digital-marketing/nextgen-micro-targeting/ (last visited Nov. 11, 2024).

[13]    *See* "Palm Beach Women's Clinic," Choose Life Marketing, https://www.chooselifemarketing.com/our-work/pregnancy-center-case-study/ (last visited Nov. 11, 2024).

[14]    *See* "Waterleaf," Choose Life Marketing, https://www.chooselifemarketing.com/our-work/pregnancy-center-case-study-2/ (last visited Nov. 11, 2024).

Website and advertisements for "Attleboro Women's Health Center" that appear on Google.

75.    Abundant Hope then approved the language of these websites and advertisements drafted by Choose Life Marketing.

76.    On information and belief, Choose Life Marketing maintains the AWHC Website, including updating any content and monitoring visitor data.

77.    Choose Life Marketing also sends Abundant Hope information about potential clients, framed as new "leads."  Emails about new "leads" contain contact information of potential clients and descriptions of services they are seeking.

78.    On information and belief, these emails with new "leads" are generated by forms completed by women online.

79.    On information and belief, some of these forms are completed by women selecting the "Book an Appointment" option on the AWHC Website.

80.    On information and belief, Choose Life Marketing also sends Abundant Hope new leads generated by forms completed on other websites beyond the AWHC Website and the Abundant Hope Website.

81.    Abundant Hope works with Choose Life Marketing solely to promote the so-called "medical" services provided under the "Attleboro Women's Health Center" name.  It has not engaged Choose Life Marketing to create content for the Abundant Hope website or promote any other activity Abundant Hope provides, like diaper banks, through Google advertisements.

## IV.    Defendants Interfere with the Reproductive Healthcare Services Marketplace Through False and Misleading Advertising.

82.    Abundant Hope uses its online presence and advertising to inject itself into the reproductive healthcare marketplace and prevent women from accessing abortion care.

83.    Choose Life Marketing shares the same mission and works to achieve it by bolstering the online presence and reach of clients like Abundant Hope.

84.    By engaging Choose Life Marketing for its marketing and advertising needs, Abundant Hope intentionally selected an advertising partner with a mission of targeting women to prevent them from receiving abortion and abortion-related care.

85.    To achieve their shared mission, Defendants publish false and misleading advertising on the AWHC Website and in Google advertisements, and Abundant Hope propagates further falsities in its printed materials.

86.    Defendants' advertising specifically targets women seeking abortions for the purpose of hijacking their appointments at clinics like Four Women.  The Abundant Hope Website highlights as a success story one such woman, who recounts: "I had an appointment scheduled at the abortion clinic on a Saturday morning. I don't speak English very well and I was so nervous, I got confused and walked into Abundant Hope instead of the abortion clinic. I spoke with a counselor and they agreed to take me in right away."[15]  According to Abundant Hope, that woman never attended her appointment for an abortion.

**A.    Defendants Falsely Advertise That Attleboro Women's Health Center Provides Reproductive Healthcare Services.**

87.    Defendants use the "Attleboro Women's Health Center" name and the AWHC Website to promote so-called "medical" services that Abundant Hope cannot legally provide.

88.    Defendants' deception starts with the "Attleboro Women's Health Center" name, which reflects a fictional entity whose name and website is employed solely to convey the false

---

[15]    *See*  "Client Stories,"  Abundant  Hope  Pregnancy  Resource  Center, https://www.ahprc.org/clients/ (last visited Nov. 26, 2024).

impression that the facility provides medical services.

89.    The AWHC Website advertises that "Attleboro Women's Health Center" provides medical appointments and medical tests.

90.    Abundant Hope proclaims that it has performed hundreds of "medical appointments" and "medical tests," at the monetary value of $157,000 in 2023 alone.[16]

91.    Defendants use Google advertisements to promote these so-called "medical" services purportedly provided by "Attleboro Women's Health Center."

92.    Defendants advertise, including through the purchase of Google advertising, that "Attleboro Women's Health Center" provides medical services to women including pregnancy testing, ultrasounds, pregnancy consultation, and testing for sexually transmitted diseases.[17]

93.    Defendants' statements on the AWHC Website and Google advertisements give the false impression that there is an entity with the name "Attleboro Women's Health Center," which provides licensed, lawful medical services.

94.    Abundant Hope, however, is not a licensed medical facility.  It cannot lawfully provide ultrasounds, gynecological care, or any of the other medical services it advertises on the AWHC Website or through Google advertising.

95.    Abundant Hope touts these medical "services" in connection with efforts to raise funds from donors for its work manipulating the reproductive healthcare marketplace.  On information and belief, Abundant Hope specifically touts its diversion of potential Four Women

---

[16] *See* "About Us," Abundant Hope Pregnancy Resource Center, https://www.ahprc.org/about/ (last visited Aug. 28, 2024).

[17] *See* **Exhibit A** (AWHC Webpages).  Abundant Hope shut down the AWHC Website in September 2024, shortly after this lawsuit was filed.  At present, the AWHC Website is password protected and no longer accessible to the public.  For this reason, Four Women attaches hereto as Exhibit A a compilation of true and accurate copies of images capturing certain webpages from the AWHC Website taken on August 30, 2024.

patients in its fundraising efforts.

**B.    Defendants Publish Falsities Concerning Pregnancy and Abortion on the AWHC Website and in Printed Materials.**

96.    Defendants advertise on the AWHC Website false medical advice intended to mislead women into thinking they need the services of "Attleboro Women's Health Center" before receiving abortion care.

97.    For example, Defendants represent that an ultrasound is "necessary" before a woman can obtain an abortion.

98.    The AWHC Website contains a page titled "Reasons You Need an Ultrasound Before Abortion," falsely indicating that an ultrasound is required under Massachusetts law before a women can obtain an abortion.[18]

99.    This representation is false.  Massachusetts law does not require women to undergo an ultrasound before receiving abortion care.

100.    Defendants also falsely advertise that a "viability" determination is necessary before a woman can obtain an abortion.

101.    For example, the AWHC Website contains a page titled "Thinking About Abortion?" which instructs women seeking abortions to first "confirm" their pregnancy with an ultrasound, stating: "Even if you've taken a home pregnancy test, you need more information.  It's critical to confirm that your pregnancy is viable (growing inside the uterus with a detectable heartbeat) with an ultrasound."

102.    According to the American College of Obstetricians and Gynecologists, "[t]he concept of viability of a fetus is frequently misrepresented or misinterpreted based on ideological

---

[18] *Id.*

15

principles."[19]  The term has two meanings: "In the first, 'viability' addresses whether a pregnancy is expected to continue developing normally.  In early pregnancy, a normally developing pregnancy would be deemed viable, whereas early pregnancy loss or miscarriage would not.  In the second, 'viability' addresses whether a fetus might survive outside of the uterus.  Later in pregnancy, a clinician may use the term 'viable' to indicate the chance for survival that a fetus has if delivered before it can fully develop in the uterus."[20]

103.    It is the latter form of "viability" that has been used in connection with abortion care from a legal standpoint, as many state laws (such as Massachusetts) prohibit abortion after a fetal gestational age (typically between 24 and 26 weeks) that is widely considered "fetal viability."

104.    The first definition of "viability" has no connection with abortion care.  There is no scientific or legal basis to restrict a woman's access to abortion care based on whether her early pregnancy is developing normally.

105.    Defendants' deception is calculated to deceive women seeking abortion care to delay them beyond the recommended time for a medication abortion, which is ordinarily limited to the first 10 weeks of pregnancy.[21]

106.    The AWHC Website also includes misinformation indicating that abortion is dangerous.

---

[19]    *See* "Facts Are Important: Understanding and Navigating Viability," https://www.acog.org/advocacy/facts-are-important/understanding-and-navigating-viability  (last visited Aug. 31, 2024).
[20] *Id.*
[21]    Medication abortion mifepristone is safe through 70 days (10 weeks) of pregnancy.  *See* "Information about Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation," U.S. Food and Drug Administration, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation, (last visited Aug. 31, 2024).

107.    The AWHC Website falsely indicates that abortion can be associated with "life-threatening outcomes" in connection with ectopic pregnancies or sexually transmitted infections.

108.    Abundant Hope also counsels women through distributed printed materials that "[y]ou may have a serious ectopic pregnancy and abortion is dangerous,"[22] falsely indicating that abortion is dangerous for women with ectopic pregnancies.

109.    This advice is both false and dangerous.  Failure to terminate an ectopic pregnancy can cause serious bodily harm or death.  According to the American College of Obstetricians and Gynecologists, "ectopic pregnancies will never be viable, and the treatment for ectopic pregnancy requires ending the nonviable pregnancy."[23] Even with proper diagnosis and management, "ectopic pregnancy continues to be a significant cause of pregnancy-related mortality and morbidity" and is "the leading cause of hemorrhage-related mortality."[24]

110.    Printed materials distributed by Abundant Hope contain further falsities, including that "[s]tudies show that abortion increases a woman's risk of breast cancer."[25]  In fact, according to the American Cancer Society: "Higher-quality studies have generally found no link between abortions and breast cancer risk. Researchers have also found flaws in previous studies that reported abortion may raise a woman's risk for breast cancer. The best scientific evidence does

---

[22] Heartbeat International provides propaganda to Abundant Hope, including a pamphlet deceiving women about ectopic pregnancies.  *See* **Exhibit B** ("Regret Taking the Abortion Pill?" Pamphlet).
[23]    *See* "Facts Are Important: Understanding and Navigating Viability," https://www.acog.org/advocacy/facts-are-important/understanding-and-navigating-viability  (last visited Aug. 31, 2024).
[24] *See* **Exhibit C** (ACOG Practice Bulletin No. 193, "Clinical Management Guidelines for Obstetrician-Gynecologists," American College of Obstetricians and Gynecologists (Mar. 2018)).
[25] *See* **Exhibit D** ("Abortion: Procedures, Risks, Side Effects" Pamphlet).

not support a link between abortion and breast cancer risk."[26]

111.    This false advice by an entity purporting to provide "medical" services is designed to mislead an abortion-seeking woman into believing abortion is dangerous.

112.    Defendants use these false and misleading statements to divert patients from licensed clinics like Four Women so that they visit Attleboro Women's Health Center at least before, if not completely in lieu of, their visit to the licensed clinic.

### C.    Defendants Mislead Women into Thinking Abundant Hope Provides Abortions Through the AWHC Website and Through Google Advertising.

113.    The AWHC Website and targeted Google advertisements mislead women into believing that Abundant Hope provides abortion care at "Attleboro Women's Health Center."

114.    For example, the AWHC Website contains a page titled "Options," of which the first "option" listed is abortion.[27]

115.    The AWHC Website also contains a page titled "Abortion," which lists questions women may have "about the abortion pill and other abortion procedures," and directs women who are "thinking about abortion" to make an appointment with a prominent button, stating "MAKE AN APPOINTMENT."[28]

116.    The page also contains quotes purporting to be a testimonial regarding Attleboro Women's Health Center's services, which states: "Great place for women considering abortion. Staff is friendly and nonjudgmental."

117.    A separate page titled "Three Things Needed Before Abortion" advises women

---

[26]    *See* "Abortion and Breast Cancer Risk," American Cancer Society, https://www.cancer.org/cancer/risk-prevention/medical-treatments/abortion-and-breast-cancer-risk.html (last visited Nov. 5, 2024).
[27]    **Exhibit A** (AWHC Webpages).
[28]    *Id.*

18

falsely that before undergoing an abortion, they "need" an appointment with "Attleboro Women's Health Center."[29]

118.   Disclaimer text stating that Attleboro Women's Health Center does not perform or refer for abortions does not appear within the body of these webpages.  Instead, a disclaimer that Attleboro Women's Health Center does not perform or refer for abortions appears only at the bottom of certain pages on the website, in small, gray text.

119.   On information and belief, advertising drafted, prepared, and published by Defendants for "Attleboro Women's Health Center" does not include such a disclaimer within the advertisement.

120.   Instead, Defendants use targeted advertising to further mislead women into thinking "Attleboro Women's Health Center" provides abortion care.

121.   For example, in response to a Google search for "abortion near me attleboro ma," an advertisement for "Attleboro Women's Health Center" is among the first hits.  That advertisement states, without qualifier: "Attleboro Women's Health – Schedule An Appointment Today," suggesting "Attleboro Women's Health Center" provides abortions.

122.   The Google advertisement also includes links to "Abortion Cost," "Abortion Pill Info," "Abortion Clinic Info," and "Abortion Info" and highlights "Free Support."  These links indicate falsely that, even if "Attleboro Women's Health Center" does not provide abortions, it does assist women in obtaining information about how and where to obtain one and the associated costs, and it will do so for free.

---

[29] *Id.*

**V.    Defendants' Misrepresentations Target Four Women Patients.**

123.    Defendants' false and misleading statements are designed to deceive and confuse women seeking abortion services from Four Women.

124.    Prospective patients, perhaps aware that the only abortion care provider in the region is in Attleboro, Massachusetts, are reasonably misled by the AWHC Website and targeted advertising to believe that Abundant Hope provides abortion care.

125.    Defendants' statements create the false impression that women will receive free medical care from a licensed provider at a licensed clinic that complies with state law, and perhaps even free abortion care.  Accordingly, many women seeking this healthcare in the Attleboro, Massachusetts area choose to do so at "Attleboro Women's Health Center," not Four Women.

126.    Defendants' misrepresentations deceive women into thinking that Attleboro Women's Health Center either *is* Four Women (and provides abortion care) or is affiliated with Four Women (and provides necessary pre-abortion procedures).

127.    Additionally, Defendants' misrepresentations deceive women into believing that certain procedures, such as an ultrasound, are necessary before they can get an abortion, leading many women seeking abortion care to make appointments with "Attleboro Women's Health Center" believing they must do so before their Four Women appointment.

128.    Abundant Hope's efforts to masquerade as Four Women and to compete for Four Women's clients have been successful.  From January 2023 to August 2024, 591 patients interacted with both Four Women and "Attleboro Women's Health Center" via telephone.

129.    When women contact "Attleboro Women's Health Center" seeking abortion care, they are not informed that it does not provide abortion care; they are instead given appointments there.

130.    Once at "Attleboro Women's Health Center" for these "necessary" tests, women receive pamphlets stating falsely that abortion is "dangerous" and increases the risk of breast cancer.  Such materials aim to deter women altogether from attending their appointments at Four Women.

**A.    Four Women Patients, Deceived by Defendants' Online Statements, Inadvertently Provide Their Contact Information to Defendants.**

131.    Many Four Women patients have complained to Four Women that "Attleboro Women's Health Center" has contacted them out of the blue to schedule appointments that precede or replace their Four Women appointments.

132.    Even where discovery has revealed that Abundant Hope received these patients' contact information prior to calling, the patients still have no idea that they ever contacted Abundant Hope or "Attleboro Women's Health Center."

133.    On October 30, 2023, Jane Doe 5[30] contacted Four Women seeking medical abortion care.  During an online exchange to schedule an appointment with Four Women, Jane Doe 5 received a call from Abundant Hope.  Jane Doe 5 believed she was speaking with Four Women or a Four Women affiliated entity and scheduled an appointment.  Jane Doe 5 messaged Four Women: "I received a call from someone at your office and I scheduled an appointment for Thursday morning at 9:15."  Four Women, however, had not called Jane Doe 5.  Instead, Jane Doe 5's appointment was made with "Attleboro Women's Health Center."

---

[30] Four Women patients are referred to herein using pseudonyms.  *See Doe v. Bell Atl. Bus. Sys. Servs., Inc.*, 162 F.R.D. 418, 420 (D. Mass. 1995) (courts permit the utilization of pseudonyms for parties "in cases involving social stigmatization [or] real danger of physical harm . . . . Cases in which parties are allowed to proceed anonymously because of privacy interests often involve abortion.").  For ease of reference, references herein to Jane Does 1-8 refer to the same Jane Does 1-8 as identified in the initial Complaint and Jury Demand, *see* ECF 1.  Jane Does 6 and 7 have been intentionally omitted in this Amended Complaint.

134.    As of October 30, 2023, Jane Doe 5 did not recall ever contacting or communicating with "Attleboro Women's Health Center" or Abundant Hope.  She stated she had only ever given her information to Four Women and a website called carafem.com.

135.    In fact, discovery produced by Abundant Hope suggests that Jane Doe 5 had submitted an online inquiry form two days prior, which Choose Life Marketing received and sent as a "new lead" to Abundant Hope.

136.    It is unclear where Jane Doe 5 submitted this inquiry form.  Abundant Hope has stated it does not know what website or form was used to prepare the information about Jane Doe 5 sent by Choose Life Marketing.

137.    Jane Doe 5 has reviewed discovery in this case and still has no recollection of visiting the AWHC Website or filling out a form on any website other than Four Women and carafem.com.[31]

138.    Additionally, on or around May 6, 2024, Jane Doe 8 made an appointment at Four Women for a medication abortion.  On the day of her appointment, Abundant Hope called Jane Doe 8 and attempted to persuade her to come to "Attleboro Women's Health Center" before or in lieu of Four Women.

139.    Jane Doe 8 did not recall ever contacting or communicating with "Attleboro Women's Health Center" or Abundant Hope prior to May 6, 2024 and did not know how Abundant Hope obtained her contact information.

140.    Defendants' deceptive and targeted advertising misled at least Jane Does 5 and 8 into submitting an online inquiry form without understanding they were submitting the form to

---

[31] *See* **Exhibit E** (Affidavit of Jane Doe 5) ¶¶ 16, 18, 19.

Abundant Hope.  Abundant Hope then used this information to try to hijack their appointments.

**B.    Abundant Hope's Onsite Deception Delays or Prevents Four Women Patients from Attending Their Four Women Appointments.**

141.    Defendants' focus on diverting patients from Four Women is also evident from its physical location and onsite conduct.

142.    In or around May 2018, Abundant Hope attempted to move into the same address as Four Women, 150 Emory Street.

143.    When this failed, Abundant Hope moved its principal office to 152 Emory Street directly next to Four Women.

144.    150 Emory Street and 152 Emory Street share a driveway and parking lot.

145.    Abundant Hope's location at 152 Emory Street does not have the name "Abundant Hope" on any sign, and its windows do not advertise the "abortion recovery bible study" programming Abundant Hope offers.  Instead, its door is labeled "Attleboro Women's Health Center," and it occasionally also hangs other signs such as "Abortion Clinic Attleboro You Have Options."

146.    These signs mislead Four Women patients when they arrive onsite.  These patients, seeing the "Abortion Clinic Attleboro You Have Options" sign, believe Abundant Hope's office is Four Women and go there for their appointment.

147.    Defendants also work with volunteers to target Four Women patients and interfere with their access to Four Women.  Individuals acting on behalf of Abundant Hope obstruct Four Women's main driveway by pacing with placards at the entrance.  Ride-sharing drivers often refuse to enter Four Women's parking lot due to this conduct.  Abundant Hope volunteers then approach women on foot to attempt to give them literature and other information.

148.    To assist patients in overcoming Abundant Hope's interference, Four Women relies on volunteers, who wear colored and labeled parking vests to protect patient access and escort them to the facility.  Individuals acting on behalf of Abundant Hope, however, often wear vests to appear as Four Women volunteers and confuse and deceive the patients into following them to "Attleboro Women's Health Center" instead of to Four Women.

149.    When women inadvertently enter "Attleboro Women's Health Center" for their Four Women appointments, they are not informed that they are in the wrong place.

150.    Instead, Abundant Hope engages in conduct to prevent women from leaving its premises, including conducting lengthy intake procedures; obtaining, holding, and copying personal identification cards; sequestering women in isolated rooms; and conducting tests appearing to be ultrasounds.

151.    Women held in isolation rooms under the auspices of receiving testing or "counseling" necessary for medical treatment often do not feel free to leave the premises or to refuse to comply with what they are led to believe are medical instructions.

152.    As an example, in or around March 2024, Jane Doe 1 undertook efforts to seek reproductive healthcare, specifically a medication abortion.

153.    Through its online advertising, Defendants led Jane Doe 1 to believe that "Attleboro Women's Health Center" was the Attleboro clinic that provided abortions—*i.e.*, that it was Four Women.

154.    Jane Doe 1's support person called the telephone number for "Attleboro Women's Health Center" on her behalf to schedule an appointment for a medication abortion, and Abundant Hope—rather than stating that they do not provide such care—made an appointment for her, leading Jane Doe 1 to believe that her appointment was for the medication abortion she sought.

24

155.    Jane Doe 1 brought cash with her to the appointment as she was prepared to pay for the reproductive healthcare services.  Upon arrival at her appointment, Abundant Hope requested Jane Doe 1's identification and informed her that they accepted health insurance, so the cash was not necessary.

156.    Abundant Hope also required Jane Doe 1 to complete numerous forms indicating that medical services would be provided, including services such as "Abortion Pre-Screening."

157.    Abundant Hope then brought Jane Doe 1 to a room away from the waiting room and her support person, with only one door, no windows, and no phone.

158.    Abundant Hope kept Jane Doe 1 in this sequestration room for more than an hour, during which time Abundant Hope staff provided medically inaccurate information regarding abortions.

159.    Abundant Hope misled Jane Doe 1 to believe that this consultation was a required step in the process for undergoing an abortion and, therefore, that she could not leave if she wanted to obtain the services she sought.

160.    Abundant Hope staff then brought Jane Doe 1 to another room where three employees—including one self-identified ultrasound technician and one self-identified Registered Nurse—performed an ultrasound.

161.    The Abundant Hope staff told Jane Doe 1 that no heartbeat could be detected but provided ultrasound images to her purportedly stating the gestational age of her fetus.  Using this information, they informed her that she could not undergo an abortion at that time as she was only six weeks pregnant.

162.    Jane Doe 1 requested to still undergo the medication abortion, but Abundant Hope instructed her that in order to do so she would need to return in two weeks for another ultrasound.

163.    This follow-up ultrasound instruction was not driven by Jane Doe 1's medical needs; even if Abundant Hope's ultrasound assessment was correct, neither a six-week gestational age nor a lack of heartbeat counsels against or requires delay of abortion care.  This instruction was instead intended to manipulate Jane Doe 1's access to reproductive healthcare.

164.    Jane Doe 1 believes she was actually ten weeks pregnant at the time.

165.    There was no doctor present at any point during Jane Doe 1's experience at "Attleboro Women's Health Center," despite Jane Doe 1 being informed that the facility was "staffed with licensed medical professionals."

166.    Jane Doe 1's ultrasound images were allegedly "[e]lectronically signed" several days after her appointment by "Levis Guzman, MD" who, upon information and belief, was not licensed to practice medicine in Massachusetts at the time, nor today.

167.    Abundant Hope made no attempt to communicate with Jane Doe 1 following review by Guzman to convey any diagnosis or other findings.  Abundant Hope did call Jane Doe 1 again, but only to ask if she was keeping the baby.

168.    Abundant Hope's behavior during Jane Doe 1's visit was designed to mislead Jane Doe 1 and delay and even prevent her from obtaining abortion care services from Four Women.

169.    A few days later, Jane Doe 1 attended her appointment with Four Women.  While inside Four Women's office for that appointment, Abundant Hope called Jane Doe 1 on her cell phone. Jane Doe 1, unaware that the caller was Abundant Hope, answered the call.  The Abundant Hope speaker asked Jane Doe 1 about her plans with respect to her pregnancy.  Jane Doe 1 realized the speaker was Abundant Hope and hung up the call.

170.    While she was on this call, Jane Doe 1's support person noticed an individual circling the Four Women facility.  Jane Doe 1 believes this person was affiliated with "Attleboro

Women's Health Center," conducting surveillance, and had seen her enter Four Women.

171.   Abundant Hope's actions, including holding Jane Doe 1 in isolated areas she did not feel free to leave, calling her during her Four Women appointment, and appearing to surveil the Four Women facility, placed Jane Doe 1 in apprehension and fear.  Indeed, while she still seeks reproductive healthcare from Four Women, including birth control, she does not go physically to the facility out of fear of what Abundant Hope had already done and might attempt to do next.

172.   Jane Doe 1's experience and her resulting trauma is not unique:  Four Women staff frequently hear from patients that "Attleboro Women's Health Center" has attempted to interfere with their access to Four Women.

173.   For example, on or around October 25, 2023, Jane Doe 2 had an appointment at Four Women, but because of Abundant Hope's deceptive in-person tactics, she inadvertently went into the "Attleboro Women's Health Center" facility.  Staff onsite led Jane Doe 2 to believe that "Attleboro Women's Health Center" was Four Women, putting her through their intake process and leading her to a sequestration room.  While in the sequestration room, Abundant Hope staff attempted to dissuade Jane Doe 2 from her intended healthcare decisions (terminating her pregnancy) and shamed her for that decision.

174.   Jane Does 3 and 4 also both had appointments with Four Women but inadvertently ended up in "Attleboro Women's Health Center" due to in-person misdirection.  Both women stated they had appointments, and Abundant Hope staff, rather than informing the women they did not have appointments there, proceeded with intake until the women realized they were being misled.

175.   Abundant Hope's deceptive conduct toward women who inadvertently enter the "Attleboro Women's Health Center" facility is designed to target Four Women and the patients

seeking abortion care at Four Women.

176.    Jane Doe 9 also found "Attleboro Women's Health Center" through an Internet search.  She went to Abundant Hope for an abortion in September 2023, only to learn when she was sitting for an ultrasound that Abundant Hope does not provide abortions.  Abundant Hope staff promised to provide Jane Doe 9 with the abortion pill if she still wanted an abortion after sitting for an ultrasound.  Jane Doe 9 complied and was angry and alarmed when Abundant Hope continued to refuse to provide the care that she believed she had scheduled.

177.    Abundant Hope told another woman, Jane Doe 10, that "Attleboro Women's Health Center" was affiliated with Four Women after Jane Doe 10 had gone to the wrong building for her abortion appointment with Four Women.  In trying to talk Jane Doe 10 out of her decision to have an abortion, Abundant Hope told her "horror stories" associated with abortion, gave her a bag of informational pamphlets, and explained that she could pursue "the reversal of medication abortion."  Defendants' misrepresentations have successfully delayed and perhaps even prevented Four Women's patients from accessing Four Women and obtaining services there.

178.    Four Women is aware of this deception through women who have informed Four Women of Defendants' conduct and misrepresentations.  Defendants have likely diverted countless other women seeking reproductive healthcare at Four Women.  On a regular basis, women who have scheduled appointments with Four Women do not show up for their appointments.  Four Women thus reasonably believes there are women for whom Defendants' conduct and misrepresentations have prevented their access to Four Women altogether.

179.    Beyond its attempts to harm Four Women through diverting its patients, Abundant Hope has also attempted to use its physical proximity to intimidate Four Women directly.  On June 22, 2022, Abundant Hope sent Four Women a letter threatening a lawsuit under Massachusetts

General Laws ch. 93A, § 11.  The accusations in the letter were baseless, as Four Women stated in its letter in response.  True and accurate copies of both letters are attached hereto as **Exhibit F**.

180.    Shortly after this lawsuit was filed, Abundant Hope shut down the AWHC Website. At present,  the AWHC Website is password protected and no longer accessible to the public. Upon information and belief, Abundant Hope has not been providing "medical" services since this lawsuit was filed.

<div align="center">

### COUNT I

### Violation of the Lanham Act, 15 U.S.C. § 1125, *et seq.*

</div>

181.    Four women incorporates the allegations contained in Paragraphs 1-180 as if fully set forth herein.

182.    Four Women brings this action under 15 U.S.C. § 1125(a)(1)(B), allowing any injured person to maintain a civil action against the violator of the Lanham Act.

183.    Defendants made numerous false and misleading statements or representations of fact about their own services and about reproductive healthcare in commercial advertising, including on the AWHC Website, via targeted advertisements, and in printed materials.

184.    Defendants' misrepresentations are material in that they relate to the inherent qualities or characteristics of the services offered by Abundant Hope and would likely influence the purchasing decisions of a consumer.

185.    Defendants' misrepresentations deceive or have the tendency to deceive a substantial segment of their audience.

186.    Defendants placed the misrepresentations into interstate commerce.

187.    Four Women has been or is likely to be injured as a result of the misrepresentations, including but not limited to injuries to its reputation or diversion of sales.

<div align="center">29</div>

188.    A violation of 15 U.S.C. § 1125(a)(1)(B) entitles Four Women to injunctive relief, statutory damages, and reasonable attorney's fees and costs.  15 U.S.C.S. §§ 1116(a) & 1117(a).

## COUNT II

### Violation of Massachusetts Consumer Protection Act M.G.L. c. 93A, § 1, *et seq.*

189.    Four Women incorporates the allegations contained in Paragraphs 1-188 as if fully set forth herein.

190.    Defendants through their actions and advertising have engaged in unfair competition and deceptive acts in order to manipulate the healthcare marketplace.

191.    Defendants' activities arise in a business context and thus they are engaged in trade and commerce.

192.    Defendants' actions are willful and knowing as they did so with the intent to manipulate the healthcare marketplace.

193.    Defendants' willful violation of M.G.L. c. 93A, § 11 entitles Four Women to injunctive relief, actual damages, treble damages, and reasonable attorney's fees and costs.

194.    "[A]n act or practice is a violation of M.G.L. c.93A, § 2 if . . . [i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection."  940 Mass. Code Regs. 3.16(3).

195.    The Department of Public Health's authorizing statute, including M.G.L. ch. 111, § 51, and regulations require that an entity advertised, announced, established, or maintained for the purpose of providing ambulatory medical services, including performing ultrasounds, must be licensed with the Department of Public Health.

196.    The Department of Public Health authorizing statute and its regulations are meant

30

for the protection of the public health.

197.    Defendants advertise, announce, establish, and maintain "Attleboro Women's Health Center" as providing ambulatory medical services.

198.    Abundant Hope is not licensed with the Department of Public Health.

199.    Defendants' advertising, announcing, establishing, and maintaining "Attleboro Women's Health Center" as an ambulatory medical service without a license violates the Department of Public Health statute and regulations.

200.    Defendants' violation of these statutes and regulations is a violation of M.G.L. c. 93A and 940 Mass. Code Regs. 3.16(3).

201.    Defendants' willful violation of M.G.L. c. 93A, § 11 entitles Four Women to injunctive relief, actual damages, treble damages, punitive damages, and reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Four Women respectfully prays that this Court:

a.    Enter judgment in favor of Four Women and against Defendants on all counts of the Complaint;

b.    Enter preliminary and permanent injunctions preventing Defendants from:

i.    Misleading and directing women seeking medical services at Four Women to enter Abundant Hope's premises for consultations or ultrasounds;

ii.    Providing ultrasounds, any diagnosis from ultrasounds, or any other ambulatory services without a license;

iii.    Promoting Abundant Hope or "Attleboro Women's Health Center" in any way as providing a team of board-certified doctors and

nurses that utilize ultrasounds to diagnose the viability of a pregnancy; and

 iv. Promoting Abundant Hope or "Attleboro Women's Health Center" in any way as providing the full range of appropriate and standard medical care.

c. Award damages as follows:

 i. Award statutory damages pursuant to 15 U.S.C. § 1117(a).

 ii. Award treble damages, punitive damages, and interest pursuant to M.G.L. c. 93A, § 11 for unfair trade practices.

d. Award Four Women the reasonable attorney's fees and costs of this action; and

e. Award such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Four Women demands a trial by jury on all issues so triable.

DATED:  December __, 2024                **Four Women Health Services, LLC,**

By its attorneys,


/s/ *Matthew Patton*
Matthew D. Patton (BBO No. 703798)
Law Office of Nicholas F. Ortiz, P.C.
One Boston Place, Suite 2600
Boston, MA 02108
(617) 338-9400
mdp@mass-legal.com

/s/ *Emily Nash*
Martha Coakley (BBO #87300)
Emily J. Nash (BBO #696460)
Caroline Holliday (BBO #707301)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
mcoakley@foleyhoag.com
enash@foleyhoag.com


Brenna Rosen (*pro hac vice*)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
brosen@foleyhoag.com

33

# Exhibit A to Amended Complaint

*Free and Confidential Services; Private Location*

CALL US                                                                    TEXT US

**MAKE AN APPOINTMENT**

**Services**

# Our Commitment To You

At Attleboro Women's Health Center, your Care Team consists of physicians, nurses, and ultrasonographers who will provide you with compassionate and accurate medical information free of charge.

## A Quick Guide To Your Appointment:

Your privacy is of utmost importance. When you make an appointment, be confident that:

- Our services are free
- Our staff includes licensed medical professionals
- You will receive respectful and confidential assistance
- You can bring a friend or family member for support
- We will provide medically accurate information about your options
- You will have a safe place to weigh all your options
- Our location is private and discreet
- There's free on-site parking available

MAKE AN APPOINTMENT

# Pregnancy Testing

Even if you've taken a home pregnancy test, getting a second opinion from a licensed medical professional is essential. Our free lab-quality pregnancy tests are 99% accurate and administered by a nurse. You can be confident you're getting the most accurate result.

LEARN MORE

# Ultrasounds

If you received a positive pregnancy test result at Attleboro Women's Health Center, your next step is to have an ultrasound. We offer pregnancy confirmation through free limited obstetrical ultrasound scans.

LEARN MORE

*Free and Confidential Services; Private Location*

CALL US                                                                     TEXT US

**MAKE AN APPOINTMENT**

your own decision. No one can legally force or coerce you to choose one option over another. You are the only one who decides.

LEARN MORE

# STD Testing

Most forms of contraception are ineffective in preventing the spread of STDs/STIs, which is why it's essential to get tested after having sexual contact.

LEARN MORE

**"** Staff was super nice, took their time with me and put my health and safety first. **"**

Book Appointment

**Name** *

FIRST

First

LAST

Last

**Email** *

EMAIL ADDRESS

**Phone** *

PHONE NUMBER

**Message** *

MESSAGE

SUBMIT

Contact Us

*Free and Confidential Services; Private Location*

CALL US                                                          TEXT US

MAKE AN APPOINTMENT

**Blog**

# Reasons You Need An Ultrasound Before Abortion

June 7, 2024

If you're considering an abortion, it's essential to get an ultrasound. This simple scan will give you the critical information you need to stay safe, including your pregnancy's gestational age (how far along you are), its location (growing in your uterus), and if it's viable (if there's a heartbeat).

Read on to learn more about the reasons you need an ultrasound before an abortion. Or, if you want to schedule a free ultrasound appointment and talk in a safe, non-judgmental environment, contact Attleboro Women's Health Center today. Same-day appointments may be available.

## Abortion Comes With Risks

Abortion comes with risks to your physical and mental health. For example, the abortion pill is associated with the following risks:

- Incomplete abortion, which is when parts of the terminated pregnancy remain in your uterus
- Heavy and prolonged bleeding
- Infection
- Fever
- Digestive system discomfort

You're more likely to experience one of these risks if your pregnancy is past 10 weeks gestation (the abortion drugs are only FDA-approved if your pregnancy is 10 weeks gestation or under). An ultrasound can help determine your pregnancy's gestational age.

## Ultrasound Reveals Details You Need To Know To Stay Safe

Along with determining how far along you are in your pregnancy, an ultrasound also reveals your pregnancy's location. This is important for ruling out ectopic pregnancy, which is when a pregnancy attaches and grows outside the uterus. It's a life-threatening situation that requires immediate medical intervention.

1/3

*Free and Confidential Services; Private Location*

CALL US                                        TEXT US

**MAKE AN APPOINTMENT**

# Next Steps

Navigating your pregnancy options can feel overwhelming, but you're not alone in this. At Attleboro Women's Health Center, we're here for you.

Contact us today to schedule your free, confidential appointment. Same-day appointments may also be available.

**"**Great place for women considering abortion. Staff is friendly and nonjudgmental.**"**

## Book Appointment

**Name** *

| FIRST |
|-------|

First

| LAST |
|------|

Last

**Email** *

| EMAIL ADDRESS |
|---------------|

**Phone** *

| PHONE NUMBER |
|--------------|

**Message** *

| MESSAGE |
|---------|

SUBMIT

## Contact Us

## ADDRESS

152 Emory Street, Unit 4 Rear
Attleboro, MA 02703

*Free and Confidential Services; Private Location*

CALL US                                                              TEXT US

**MAKE AN APPOINTMENT**

**Options**

### Abortion

If you're considering abortion for your unexpected pregnancy, learn about the procedures, side effects, and potential risks beforehand. You owe it to yourself to become fully informed in order to make a confident decision.

LEARN MORE



### Adoption

Like all of your options, adoption may be a difficult choice to make. It is challenging, selfless, and loving. Let's talk about making an adoption plan. You may be surprised at the benefits available for you through adoption.

LEARN MORE



### Parenting

Becoming a parent is a life-altering decision, but your unexpected pregnancy has already changed your life. Now's the time to look at all your options, and parenthood is one of them.

LEARN MORE

**"**Great place for women considering abortion. Staff is friendly and nonjudgmental.**"**

*Free and Confidential Services; Private Location*

CALL US                                                      TEXT US

**MAKE AN APPOINTMENT**

First

| LAST |
|------|

Last

**Email** *

| EMAIL ADDRESS |
|---------------|

**Phone** *

| PHONE NUMBER |
|--------------|

**Message** *

| MESSAGE |
|---------|

SUBMIT

Contact Us

ADDRESS

152 Emory Street, Unit 4 Rear
Attleboro, MA 02703

HOURS

Monday: 9am - 3pm
Tuesday: Closed
Wednesday: 9am - 3pm
Thursday: 9am - 3pm
Friday: Closed
Saturday: 7am - 11am
Sunday: Closed

PHONE

508-455-0172

*Free and Confidential Services; Private Location*

CALL US                                                            TEXT US

MAKE AN APPOINTMENT

**Abortion**

# Thinking About Abortion?

Many women have questions about the abortion pill and other abortion procedures.

- How far along can I be to take the abortion pill?
- If I take the abortion pill, will it be painful?
- Will I see the baby?
- Can I change my mind after the first abortion pill?
- How long will I bleed after my abortion?
- What if I'm too far along or don't want the abortion pill?

These are important questions to have answered so that you can make an empowered and confident decision. You owe it to yourself to get accurate information from one of our experienced CareTeam members. Same-day appointments may be available.

MAKE AN APPOINTMENT

# Have You Confirmed Your Pregnancy?

Even if you've taken a home pregnancy test, you need more information. It's critical to confirm that your pregnancy is viable (growing inside the uterus with a detectable heartbeat) with an ultrasound.

# Why Is It Important To Confirm Your Pregnancy If You Want An Abortion?

Some pregnancies may end naturally in miscarriage, but it is important for your health and safety to make sure that you don't have an ectopic pregnancy or active sexually transmitted infection. Both of these can cause life-threatening outcomes that could jeopardize your future reproductive health. Your reproductive health should be top priority.

# Types Of Abortion

There are two main methods of abortion: medication and surgical. How far along you are in your pregnancy determines the method an abortion provider uses.

*Free and Confidential Services; Private Location*

CALL US                                                          TEXT US

**MAKE AN APPOINTMENT**

the pregnancy at home. Ask the clinic for emergency protocol.

## Side Effects

- Bleeding with large blood clots (up to the size of a lemon)
- Cramping
- Nausea
- Weakness
- Fever and chills
- Headache
- Diarrhea
- Dizziness

## Potential Risks

- Incomplete abortion
- Heavy and prolonged bleeding (up to 8 weeks or more)
- Infection
- Fever
- Digestive system discomfort

# Surgical Abortion

You can opt for a surgical abortion, especially if your pregnancy is past the 70-day FDA deadline. Abortion providers use surgical abortions for later-term abortions, as well.

## Vacuum Aspiration

- Performed up to 13 weeks of pregnancy
- Often requires a local anesthetic injected into or near the cervix
- The provider may need to stretch the cervix to insert the vacuum tube
- The vacuum tube suctions out the fetus and placenta
- Bleeding may occur for four weeks or more
- Ask the clinic for emergency protocol

## Dilation And Curettage (D & C)

- Includes the above actions but is followed by a procedure to scrape the walls of the uterus

## Dilation And Evacuation (D & E)

- Performed in weeks 13-24 of pregnancy
- It may require two to three doctor's office visits
- Laminaria (seaweed) sticks and/or medication are placed into the cervix, slowly opening the cervix over several hours or up to two days
- The provider may give intravenous medications to help with pain and prevent infection
- Forceps, scraping, and suction curettage remove the fetus and placenta
- Bleeding may occur for up to 4 weeks or more
- Ask the clinic for their emergency protocol

## Side Effects

- Bleeding
- Spotting
- Cramping
- Breast pain
- Nausea
- Dizziness

*Free and Confidential Services; Private Location*

CALL US                                    TEXT US

**MAKE AN APPOINTMENT**

# Emotional Side Effects Of Abortion

Many women report feeling relieved immediately following their abortion. As time goes on, some women report adverse emotional side effects. These include:

- Guilt
- Anxiety
- Sadness
- Regret
- Anger
- Difficulty sleeping
- Depression

# How Can We Help?

Abortion is a difficult decision, but our Care Team will provide the necessary information and answer all your questions. The decision is yours and yours alone.

Make a free and confidential appointment today to talk about abortion and your other options. We are here for you.

❝Great place for women considering abortion. Staff is friendly and nonjudgmental.❞

## Book Appointment

**Name** *

FIRST

First

LAST

Last

**Email** *

EMAIL ADDRESS

**Phone** *

PHONE NUMBER

**Message** *

MESSAGE

SUBMIT

*Free and Confidential Services; Private Location*

CALL US                                                            TEXT US

MAKE AN APPOINTMENT

**Blog**

# Three Things Needed Before Abortion

June 29, 2023

If you're pregnant and considering an abortion, your health and safety are a top concern. To protect yourself and get the facts you need, there are three things you'll want to do before scheduling that abortion appointment.

Read on to learn more about the three things needed before an abortion. Or, if you want to talk to someone in person about the risks of abortion and your options, contact Attleboro Women's Health Center to schedule a free, confidential appointment.

## Ultrasound

Getting an ultrasound is vital before undergoing an abortion. This harmless scan will reveal the key information you need to stay safe and help you make your decision. An ultrasound will show the following:

- **The location of your pregnancy.** Most of the time, pregnancies develop in the uterus. But sometimes, they grow outside the uterus, usually in the fallopian tube. This is known as an ectopic pregnancy, and it's a life-threatening condition that needs immediate medical treatment. An abortion can't be performed if you're having an ectopic pregnancy.
- **The viability of your pregnancy.** It's estimated that roughly 26% of all pregnancies end in miscarriage, and it's possible to have had a miscarriage without early symptoms. An ultrasound can reveal if you've had, or are having, a miscarriage. If so, you'll need specialized medical intervention.
- **The age of your pregnancy.** This is a necessary detail that can only be discerned by an ultrasound. If your pregnancy is older than 10 weeks, a medical abortion (also known as the "abortion pill") isn't recommended due to the increased risk of adverse events.

## Medical History Review

Medical/chemical abortions, which are done earlier in pregnancy (up to 10 weeks), are riskier and aren't recommended if you have certain medical conditions or if you meet specific criteria. This is why it's important to talk to a qualified medical team before seeking an abortion.

Some situations in which a medical abortion isn't recommended include, but aren't limited to:

- Having an intrauterine device (IUD) in place
- Having a bleeding disorder
- Being on steroid medications
- Being allergic to the drugs used Pregnancy Consultation

*Free and Confidential Services; Private Location*

CALL US                                        TEXT US

**MAKE AN APPOINTMENT**

will you feel confident in making the best decision for you.

# Next Steps

Thinking about your pregnancy options can feel confusing because there's so much conflicting information on the internet. We understand, and we believe knowledge is power. This is why we offer free pregnancy resources that can help you feel empowered to make an informed decision about what to do next.

Contact us today to schedule a free, confidential appointment. We're a great place to start and are here for you with a FREE ultrasound, pregnancy consultation, and more.

**"** Great place for women considering abortion. Staff is friendly and nonjudgmental. **"**

## Book Appointment

**Name** *

FIRST

First

LAST

Last

**Email** *

EMAIL ADDRESS

**Phone** *

PHONE NUMBER

**Message** *

MESSAGE

SUBMIT

Contact Us

# Exhibit B to Amended Complaint

### Has your pregnancy been confirmed by ultrasound?

Ectopic pregnancy is when a pregnancy grows outside the uterus. Ectopic pregnancy is very serious and needs to be treated. A ruptured ectopic pregnancy can cause internal bleeding, infection, and in some cases lead to death.



Normal pregnancy     Ectopic pregnancy

Are you experiencing abdominal pain, vaginal bleeding, shoulder pain, feeling weak, dizzy or fainting? You may have a serious ectopic pregnancy and abortion is dangerous.

### Abortion Pill (RU-486) - Performed up to 10 weeks of pregnancy

The Abortion Pill consists of two medications which work together to terminate a pregnancy. At the office you will take the first pill, Mifepristone. The pill works to block the production of Progesterone. This will cause the lining of the uterus to break down, cutting off the lifeline to the developing fetus.

24-48 hours later you will take the second pill, Misoprostol. This will cause contractions which will expel the contents of your uterus, including the lining of the uterine walls along with the deceased fetus and sac.

After taking the second pill you may experience heavy bleeding, cramping, possible diarrhea, and lactation from your nipples. Other symptoms may include: dizziness, nausea, abdominal pain, and mild fever or chills.

You will be encouraged to watch for the passing of large blood clots and bodily tissue. It will take from a few hours to several days to fully pass the fetus; however, bleeding may last up to a few weeks. (*If you experience excessive bleeding, blood clots that occur for more than 2 hours, fever, nausea or diarrhea for more than 24 hours, foul smelling discharge, pregnancy symptoms, or extreme depression please contact your doctor immediately.*)

If you're not a candidate for the abortion pill (non-surgical) or if the abortion pill fails, a surgical abortion would be necessary. Some of the most common surgical abortion procedures include:

### Vacuum Aspiration (D&C) Performed up to 13 weeks of pregnancy

Requires a local anesthetic injected into or near the cervix. The cervix is then stretched open, allowing a tube to be inserted. The unborn baby and placenta are then suctioned out. Occasionally, this is followed by a procedure to scrape the walls of the uterus, making sure it has been completely emptied.

### Dilation and Evacuation (D&E) Performed in weeks 13 to 24 of pregnancy (May required 2 to 3 visits)

Laminaria (seaweed) sticks and/or medication are placed into the cervix, slowly opening the cervix over a period of several hours or up to two days. You may be given intravenous medications to help with pain and to prevent infection. A general anesthesia may be given, and the unborn baby and placenta are then removed with forceps and suction curettage. It may be necessary to dismember the unborn baby.

**Immediate Abortion Risks**
Heavy bleeding (hemorrhage) or pelvic infection (sepsis)
Incomplete abortion
Cut or torn cervix or perforation of the wall of the uterus
Anesthesia-related complications
Rh Immune Globulin Disorders

**Long Term Abortion Risks**
Rh blood testing is required for all pregnancies to prevent the mother's body from rejecting future pregnancies. Future childbearing—in some cases, complications associated with abortion may make it difficult or impossible to carry a pregnancy to term in the future.

100% SURE of your choice? If not, **WAIT!** You have time to explore your options.

**Psychological Abortion Risks**
It is important to note that although many women experience a sense of relief initially following an abortion, some women encounter a variety of psychological effects. These range from irritability, difficulty sleeping, depression and even post-traumatic stress disorder. It is helpful for a woman to speak with someone if she is experiencing these symptoms.

## Abortion Pill Reversal.com

# Regret taking the abortion pill?

# It may not be too late

# Call Now
# 877-558-0333



**No Insurance Required**

### A Story of Regret

*"I went back into the waiting room and when they called me back I was taken to a room with an ultrasound machine. I remember lying down and the doctor checking to see how far along I was. I remember seeing my baby. The doctor then gave me the first abortion pill (mifepristone RU-486). I took the pill with no hesitation. I just wanted out of there and didn't want to think about it ever again. I had to take the second pill the next day so the abortion process would finish. I remember hours after taking the second pill excruciating pain, crying and bleeding. My husband was with me that whole night and neither of us got any sleep. After the abortion we never spoke about it again, but it never left my mind. The guilt haunts me until this day. I think about how old my baby would be and if it would have been a boy or girl."*

Exhibit C to Amended Complaint

INTERIM UPDATE

The American College of
Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS

# ACOG PRACTICE BULLETIN

## Clinical Management Guidelines for Obstetrician–Gynecologists

NUMBER 193, MARCH 2018

(Replaces Practice Bulletin Number 191, February 2018)

**Committee on Practice Bulletins—Gynecology.** This Practice Bulletin was developed by the Committee on Practice Bulletins—Gynecology in collaboration with Kurt T. Barnhart, MD, MSCE; and Jason M. Franasiak, MD, TS (ABB).

INTERIM UPDATE: This Practice Bulletin is updated as highlighted to clarify the guidance on the assessment of hCG levels after uterine aspiration in women with a pregnancy of unknown location.

# Tubal Ectopic Pregnancy

*Ectopic pregnancy is defined as a pregnancy that occurs outside of the uterine cavity. The most common site of ectopic pregnancy is the fallopian tube. Most cases of tubal ectopic pregnancy that are detected early can be treated successfully either with minimally invasive surgery or with medical management using methotrexate. However, tubal ectopic pregnancy in an unstable patient is a medical emergency that requires prompt surgical intervention. The purpose of this document is to review information on the current understanding of tubal ectopic pregnancy and to provide guidelines for timely diagnosis and management that are consistent with the best available scientific evidence.*

## Background

### Epidemiology

According to the Centers for Disease Control and Prevention, ectopic pregnancy accounts for approximately 2% of all reported pregnancies (1). However, the true current incidence of ectopic pregnancy is difficult to estimate because many patients are treated in an outpatient setting where events are not tracked, and national surveillance data on ectopic pregnancy have not been updated since 1992 (1). Despite improvements in diagnosis and management, ruptured ectopic pregnancy continues to be a significant cause of pregnancy-related mortality and morbidity. In 2011–2013, ruptured ectopic pregnancy accounted for 2.7% of all pregnancy-related deaths and was the leading cause of hemorrhage-related mortality (2). The prevalence of ectopic pregnancy among women presenting to an emergency department with first-trimester vaginal bleeding, or abdominal pain, or both, has been reported to be as high as 18% (3).

### Etiology

The fallopian tube is the most common location of ectopic implantation, accounting for more than 90% of cases (4). However, implantation in the abdomen (1%), cervix (1%), ovary (1–3%), and cesarean scar (1–3%)

can occur and often results in greater morbidity because of delayed diagnosis and treatment (4). An ectopic pregnancy also can co-occur with an intrauterine pregnancy, a condition known as heterotopic pregnancy. The risk of heterotopic pregnancy among women with a naturally achieved pregnancy is estimated to range from 1 in 4,000 to 1 in 30,000, whereas the risk among women who have undergone in vitro fertilization is estimated to be as high as 1 in 100 (5, 6).

### Risk Factors

One half of all women who receive a diagnosis of an ectopic pregnancy do not have any known risk factors (3). Women with a history of ectopic pregnancy are at increased risk of recurrence. The chance of a repeat ectopic pregnancy in a woman with a history of one ectopic pregnancy is approximately 10% (odds ratio [OR] 3.0; 95% CI, 2.1–4.4). In a woman with two or more prior ectopic pregnancies, the risk of recurrence increases to more than 25% (OR, 11.17; 95% CI, 4.0–29.5) (3). Other important risk factors for ectopic pregnancy include previous damage to the fallopian tubes, factors secondary to ascending pelvic infection, and prior pelvic or fallopian tube surgery (3, 7). Among women who become pregnant through the use of assisted reproductive technology, certain factors such as tubal factor infertility and multiple

embryo transfer are associated with an increased risk of ectopic pregnancy (8, 9). Women with a history of infertility also are at increased risk of ectopic pregnancy independent of how they become pregnant (7). Other less significant risk factors include a history of cigarette smoking and age older than 35 years (7).

Women who use an intrauterine device (IUD) have a lower risk of ectopic pregnancy than women who are not using any form of contraception because IUDs are highly effective at preventing pregnancy. However, up to 53% of pregnancies that occur with an IUD in place are ectopic (10). Factors such as oral contraceptive use, emergency contraception failure, previous elective pregnancy termination, pregnancy loss, and cesarean delivery have not been associated with an increased risk of ectopic pregnancy (3, 7, 11, 12).

# Clinical Considerations and Recommendations

▶ *How is an ectopic pregnancy diagnosed?*

The minimum diagnostic evaluation of a suspected ectopic pregnancy is a transvaginal ultrasound evaluation and confirmation of pregnancy. Serial evaluation with transvaginal ultrasonography, or serum hCG level measurement, or both, often is required to confirm the diagnosis.

Women with clinical signs and physical symptoms of a ruptured ectopic pregnancy, such as hemodynamic instability or an acute abdomen, should be evaluated and treated urgently. Early diagnosis is aided by a high index of suspicion. Every sexually active, reproductive-aged woman who presents with abdominal pain or vaginal bleeding should be screened for pregnancy, regardless of whether she is currently using contraception (13, 14). Women who become pregnant and have known significant risk factors should be evaluated for possible ectopic pregnancy even in the absence of symptoms.

## Transvaginal Ultrasonography

Ultrasonography can definitively diagnose an ectopic pregnancy when a gestational sac with a yolk sac, or embryo, or both, is noted in the adnexa (15, 16); however, most ectopic pregnancies do not progress to this stage (15). The ultrasound findings of a mass or a mass with a hypoechoic area that is separate from the ovary should raise suspicion for the presence of an ectopic pregnancy; however, its positive predictive value is only 80% (15) because these findings can be confused with pelvic structures, such as a paratubal cyst, corpus luteum, hydrosalpinx, endometrioma, or bowel. Although an early intrauterine gestational sac may be visualized as early as 5 weeks of gestation (17), definitive ultrasound evidence of an intrauterine pregnancy includes visual-

ization of a gestational sac with a yolk sac or embryo (16). Visualization of a definitive intrauterine pregnancy eliminates ectopic pregnancy except in the rare case of a heterotopic pregnancy. Although a hypoechoic "sac-like" structure (including a "double sac sign") (18) in the uterus likely represents an intrauterine gestation, it also may represent a pseudogestational sac, which is a collection of fluid or blood in the uterine cavity that is sometimes visualized with ultrasonography in women with an ectopic pregnancy (19, 20).

## Serum Human Chorionic Gonadotropin Measurement

Measurement of the serum hCG level aids in the diagnosis of women at risk of ectopic pregnancy. However, serum hCG values alone should not be used to diagnose an ectopic pregnancy and should be correlated with the patient's history, symptoms, and ultrasound findings (21, 22). Accurate gestational age calculation, rather than an absolute hCG level, is the best determinant of when a normal pregnancy should be seen within the uterus with transvaginal ultrasonography (23, 24). An intrauterine gestational sac with a yolk sac should be visible between 5 weeks and 6 weeks of gestation regardless of whether there are one or multiple gestations (25, 26). In the absence of such definitive information, the serum hCG level can be used as a surrogate for gestational age to help interpret a nondiagnostic ultrasonogram.

The "discriminatory level" is the concept that there is a hCG value above which the landmarks of a normal intrauterine gestation should be visible on ultrasonography. The absence of a possible gestational sac on ultrasound examination in the presence of a hCG measurement above the discriminatory level strongly suggests a nonviable gestation (an early pregnancy loss or an ectopic pregnancy). In 50–70% of cases, these findings are consistent with an ectopic pregnancy (27–29). However, the utility of the hCG discriminatory level has been challenged (24) in light of a case series that noted ultrasonography confirmation of an intrauterine gestational sac on follow-up when no sac was noted on initial scan and the serum hCG level was above the discriminatory level (30–32). If the concept of the hCG discriminatory level is to be used as a diagnostic aid in women at risk of ectopic pregnancy, the value should be conservatively high (eg, as high as 3,500 mIU/mL) to avoid the potential for misdiagnosis and possible interruption of an intrauterine pregnancy that a woman hopes to continue (24, 32). Women with a multiple gestation have higher hCG levels than those with a single gestation at any given gestational age and may have hCG levels above traditional discriminatory hCG levels before ultrasonography recognition (24).

## Trends of Serial Serum Human Chorionic Gonadotropin

A single hCG concentration measurement cannot diagnose viability or location of a gestation. Serial hCG concentration measurements are used to differentiate normal from abnormal pregnancies (21, 22, 33, 34). When clinical findings suggest an abnormal gestation, a second hCG value measurement is recommended 2 days after the initial measurement to assess for an increase or decrease. Subsequent assessments of hCG concentration should be obtained 2–7 days apart, depending on the pattern and the level of change.

In early pregnancy, serum hCG levels increase in a curvilinear fashion until a plateau at 100,000 mIU/mL by 10 weeks of gestation. Guidelines regarding the minimal increase in hCG for a potentially viable intrauterine pregnancy have become more conservative (ie, slower increase) (21, 22) and have been demonstrated to be dependent on the initial value (35). There is a slower than expected increase in serum hCG levels for a normal gestation when initial values are high. For example, the expected rate of increase is 49% for an initial hCG level of less than 1,500 mIU/mL, 40% for an initial hCG level of 1,500–3,000 mIU/mL, and 33% for an initial hCG level greater than 3,000 mIU/mL (35). In early pregnancy, an increase in serum hCG of less than a minimal threshold in 48 hours is suspicious of an abnormal pregnancy (ectopic or early pregnancy loss) because 99% of normal intrauterine pregnancies will have a rate of increase faster than this minimum. However, even hCG patterns consistent with a growing or resolving gestation do not eliminate the possibility of an ectopic pregnancy (36).

Decreasing hCG values suggest a failing pregnancy and may be used to monitor spontaneous resolution, but this decrease should not be considered diagnostic. Approximately 95% of women with a spontaneous early pregnancy loss will have a decrease in hCG concentration of 21–35% in 2 days depending on initial hCG levels (34). A woman with decreasing hCG values and a possible ectopic pregnancy should be monitored until nonpregnant levels are reached because rupture of an ectopic pregnancy can occur while levels are decreasing or are very low.

## Pregnancy of Unknown Location

A pregnant woman without a definitive finding of an intrauterine or ectopic pregnancy on ultrasound examination has a "pregnancy of unknown location" (37). A pregnancy of unknown location should not be considered a diagnosis, rather it should be treated as a transient state and efforts should be made to establish a definitive diagnosis when possible (16). A woman with a pregnancy of unknown location who is clinically stable and has a desire to continue the pregnancy, if intrauterine, should have a repeat transvaginal ultrasound examination, or serial measurement of hCG concentration, or both, to confirm the diagnosis and guide management (22, 37). Follow-up to confirm a diagnosis of ectopic pregnancy in a stable patient, especially at first clinical encounter, is recommended to eliminate misdiagnosis and to avoid unnecessary exposure to methotrexate, which can lead to interruption or teratogenicity of an ongoing intrauterine pregnancy (16, 38, 39). The first step is to assess for the possibility that the gestation is advancing.

When the possibility of a progressing intrauterine gestation has been reasonably excluded, uterine aspiration can help to distinguish early intrauterine pregnancy loss from ectopic pregnancy by identifying the presence or absence of intrauterine chorionic villi. Choosing the appropriate time and intervention should be done through shared decision making, incorporating the patient's values and preferences regarding maternal risk and the possibility of interrupting a progressing pregnancy. If chorionic villi are found, then failed intrauterine pregnancy is confirmed and no further evaluation is necessary. If chorionic villi are not confirmed, hCG levels should be monitored, with the first measurement taken 12–24 hours after aspiration. A plateau or increase in hCG postprocedure suggests that evacuation was incomplete or there is a nonvisualized ectopic pregnancy, and further treatment is warranted. Although the change at which hCG is considered to have plateaued is not precisely defined, it would be reasonable to consider levels to have plateaued if they have decreased by less than 10–15%. Large decreases in hCG levels are more consistent with failed intrauterine pregnancy than ectopic pregnancy. In two small series of women undergoing uterine aspiration for pregnancy of unknown location, nearly all women with a decrease in hCG levels of 50% or greater within 12–24 hours after aspiration had failed intrauterine pregnancies (29, 40). Patients with a decrease in hCG of 50% or greater can be monitored with serial hCG measurements, with further treatment reserved for those whose levels plateau or increase, or who develop symptoms of ectopic pregnancy. Management of patients with an hCG decrease of less than 50% should be individualized, as while failed intrauterine pregnancy is more frequent, ectopic pregnancy risk is appreciable. One study (29) noted 55.6% of patients with ectopic pregnancies had an hCG decrease of more than 10%, 23.5% had a decrease of more than 30%, and 7.1% had a decrease of more than 50%. In a series of patients who had an initial decrease of hCG levels between 15% and 50% 12–24 hours after office uterine aspiration for pregnancy

of unknown location who were monitored with serial hCG measurement, 3 of 46 patients had rising or plateauing hCG levels necessitating treatment for ectopic pregnancy (41). The other patients had resolving hCG levels, and were presumed to have failed intrauterine pregnancies. Patients with an hCG decline between 15% and 50% 12–24 hours after aspiration require at least close follow-up with serial hCG measurement, with consideration of treatment for ectopic pregnancy based on clinical factors such as plateau or increase in hCG, development of symptoms, or high clinical suspicion or strong risk factors for ectopic pregnancy (29, 40, 41).

There is debate among experts about the need to determine pregnancy location by uterine aspiration before providing methotrexate (42, 43). Proponents cite the importance of confirming the diagnosis to avoid unnecessary exposure to methotrexate and to help guide management of the current pregnancy and future pregnancies (37, 42). Arguments against the need for a definitive diagnosis include concern about the increased risk of tubal rupture because of delay in treatment while diagnosis is established and the increased health-care costs associated with additional tests and procedures (43). However, with close follow-up during this diagnostic phase, the risk of rupture is low. In one large series with serial hCG measurement of women with pregnancies of unknown location, the risk of rupture of an ectopic pregnancy during surveillance was as low as 0.03 % among all women at risk and as low as 1.7% among all ectopic pregnancies diagnosed (22). In addition, presumptive treatment with methotrexate has not been found to confer a significant cost savings or to decrease the risk of complications (44). The choice of performing a uterine aspiration before treatment with methotrexate should be guided by a discussion with the patient regarding the benefits and risks, including the risk of teratogenicity in the case of an ongoing intrauterine pregnancy and exposure to methotrexate.

▶ *Who are candidates for medical management of ectopic pregnancy?*

Medical management with methotrexate can be considered for women with a confirmed or high clinical suspicion of ectopic pregnancy who are hemodynamically stable, who have an unruptured mass, and who do not have absolute contraindications to methotrexate administration (45). These patients generally also are candidates for surgical management. The decision for surgical management or medical management of ectopic pregnancy should be guided by the initial clinical, laboratory, and radiologic data as well as patient-informed choice based on a discussion of the benefits and risks

of each approach. Women who choose methotrexate therapy should be counseled about the importance of follow-up surveillance.

## Methotrexate

Methotrexate is a folate antagonist that binds to the catalytic site of dihydrofolate reductase, which interrupts the synthesis of purine nucleotides and the amino acids serine and methionine, thereby inhibiting DNA synthesis and repair and cell replication. Methotrexate affects actively proliferating tissues, such as bone marrow, buccal and intestinal mucosa, respiratory epithelium, malignant cells, and trophoblastic tissue. Systemic methotrexate has been used to treat gestational trophoblastic disease since 1956 and was first used to treat ectopic pregnancy in 1982 (46). There are no recommended alternative medical treatment strategies for ectopic pregnancy beyond intramuscular methotrexate. Although oral methotrexate therapy for ectopic pregnancy has been studied, the outcomes data are sparse and indicate that benefits are limited (47).

## Contraindications

Box 1 lists absolute and relative contraindications to methotrexate therapy (45). Before administering methotrexate, it is important to reasonably exclude the presence of an intrauterine pregnancy. In addition, methotrexate administration should be avoided in patients with clinically significant elevations in serum creatinine, liver transaminases, or bone marrow dysfunction indicated by significant anemia, leukopenia, or thrombocytopenia. Because methotrexate affects all rapidly dividing tissues within the body, including bone marrow, the gastrointestinal mucosa, and the respiratory epithelium, it should not be given to women with blood dyscrasias or active gastrointestinal or respiratory disease. However, asthma is not an exclusion to the use of methotrexate. Methotrexate is directly toxic to the hepatocytes and is cleared from the body by renal excretion; therefore, methotrexate typically is not used in women with liver or kidney disease.

Relative contraindications for the use of methotrexate (Box 1) do not serve as absolute cut-offs but rather as indicators of potentially reduced effectiveness in certain settings. For example, a high initial hCG level is considered a relative contraindication. Systematic review evidence shows a failure rate of 14.3% or higher with methotrexate when pretreatment hCG levels are higher than 5,000 mIU/mL compared with a 3.7% failure rate for hCG levels less than 5,000 mIU/mL (48). Of note, studies often have excluded patients from methotrexate treatment when hCG levels are greater than

---

**Box 1. Contraindications to Methotrexate Therapy** ⇔

*Absolute Contraindications*

- Intrauterine pregnancy
- Evidence of immunodeficiency
- Moderate to severe anemia, leukopenia, or thrombocytopenia
- Sensitivity to methotrexate
- Active pulmonary disease
- Active peptic ulcer disease
- Clinically important hepatic dysfunction
- Clinically important renal dysfunction
- Breastfeeding
- Ruptured ectopic pregnancy
- Hemodynamically unstable patient
- Inability to participate in follow-up

*Relative Contraindications*

- Embryonic cardiac activity detected by transvaginal ultrasonography
- High initial hCG concentration
- Ectopic pregnancy greater than 4 cm in size as imaged by transvaginal ultrasonography
- Refusal to accept blood transfusion

Modified from Medical treatment of ectopic pregnancy: a committee opinion. Practice Committee of American Society for Reproductive Medicine. Fertil Steril 2013;100:638–44.

---

5,000 mIU/mL based on expert opinion that these levels are a relative contraindication to medical management. Other predictors of methotrexate treatment failure include the presence of an advanced or rapidly growing gestation (as evidenced by fetal cardiac activity) and a rapidly increasing hCG concentration (greater than 50% in 48 hours) (48–50).

▶ *What methotrexate regimens are used in the management of ectopic pregnancy, and how do they compare in effectiveness and risk of adverse effects?*

There are three published protocols for the administration of methotrexate to treat ectopic pregnancy: 1) a single-dose protocol (51), 2) a two-dose protocol (52), and 3) a fixed multiple-dose protocol (53) (Box 2). The single-dose regimen is the simplest of the three regimens; however, an additional dose may be required to ensure resolution in up to one quarter of patients (54, 55). The two-dose regimen was first proposed in 2007 in an effort to combine the efficacy of the multiple-dose protocol with the favorable adverse effect profile of the single-dose regimen (55). The two-dose regimen adheres to the same hCG monitoring schedule as the single-dose regimen, but a second dose of methotrexate is administered on day 4 of treatment. The multiple-dose methotrexate regimen involves up to 8 days of treatment with alternating administration of methotrexate and folinic acid, which is given as a rescue dose to minimize the adverse effects of the methotrexate.

The overall treatment success of systemic methotrexate for ectopic pregnancy, defined as resolution of the ectopic pregnancy without the need for surgery, in observational studies ranges from approximately 70% to 95% (55). Resolution of an ectopic pregnancy may depend on the methotrexate treatment regimen used and the initial hCG level. However, there is no clear consensus in the literature regarding the optimal methotrexate regimen for the management of ectopic pregnancy. The choice of methotrexate protocol should be guided by the initial hCG level and discussion with the patient regarding the benefits and risks of each approach. In general, the single-dose protocol may be most appropriate for patients with a relatively low initial hCG level or a plateau in hCG values, and the two-dose regimen may be considered as an alternative to the single-dose regimen, particularly in women with an initial high hCG value.

## Single-Dose Versus Multiple-Dose

Observational studies that compared the single-dose and multiple-dose regimens have indicated that although the multiple-dose regimen is statistically more effective (92.7% versus 88.1%, respectively; *P*=.035) (single-dose

### Box 2. Methotrexate Treatment Protocols ⇦

***Single-dose regimen****

- Administer a single dose of methotrexate at a dose of 50 mg/m$^2$ intramuscularly on day 1
- Measure hCG level on posttreatment day 4 and day 7
  - — If the decrease is greater than 15%, measure hCG levels weekly until reaching nonpregnant level
  - — If decrease is less than 15%, readminister methotrexate at a dose of 50 mg/m$^2$ intramuscularly and repeat hCG level
  - — If hCG does not decrease after two doses, consider surgical management
- If hCG levels plateau or increase during follow-up, consider administering methotrexate for treatment of a persistent ectopic pregnancy

***Two-dose regimen***†

- Administer methotrexate at a dose of 50 mg/m$^2$ intramuscularly on day 1
- Administer second dose of methotrexate at a dose of 50 mg/m$^2$ intramuscularly on day 4
- Measure hCG level on posttreatment day 4 and day 7
  - — If the decrease is greater than 15%, measure hCG levels weekly until reaching nonpregnant level
  - — If decrease is less than 15%, readminister methotrexate 50 mg/m$^2$ intramuscularly on day 7 and check hCG levels on day 11
  - — If hCG levels decrease 15% between day 7 and day 11, continue to monitor weekly until reaching nonpregnant levels
  - — If the decrease is less than 15% between day 7 and day 11, readminister dose of methotrexate 50 mg/m$^2$ intramuscularly on day 11 and check hCG levels on day 14
  - — If hCG does not decrease after four doses, consider surgical management
- If hCG levels plateau or increase during follow-up, consider administering methotrexate for treatment of a persistent ectopic pregnancy

***Fixed multiple-dose regimen***‡

- Administer methotrexate 1 mg/kg intramuscularly on days 1, 3, 5, 7; alternate with folinic acid 0.1 mg/kg intramuscularly on days 2, 4, 6, 8
- Measure hCG levels on methotrexate dose days and continue until hCG has decreased by 15% from its previous measurement
  - — If the decrease is greater than 15%, discontinue administration of methotrexate and measure hCG levels weekly until reaching nonpregnant levels (may ultimately need one, two, three, or four doses)
  - — If hCG does not decrease after four doses, consider surgical management
- If hCG levels plateau or increase during follow-up, consider administering methotrexate for treatment of a persistent ectopic pregnancy

Abbreviation: hCG, human chorionic gonadotropin.

*Stovall TG, Ling FW. Single-dose methotrexate: an expanded clinical trial. Am J Obstet Gynecol 1993;168:1759-62; discussion 1762–5.
†Barnhart K, Hummel AC, Sammel MD, Menon S, Jain J, Chakhtoura N. Use of "2-dose" regimen of methotrexate to treat ectopic pregnancy. Fertil Steril 2007;87:250–6.
‡Rodi IA, Sauer MV, Gorrill MJ, Bustillo M, Gunning JE, Marshall JR, et al. The medical treatment of unruptured ectopic pregnancy with methotrexate and citrovorum rescue: preliminary experience. Fertil Steril 1986;46:811–3.

failure OR, 1.71; 95% CI, 1.04–2.82), the single-dose regimen is associated with a decreased risk of adverse effects (OR, 0.44; 95% CI, 0.31–0.63) (55). However, a more recent systematic review of randomized controlled trials showed similar rates of successful resolution with the single-dose and multiple-dose regimens (relative risk [RR], 1.07; 95% CI, 0.99–1.17) and an increased risk of adverse effects with the multiple-dose protocol (RR, 1.64; 95% CI, 1.15–2.34) (56).

### Single-Dose Versus Two-Dose

A systematic review and meta-analysis of three randomized controlled trials showed similar rates of successful resolution for the two-dose and single-dose protocols (RR, 1.09; 95% CI 0.98–1.20) and comparable risk of adverse effects (RR, 1.33; 95% CI, 0.92–1.94) (56). However, in two of the three trials included in the review, the two-dose regimen was associated with greater success among women with high initial hCG levels. In the first trial, there was a nonstatistically significant trend toward greater success for the two-dose regimen in the subgroup with an initial hCG level greater than 5,000 mIU/mL (80.0% versus 58.8%, *P*=.279) (RR, 0.74; 95% CI, 0.47–1.16) (57). The second trial reported a statistically significant higher success rate for the two-dose regimen versus the single-dose regimen in patients with initial serum hCG levels between 3,600 mIU/mL and 5,500 mIU/mL (88.9% versus 57.9%, *P*=.03) (OR 5.80; 95% CI, 1.29–26.2) (58).

▶ **What surveillance is needed after methotrexate treatment?**

After administration of methotrexate treatment, hCG levels should be serially monitored until a nonpregnancy level (based upon the reference laboratory assay) is reached (51). Close monitoring is required to ensure disappearance of trophoblastic activity and to eliminate the possibility of persistent ectopic pregnancy. During the first few days after treatment, the hCG level may increase to levels higher than the pretreatment level but then should progressively decrease to reach a nonpregnant level (51). Failure of the hCG level to decrease by at least 15% from day 4 to day 7 after methotrexate administration is associated with a high risk of treatment failure and requires additional methotrexate administration (in the case of the single-dose or two-dose regimen) or surgical intervention (51). Methotrexate treatment failure in patients who did not undergo pretreatment uterine aspiration should raise concern for the presence of an abnormal intrauterine gestation. In these patients, uterine aspiration should be considered before repeat methotrexate administration or surgical management, unless there is clear evidence of a tubal ectopic pregnancy. Ultrasound surveillance of resolution of an ectopic pregnancy is not routinely indicated because findings do not predict rupture or time to resolution (59, 60). Resolution of serum hCG levels after medical management is usually complete in 2–4 weeks but can take up to 8 weeks (55). The resolution of hCG levels is significantly faster in patients successfully treated with the two-dose methotrexate regimen compared with the single-dose regimen (25.7+13.6 versus 31.9+14.1 days; *P*>.025) (57).

▶ **What are the potential adverse effects of systemic methotrexate administration?**

Adverse effects of methotrexate usually are dependent on dose and treatment duration. Because methotrexate affects rapidly dividing tissues, gastrointestinal problems (eg, nausea, vomiting, and stomatitis) are the most common adverse effects after multiple doses. Vaginal spotting is expected. It is not unusual for women treated with methotrexate to experience abdominal pain 2–3 days after administration, presumably from the cytotoxic effect of the drug on the trophoblastic tissue. In the absence of signs and symptoms of overt tubal rupture and significant hemoperitoneum, abdominal pain usually can be managed expectantly by monitoring a woman's hemoglobin level and intraperitoneal fluid amount with transvaginal ultrasonography.

Elevation of liver enzymes is a less commonly reported adverse effect and typically resolves after discontinuing methotrexate use (61). Alopecia also is a rare adverse effect of the low doses used to treat ectopic pregnancy. Cases of pneumonitis also have been reported, and women should be counseled to report any fever or respiratory symptoms to their physicians (62).

▶ **How should women be counseled regarding the treatment effects of methotrexate?**

Patients treated with methotrexate should be counseled about the risk of ectopic pregnancy rupture; about avoiding certain foods, supplements, or drugs that can decrease efficacy; and about the importance of not becoming pregnant again until resolution has been confirmed. It is important to educate patients about the symptoms of tubal rupture and to emphasize the need to seek immediate medical attention if these symptoms occur. Vigorous activity and sexual intercourse should be avoided until confirmation of resolution because of the theoretical risk of inducing rupture of the ectopic pregnancy. Additionally, practitioners should limit pelvic and ultrasound examinations when possible. Patients should be advised to avoid folic acid supplements, foods

that contain folic acid, and nonsteroidal antiinflammatory drugs during therapy because these products may decrease the efficacy of methotrexate. Avoidance of narcotic analgesic medications, alcohol, and gas-producing foods are recommended so as not to mask, or be confused with, escalation of symptoms of rupture. Sunlight exposure also should be avoided during treatment to limit the risk of methotrexate dermatitis (63).

Before treatment with methotrexate, women should be counseled about the potential for fetal death or teratogenic effects when administered during pregnancy. The product labeling approved by the U.S. Food and Drug Administration recommends that women avoid pregnancy during treatment and for at least one ovulatory cycle after methotrexate therapy (63). Methotrexate is cleared from the serum before the 4–12 weeks necessary for the resolution of the ectopic gestation and ovulation in the next cycle (64, 65). However, there are reports of methotrexate detectable in liver cells 116 days past exposure (66). Limited evidence suggests that the frequency of congenital anomalies or early pregnancy loss is not elevated in women who have become pregnant shortly after methotrexate exposure (66). However, perhaps based on the timing of methotrexate's clearance from the body, some experts continue to recommend that women delay pregnancy for at least 3 months after the last dose of methotrexate (67).

▶ *How does methotrexate treatment affect subsequent fertility?*

Patients can be counseled that available evidence, although limited, suggests that methotrexate treatment of ectopic pregnancy does not have an adverse effect on subsequent fertility or on ovarian reserve. A prospective observational study noted no difference in anti-müllerian hormone levels or reproductive outcomes after administration of methotrexate (68). Furthermore, a systematic review of women undergoing fertility treatment found no significant differences in the mean number of oocytes retrieved during the cycles before and after methotrexate administration (69).

▶ *Who are candidates for surgical management of ectopic pregnancy?*

In clinically stable women in whom a nonruptured ectopic pregnancy has been diagnosed, laparoscopic surgery or intramuscular methotrexate administration are safe and effective treatments. The decision for surgical management or medical management of ectopic pregnancy should be guided by the initial clinical, laboratory, and radiologic data as well as patient-informed choice based on a discussion of the benefits and risks of each

approach. Surgical management of ectopic pregnancy is required when a patient is exhibiting any of the following: hemodynamic instability, symptoms of an ongoing ruptured ectopic mass (such as pelvic pain), or signs of intraperitoneal bleeding.

Surgical management is necessary when a patient meets any of the absolute contraindications to medical management listed in Box 1 and should be considered when a patient meets any of the relative contraindications. Surgical management should be employed when a patient who initially elects medical management experiences a failure of medical management. Surgical treatment also can be considered for a clinically stable patient with a nonruptured ectopic pregnancy or when there is an indication for a concurrent surgical procedure, such as tubal sterilization or removal of hydrosalpinx when a patient is planning to undergo subsequent in vitro fertilization.

Surgical management generally is performed using laparoscopic salpingectomy (removal of part or all of the affected fallopian tube) or laparoscopic salpingostomy (removal of the ectopic pregnancy while leaving the affected fallopian tube in situ). Laparotomy typically is reserved for unstable patients, patients with a large amount of intraperitoneal bleeding, and patients in whom visualization has been compromised at laparoscopy.

▶ *How do medical management and surgical management of ectopic pregnancy compare in effectiveness and risk of complications?*

Medical management of ectopic pregnancy avoids the inherent risks of surgery and anesthesia. However, compared with laparoscopic salpingectomy, medical management of ectopic pregnancy has a lower success rate and requires longer surveillance, more office visits, and phlebotomy. Randomized trials that compared medical management of ectopic pregnancy with methotrexate to laparoscopic salpingostomy have demonstrated a statistically significant lower success rate with the use of single-dose methotrexate (relative rate for success, 0.82; 95% CI, 0.72–0.94) and no difference with the use of multidose methotrexate (relative rate for success, 1.8; 95% CI, 0.73–4.6) (70). Comparing systemic methotrexate with tube-sparing laparoscopic surgery, randomized trials have shown no difference in overall tubal preservation, tubal patency, repeat ectopic pregnancy, or future pregnancies (70).

Medical management of ectopic pregnancy is cost effective when laparoscopy is not needed to make the diagnosis and hCG values are less 1,500 mIU/mL (71). Surgical management of ectopic pregnancy is more cost

effective if time to resolution is expected to be prolonged, or there is a relatively high chance of medical management failure, such as in cases with high or increasing hCG values or when embryonic cardiac activity is detected (72, 73).

▶ *How do salpingostomy and salpingectomy compare in effectiveness and fertility outcomes in the management of ectopic pregnancy?*

The decision to perform a salpingostomy or salpingectomy for the treatment of ectopic pregnancy should be guided by the patient's clinical status, her desire for future fertility, and the extent of fallopian tube damage. Randomized controlled trials that compared salpingectomy with salpingostomy for the management of ectopic pregnancy have found no statistically significant difference in the rates of subsequent intrauterine pregnancy (RR, 1.04; 95% CI, 0.899–1.21) or repeat ectopic pregnancy (RR, 1.30; 95% CI, 0.72–2.38) (74). In contrast, cohort study findings indicate that salpingostomy is associated with a higher rate of subsequent intrauterine pregnancy (RR, 1.24; 95% CI, 1.08–1.42) but also with an increased risk of repeat ectopic pregnancy (10% versus 4%; RR, 2.27; 95% CI, 1.12–4.58) compared with salpingectomy (74).

In general, salpingectomy is the preferred approach when severe fallopian tube damage is noted and in cases in which there is significant bleeding from the proposed surgical site. Salpingectomy can be considered in cases of desired future fertility when the patient has a healthy contralateral fallopian tube. However, salpingostomy should be considered in patients who desire future fertility but have damage to the contralateral fallopian tube and in whom removal would require assisted reproduction for future childbearing. When salpingostomy is performed, it is important to monitor the patient with serial hCG measurement to ensure resolution of ectopic trophoblastic tissue. If there is concern for incomplete resection, a single prophylactic dose of methotrexate may be considered (45).

▶ *Who are candidates for expectant management of diagnosed ectopic pregnancy?*

There may be a role for expectant management of ectopic pregnancy in specific circumstances. Candidates for successful expectant management of ectopic pregnancy should be asymptomatic; should have objective evidence of resolution (generally, manifested by a plateau or decrease in hCG levels); and must be counseled and willing to accept the potential risks, which include tubal rupture, hemorrhage, and emergency surgery. If the initial

hCG level is less than 200 mIU/mL, 88% of patients will experience spontaneous resolution; lower spontaneous resolution rates can be anticipated with higher hCG levels (75). In a single small randomized trial of women with hCG levels less than 2,000 mIU/mL, expectant management was not associated with a statistically significant lower treatment success than single-dose methotrexate for the management of ectopic pregnancy (59% versus 76%, respectively) (RR, 1.3; 95% CI, 0.9–1.8) (76). Reasons for abandoning expectant management include intractable or significantly increased pain, insufficient decrease of hCG levels, or tubal rupture with hemoperitoneum.

# Summary of Recommendations

*The following recommendations are based on good and consistent scientific evidence (Level A):*

▶ In clinically stable women in whom a nonruptured ectopic pregnancy has been diagnosed, laparoscopic surgery or intramuscular methotrexate administration are safe and effective treatments. The decision for surgical management or medical management of ectopic pregnancy should be guided by the initial clinical, laboratory, and radiologic data as well as patient-informed choice based on a discussion of the benefits and risks of each approach.

▶ Surgical management of ectopic pregnancy is required when a patient is exhibiting any of the following: hemodynamic instability, symptoms of an ongoing ruptured ectopic mass (such as pelvic pain), or signs of intraperitoneal bleeding.

*The following recommendations are based on limited or inconsistent scientific evidence (Level B):*

▶ Serum hCG values alone should not be used to diagnose an ectopic pregnancy and should be correlated with the patient's history, symptoms, and ultrasound findings.

▶ If the concept of the hCG discriminatory level is to be used as a diagnostic aid in women at risk of ectopic pregnancy, the value should be conservatively high (eg, as high as 3,500 mIU/mL) to avoid the potential for misdiagnosis and possible interruption of an intrauterine pregnancy that a woman hopes to continue.

▶ The decision to perform a salpingostomy or salpingectomy for the treatment of ectopic pregnancy

should be guided by the patient's clinical status, her desire for future fertility, and the extent of fallopian tube damage.

▶ The choice of methotrexate protocol should be guided by the initial hCG level and discussion with the patient regarding the benefits and risks of each approach. In general, the single-dose protocol may be most appropriate for patients with a relatively low initial hCG level or a plateau in hCG values, and the two-dose regimen may be considered as an alternative to the single-dose regimen, particularly in women with an initial high hCG value.

▶ Failure of the hCG level to decrease by at least 15% from day 4 to day 7 after methotrexate administration is associated with a high risk of treatment failure and requires additional methotrexate administration (in the case of the single-dose or two-dose regimen) or surgical intervention.

▶ Patients can be counseled that available evidence, although limited, suggests that methotrexate treatment of ectopic pregnancy does not have an adverse effect on subsequent fertility or on ovarian reserve.

▶ There may be a role for expectant management of ectopic pregnancy in specific circumstances.

***The following recommendations are based primarily on consensus and expert opinion (Level C):***

▶ The minimum diagnostic evaluation of a suspected ectopic pregnancy is a transvaginal ultrasound evaluation and confirmation of pregnancy. Serial evaluation with transvaginal ultrasonography, or serum hCG level measurement, or both, often is required to confirm the diagnosis.

▶ A woman with a pregnancy of unknown location who is clinically stable and has a desire to continue the pregnancy, if intrauterine, should have a repeat transvaginal ultrasound examination, or serial measurement of hCG concentration, or both, to confirm the diagnosis and guide management.

▶ Medical management with methotrexate can be considered for women with a confirmed or high clinical suspicion of ectopic pregnancy who are hemodynamically stable, who have an unruptured mass, and who do not have absolute contraindications to methotrexate administration.

▶ After administration of methotrexate treatment, hCG levels should be serially monitored until a non-pregnancy level (based upon the reference laboratory assay) is reached.

▶ Patients treated with methotrexate should be counseled about the risk of ectopic pregnancy rupture; about avoiding certain foods, supplements, or drugs that can decrease efficacy; and about the importance of not becoming pregnant again until resolution has been confirmed.

# References

1. Ectopic pregnancy--United States, 1990-1992. Centers for Disease Control and Prevention (CDC). MMWR Morb Mortal Wkly Rep. 1995;44:46–8. (Level II-2) ⇦

2. Creanga AA, Syverson C, Seed K, Callaghan WM. Pregnancy-related mortality in the United States, 2011-2013. Obstet Gynecol 2017;130:366–73. (Level II-2) ⇦

3. Barnhart KT, Sammel MD, Gracia CR, Chittams J, Hummel AC, Shaunik A. Risk factors for ectopic pregnancy in women with symptomatic first-trimester pregnancies. Fertil Steril 2006;86:36–43 (Level II-2) ⇦

4. Bouyer J, Coste J, Fernandez H, Pouly JL, Job-Spira N. Sites of ectopic pregnancy: a 10 year population-based study of 1800 cases. Hum Reprod 2002;17:3224–30. (Level II-3) ⇦

5. Maymon R, Shulman A. Controversies and problems in the current management of tubal pregnancy. Hum Reprod Update 1996;2:541–51. (Level III) ⇦

6. Barrenetxea G, Barinaga-Rementeria L, Lopez de Larruzea A, Agirregoikoa JA, Mandiola M, Carbonero K. Heterotopic pregnancy: two cases and a comparative review. Fertil Steril 2007;87:417.e9–15. (Level II-3) ⇦

7. Ankum WM, Mol BW, Van der Veen F, Bossuyt PM. Risk factors for ectopic pregnancy: a meta-analysis. Fertil Steril 1996;65:1093–9. (Meta-Analysis) ⇦

8. Clayton HB, Schieve LA, Peterson HB, Jamieson DJ, Reynolds MA, Wright VC. Ectopic pregnancy risk with assisted reproductive technology procedures. Obstet Gynecol 2006;107:595–604. (Level II-3) ⇦

9. Perkins KM, Boulet SL, Kissin DM, Jamieson DJ. Risk of ectopic pregnancy associated with assisted reproductive technology in the United States, 2001-2011. National ART Surveillance (NASS) Group. Obstet Gynecol 2015;125:70–8. (Level II-3) ⇦

10. Backman T, Rauramo I, Huhtala S, Koskenvuo M. Pregnancy during the use of levonorgestrel intrauterine system. Am J Obstet Gynecol 2004;190:50–4. (Level II-3) ⇦

11. Cleland K, Raymond E, Trussell J, Cheng L, Zhu H. Ectopic pregnancy and emergency contraceptive pills: a systematic review. Obstet Gynecol 2010;115:1263–6. (Systematic Review) ⇦

12. Emergency contraception. Practice Bulletin No. 152. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;126:e1–11. (Level III) ⇦

13. Kirk E, Papageorghiou AT, Condous G, Tan L, Bora S, Bourne T. The diagnostic effectiveness of an initial transvaginal scan in detecting ectopic pregnancy. Hum Reprod 2007;22:2824–8. (Level II-3) ⇦

14. van Mello NM, Mol F, Opmeer BC, Ankum WM, Barnhart K, Coomarasamy A, et al. Diagnostic value of serum hCG on the outcome of pregnancy of unknown location: a systematic review and meta-analysis. Hum Reprod Update 2012;18:603–17. (Systematic Review and Meta-Analysis)

15. Barnhart KT, Fay CA, Suescum M, Sammel MD, Appleby D, Shaunik A, et al. Clinical factors affecting the accuracy of ultrasonography in symptomatic first-trimester pregnancy. Obstet Gynecol 2011;117:299–306. (Level II-3)

16. Barnhart K, van Mello NM, Bourne T, Kirk E, Van Calster B, Bottomley C, et al. Pregnancy of unknown location: a consensus statement of nomenclature, definitions, and outcome. Fertil Steril 2011;95:857–66. (Level III)

17. Goldstein SR, Snyder JR, Watson C, Danon M. Very early pregnancy detection with endovaginal ultrasound. Obstet Gynecol 1988;72:200–4. (Level III)

18. Doubilet PM, Benson CB. Double sac sign and intra-decidual sign in early pregnancy: interobserver reliability and frequency of occurrence. J Ultrasound Med 2013;32:1207–14. (Level II-3)

19. Ackerman TE, Levi CS, Lyons EA, Dashefsky SM, Lindsay DJ, Holt SC. Decidual cyst: endovaginal sonographic sign of ectopic pregnancy. Radiology 1993;189:727–31. (Level II-3)

20. Ahmed AA, Tom BD, Calabrese P. Ectopic pregnancy diagnosis and the pseudo-sac. Fertil Steril 2004;81:1225–8. (Level III)

21. Seeber BE, Sammel MD, Guo W, Zhou L, Hummel A, Barnhart KT. Application of redefined human chorionic gonadotropin curves for the diagnosis of women at risk for ectopic pregnancy. Fertil Steril 2006;86:454–9. (Level II-3)

22. Morse CB, Sammel MD, Shaunik A, Allen-Taylor L, Oberfoell NL, Takacs P, et al. Performance of human chorionic gonadotropin curves in women at risk for ectopic pregnancy: exceptions to the rules. Fertil Steril 2012;97:101–6.e2. (Level II-3)

23. Early pregnancy loss. Practice Bulletin No. 150. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:1258–67. (Level III)

24. Doubilet PM, Benson CB, Bourne T, Blaivas M, Barnhart KT, Benacerraf BR, et al. Diagnostic criteria for nonviable pregnancy early in the first trimester. Society of Radiologists in Ultrasound Multispecialty Panel on Early First Trimester Diagnosis of Miscarriage and Exclusion of a Viable Intrauterine Pregnancy. N Engl J Med 2013;369:1443–51. (Level III)

25. Goldstein I, Zimmer EA, Tamir A, Peretz BA, Paldi E. Evaluation of normal gestational sac growth: appearance of embryonic heartbeat and embryo body movements using the transvaginal technique. Obstet Gynecol 1991;77:885–8. (Level II-3)

26. Rossavik IK, Torjusen GO, Gibbons WE. Conceptual age and ultrasound measurements of gestational sac and crown-rump length in in vitro fertilization pregnancies. Fertil Steril 1988;49:1012–7. (Level III)

27. Barnhart KT, Katz I, Hummel A, Gracia CR. Presumed diagnosis of ectopic pregnancy. Obstet Gynecol 2002;100:505–10. (Level II-3)

28. Chung K, Chandavarkar U, Opper N, Barnhart K. Reevaluating the role of dilation and curettage in the diagnosis of pregnancy of unknown location. Fertil Steril 2011;96:659–62. (Level II-3)

29. Shaunik A, Kulp J, Appleby DH, Sammel MD, Barnhart KT. Utility of dilation and curettage in the diagnosis of pregnancy of unknown location. Am J Obstet Gynecol 2011;204:130.e1–6. (Level II-3)

30. Doubilet PM, Benson CB. Further evidence against the reliability of the human chorionic gonadotropin discriminatory level. J Ultrasound Med 2011;30:1637–42. (Level II-3)

31. Mehta TS, Levine D, Beckwith B. Treatment of ectopic pregnancy: is a human chorionic gonadotropin level of 2,000 mIU/mL a reasonable threshold? Radiology 1997;205:569–73. (Level II-3)

32. Connolly A, Ryan DH, Stuebe AM, Wolfe HM. Reevaluation of discriminatory and threshold levels for serum beta-hCG in early pregnancy. Obstet Gynecol 2013;121:65–70. (Level II-3)

33. Barnhart KT, Sammel MD, Rinaudo PF, Zhou L, Hummel AC, Guo W. Symptomatic patients with an early viable intrauterine pregnancy: HCG curves redefined. Obstet Gynecol 2004;104:50–5. (Level II-3)

34. Barnhart K, Sammel MD, Chung K, Zhou L, Hummel AC, Guo W. Decline of serum human chorionic gonadotropin and spontaneous complete abortion: defining the normal curve. Obstet Gynecol 2004;104:975–81. (Level II-3)

35. Barnhart KT, Guo W, Cary MS, Morse CB, Chung K, Takacs P, et al. Differences in serum human chorionic gonadotropin rise in early pregnancy by race and value at presentation. Obstet Gynecol 2016;128:504–11. (Level II-3)

36. Silva C, Sammel MD, Zhou L, Gracia C, Hummel AC, Barnhart K. Human chorionic gonadotropin profile for women with ectopic pregnancy. Obstet Gynecol 2006;107:605–10. (Level II-3)

37. Barnhart KT. Early pregnancy failure: beware of the pitfalls of modern management. Fertil Steril 2012;98:1061–5. (Level III)

38. Nurmohamed L, Moretti ME, Schechter T, Einarson A, Johnson D, Lavigne SV, et al. Outcome following high-dose methotrexate in pregnancies misdiagnosed as ectopic. Am J Obstet Gynecol 2011;205:533.e1–3. (Level III)

39. Addar MH. Methotrexate embryopathy in a surviving intrauterine fetus after presumed diagnosis of ectopic pregnancy: case report. J Obstet Gynaecol Can 2004;26:1001–3. (Level III)

40. Rivera V, Nguyen PH, Sit A. Change in quantitative human chorionic gonadotropin after manual vacuum aspiration in women with pregnancy of unknown location. Am J Obstet Gynecol 2009;200:e56–9.

41. Insogna IG, Farland LV, Missmer SA, Ginsburg ES, Brady PC. Outpatient endometrial aspiration: an alternative to

methotrexate for pregnancy of unknown location. Am J Obstet Gynecol 2017;217:185.e1–9. ⇐

42. Rubal L, Chung K. Do you need to definitively diagnose the location of a pregnancy of unknown location? The case for "yes." Fertil Steril 2012;98:1078–84. (Level III) ⇐

43. Reid S, Condous G. Is there a need to definitively diagnose the location of a pregnancy of unknown location? The case for "no." Fertil Steril 2012;98:1085–90. (Level III) ⇐

44. Ailawadi M, Lorch SA, Barnhart KT. Cost-effectiveness of presumptively medically treating women at risk for ectopic pregnancy compared with first performing a dilatation and curettage. Fertil Steril 2005;83:376–82. (Cost-analysis) ⇐

45. Medical treatment of ectopic pregnancy: a committee opinion. Practice Committee of American Society for Reproductive Medicine. Fertil Steril 2013;100:638–44. (Level III) ⇐

46. Tanaka T, Hayashi H, Kutsuzawa T, Fujimoto S, Ichinoe K. Treatment of interstitial ectopic pregnancy with methotrexate: report of a successful case. Fertil Steril 1982; 37:851–2. (Level III) ⇐

47. Lipscomb GH, Meyer NL, Flynn DE, Peterson M, Ling FW. Oral methotrexate for treatment of ectopic pregnancy. Am J Obstet Gynecol 2002;186:1192–5. (Level II-2) ⇐

48. Menon S, Colins J, Barnhart KT. Establishing a human chorionic gonadotropin cutoff to guide methotrexate treatment of ectopic pregnancy: a systematic review. Fertil Steril 2007;87:481–4. (Systematic Review) ⇐

49. Lipscomb GH, Bran D, McCord ML, Portera JC, Ling FW. Analysis of three hundred fifteen ectopic pregnancies treated with single-dose methotrexate. Am J Obstet Gynecol 1998;178:1354–8. (Level II-3) ⇐

50. Cohen A, Zakar L, Gil Y, Amer-Alshiek J, Bibi G, Almog B, et al. Methotrexate success rates in progressing ectopic pregnancies: a reappraisal. Am J Obstet Gynecol 2014;211:128.e1–5. (Level II-3) ⇐

51. Stovall TG, Ling FW. Single-dose methotrexate: an expanded clinical trial. Am J Obstet Gynecol 1993;168:1759-62; discussion 1762–5. (Level II-3) ⇐

52. Barnhart K, Hummel AC, Sammel MD, Menon S, Jain J, Chakhtoura N. Use of "2-dose" regimen of methotrexate to treat ectopic pregnancy. Fertil Steril 2007;87:250–6. (Level III) ⇐

53. Rodi IA, Sauer MV, Gorrill MJ, Bustillo M, Gunning JE, Marshall JR, et al. The medical treatment of unruptured ectopic pregnancy with methotrexate and citrovorum rescue: preliminary experience. Fertil Steril 1986;46:811–3. (Level III) ⇐

54. Lipscomb GH, Givens VM, Meyer NL, Bran D. Comparison of multidose and single-dose methotrexate protocols for the treatment of ectopic pregnancy. Am J Obstet Gynecol 2005;192:1844-7; discussion 1847–8. (Level II-3) ⇐

55. Barnhart KT, Gosman G, Ashby R, Sammel M. The medical management of ectopic pregnancy: a meta-analysis comparing "single dose" and "multidose" regimens. Obstet Gynecol 2003;101:778–84. (Meta-Analysis) ⇐

56. Yang C, Cai J, Geng Y, Gao Y. Multiple-dose and double-dose versus single-dose administration of methotrexate for the treatment of ectopic pregnancy: a systematic review and meta-analysis. Reprod Biomed Online 2017;34:383–91. (Systematic Review and Meta-Analysis) ⇐

57. Song T, Kim MK, Kim ML, Jung YW, Yun BS, Seong SJ. Single-dose versus two-dose administration of methotrexate for the treatment of ectopic pregnancy: a randomized controlled trial. Hum Reprod 2016;31:332–8. (Level I) ⇐

58. Hamed HO, Ahmed SR, Alghasham AA. Comparison of double- and single-dose methotrexate protocols for treatment of ectopic pregnancy. Int J Gynaecol Obstet 2012;116:67–71. (Level I) ⇐

59. Atri M, Bret PM, Tulandi T, Senterman MK. Ectopic pregnancy: evolution after treatment with transvaginal methotrexate. Radiology 1992;185:749–53. (Level III) ⇐

60. Brown DL, Doubilet PM. Transvaginal sonography for diagnosing ectopic pregnancy: positivity criteria and performance characteristics. J Ultrasound Med 1994;13: 259–66. (Level III) ⇐

61. Pisarska MD, Carson SA, Buster JE. Ectopic pregnancy. Lancet 1998;351:1115–20. (Level III) ⇐

62. Dasari P, Sagili H. Life-threatening complications following multidose methotrexate for medical management of ectopic pregnancy. BMJ Case Rep 2012;2012. (Level III) ⇐

63. Methotrexate – injection. In: Drug facts and comparisons. St. Louis (MO): Wolters Kluwer; 2017. p. 3883–90. (Level III) ⇐

64. Huffman DH, Wan SH, Azarnoff DL, Hogstraten B. Pharmacokinetics of methotrexate. Clin Pharmacol Ther 1973;14:572–9. (Level III) ⇐

65. Shen DD, Azarnoff DL. Clinical pharmacokinetics of methotrexate. Clin Pharmacokinet 1978;3:1–13. (Level III) ⇐

66. Svirsky R, Rozovski U, Vaknin Z, Pansky M, Schneider D, Halperin R. The safety of conception occurring shortly after methotrexate treatment of an ectopic pregnancy. Reprod Toxicol 2009;27:85–7. (Level II-3) ⇐

67. Hackmon R, Sakaguchi S, Koren G. Effect of methotrexate treatment of ectopic pregnancy on subsequent pregnancy. Can Fam Physician 2011;57:37–9. (Level III) ⇐

68. Oriol B, Barrio A, Pacheco A, Serna J, Zuzuarregui JL, Garcia-Velasco JA. Systemic methotrexate to treat ectopic pregnancy does not affect ovarian reserve. Fertil Steril 2008;90:1579–82. (Level III) ⇐

69. Ohannessian A, Loundou A, Courbiere B, Cravello L, Agostini A. Ovarian responsiveness in women receiving fertility treatment after methotrexate for ectopic pregnancy: a systematic review and meta-analysis. Hum Reprod 2014;29:1949–56. (Systematic Review and Meta-Analysis) ⇐

70. Hajenius PJ, Mol F, Mol BW, Bossuyt PM, Ankum WM, Van der Veen F. Interventions for tubal ectopic pregnancy. Cochrane Database of Systematic Reviews 2007, Issue 1. Art. No.: CD000324. DOI: 10.1002/14651858. CD000324.pub2. (Meta-Analysis) ⇐

71. Mol BW, Swart P, Bossuyt PM, van der Veen F. Prognostic significance of diagnostic laparoscopy for spontaneous fertility. J Reprod Med 1999;44:81–6. (Level II-2) ⇐

72. Morlock RJ, Lafata JE, Eisenstein D. Cost-effectiveness of single-dose methotrexate compared with laparoscopic treatment of ectopic pregnancy. Obstet Gynecol 2000;95:407–12. (Cost-analysis) ⇔

73. Sowter MC, Farquhar CM, Gudex G. An economic evaluation of single dose systemic methotrexate and laparoscopic surgery for the treatment of unruptured ectopic pregnancy. BJOG 2001;108:204–12. (Cost-analysis) ⇔

74. Cheng X, Tian X, Yan Z, Jia M, Deng J, Wang Y, et al. Comparison of the fertility outcome of salpingotomy and salpingectomy in women with tubal pregnancy: a systematic review and meta-analysis. PLoS One 2016;11:e0152343. (Systematic Review and Meta-Analysis) ⇔

75. Korhonen J, Stenman UH, Ylostalo P. Serum human chorionic gonadotropin dynamics during spontaneous resolution of ectopic pregnancy. Fertil Steril 1994;61:632–6. (Level II-3) ⇔

76. van Mello NM, Mol F, Verhoeve HR, van Wely M, Adriaanse AH, Boss EA, et al. Methotrexate or expectant management in women with an ectopic pregnancy or pregnancy of unknown location and low serum hCG concentrations? A randomized comparison. Hum Reprod 2013;28:60–7. (Level I) ⇔

Copyright March 2018 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the Internet, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher.

Requests for authorization to make photocopies should be directed to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400.

American College of Obstetricians and Gynecologists
409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920

Tubal ectopic pregnancy. ACOG Practice Bulletin No. 193. American College of Obstetricians and Gynecologists. Obstet Gynecol 2018; 131:e91–103.

The MEDLINE database, the Cochrane Library, and ACOG's own internal resources and documents were used to conduct a literature search to locate relevant articles published between January 2000 and September 2017. The search was restricted to articles published in the English language. Priority was given to articles reporting results of original research, although review articles and commentaries also were consulted. Abstracts of research presented at symposia and scientific conferences were not considered adequate for inclusion in this document. Guidelines published by organizations or institutions such as the National Institutes of Health and the American College of Obstetricians and Gynecologists were reviewed, and additional studies were located by reviewing bibliographies of identified articles. When reliable research was not available, expert opinions from obstetrician–gynecologists were used.

Studies were reviewed and evaluated for quality according to the method outlined by the U.S. Preventive Services Task Force:

I    Evidence obtained from at least one properly designed randomized controlled trial.

II-1  Evidence obtained from well-designed controlled trials without randomization.

II-2  Evidence obtained from well-designed cohort or case–control analytic studies, preferably from more than one center or research group.

II-3  Evidence obtained from multiple time series with or without the intervention. Dramatic results in uncontrolled experiments also could be regarded as this type of evidence.

III   Opinions of respected authorities, based on clinical experience, descriptive studies, or reports of expert committees.

Based on the highest level of evidence found in the data, recommendations are provided and graded according to the following categories:

Level A—Recommendations are based on good and consistent scientific evidence.

Level B—Recommendations are based on limited or inconsistent scientific evidence.

Level C—Recommendations are based primarily on consensus and expert opinion.

*This information is designed as an educational resource to aid clinicians in providing obstetric and gynecologic care, and use of this information is voluntary. This information should not be considered as inclusive of all proper treatments or methods of care or as a statement of the standard of care. It is not intended to substitute for the independent professional judgment of the treating clinician. Variations in practice may be warranted when, in the reasonable judgment of the treating clinician, such course of action is indicated by the condition of the patient, limitations of available resources, or advances in knowledge or technology. The American College of Obstetricians and Gynecologists reviews its publications regularly; however, its publications may not reflect the most recent evidence. Any updates to this document can be found on www.acog.org or by calling the ACOG Resource Center.*

*While ACOG makes every effort to present accurate and reliable information, this publication is provided "as is" without any warranty of accuracy, reliability, or otherwise, either express or implied. ACOG does not guarantee, warrant, or endorse the products or services of any firm, organization, or person. Neither ACOG nor its officers, directors, members, employees, or agents will be liable for any loss, damage, or claim with respect to any liabilities, including direct, special, indirect, or consequential damages, incurred in connection with this publication or reliance on the information presented.*

# Exhibit D to Amended Complaint

Case 1:24-cv-12283-JEK    Document 46-1    Filed 12/11/24    Page 70 of 145



# Abortion

## Procedures, Risks, Side Effects

84% of the American sample of women said they did not receive adequate counseling before making the decision to have an abortion.

64% felt pressured by others.

---

### INFORMATION INSIDE

Abortion Procedures

Fetal Development

Reproductive Health Risks

---

**Disclaimer:**

This fact sheet is designed to be an informational tool only. It is not intended to provide medical advice or replace care from a qualified medical practitioner.

**Attleboro Women's Health Center**

Ph:508-455-0172  |  Text: 774-340-0502
152 Emory Street, Unit 4, Attleboro MA 02703
www.awhc.net

---

# Protect Your Future Reproductive Health

## Future Pre-term Deliveries

• Abortion is associated with a significantly increased risk of low birth weight and preterm birth. The risk increases with each additional abortion.⁹ Surgical abortion increases relative risk of future preterm birth by 52%, low birth weight by 41% and still birth for gestational age by 19%.⁸

• The number of previous [surgical abortions] was significantly associated with endometrial thinning.⁹ A thin endometrium makes achieving and sustaining future pregnancies more difficult.¹⁰

## Breast Cancer

• Studies show that abortion increases a woman's risk of breast cancer. A 2013 analysis revealed a 44% increased risk of breast cancer among females who had at least one induced abortion. The risk increased by 76% and 89% for those who had at least two or three abortions, respectively.¹¹

• Among women who have given birth, an increasing number of full-term pregnancies was associated with a statistically significant decrease in the risk of breast cancer: risk was reduced by 14% for each additional birth.¹²

## STDs & Pelvic Inflammatory Disease

• There is a high prevalence rate of Chlamydia (9.6%) and Gonorrhea (1.9%) among women presenting for abortion.¹³

• Of patients who have a Chlamydia infection at the time of abortion, 23% will develop PID within 4 weeks.¹³

• Some of the complications of PID are: formation of scar tissue both outside and inside the fallopian tubes that can lead to tubal blockage; ectopic pregnancy (pregnancy outside the womb); infertility (inability to get pregnant); long-term pelvic/abdominal pain.¹⁴

## Mental Health

• Women who had undergone an abortion experienced an 81% increased risk of mental health problems, and nearly 10% of the incidence of mental health problems was shown to be attributable to abortion.¹⁵

---

1. Rue VM, C-Armant PK, Reej JJ Reardon DC 2004: Induced abortion and traumatic stress: A preliminary comparison of American and Russian women. Medical Science Monitor. 10 (10): SR5-16

2. U.S. Food and Drug Administration (2016). Mifeprex Medication Guide. U.S. Department of Health. Retrieved May 02, 2016 from http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088643.pdf

3. Mifeprex Label [2016]. Table 4

4. Winkoff B, Dabis K, Cheng F, Chong E, Goldberg AR Schweikert JES Kahl L, et al [2012]: Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol. 120 (5): 1070-6

5. Upadhyi K Desai S Zlidar VM, et al. (2015). Incidence of emergency department visits and complications after abortion. Obstet Gynecol. 125 (1): 175-83

6. Grimes DA, Cates W. (2009). Abortion surveillance-United States 2006. MMWR Surveill Summ. 58 (8): 1-35

7. Shah PS, Zao J. Knowledge Synthesis Group of Determinants of preterm LBW births. (2009). Induced termination of pregnancy and low birthweight and preterm birth: a systematic review and meta-analysis. BJOG 116 (11): 1425-42.

8. Saccone G, Perriera L, Berghella V (2016). Prior uterine evacuation of pregnancy as independent risk factor for preterm birth: a systematic review and metaanalysis. Am J Obstet Gynecol. 214(5):572-91

9. Aumuguri A, Homi H, Obaidu H, Endo T Sato T [2017]: Role of dilatation and curettage performed for spontaneous or induced abortion in the etiology of endometrial thinning. J Obstet Gynecol Res. 43(3):523-9.

10. Richter KS, Bugge KR, Bromer JG, Levy MJ [2007]: Relationship between endometrial thickness and embryo implantation, based on 1294 cycles of in vitro fertilization with transfer of two blastocyst stage embryos. Fertil Steril. 87(1):53-9

11. Huang Y, Zhang X, Li W Song F Dai H Wang J Gao Y Liu X Chen C Yan Y Wang X Chen K [2014]. A meta-analysis of the association between induced abortion and breast cancer risk among Chinese females. Cancer Causes Control. 25(2):227-36.

12. Andreu N Goldgar DE Easton DF Rookus M Brohet R, Antoniou AC et al. (2006). Pregnancy, breastfeeding and breast cancer risk in the international BRCA1/2 carrier cohort study. J Natl Cancer Inst. 98(8): 535-44.

13. Westergaard L Phillipsen T Scheibel J (1982): Significance of cervical Chlamydia trachomatis infection in postabortal pelvic inflammatory disease. Obstetrics and Gynecology. 68(5): 668-90. Ovgaard L, et al. (1983): Pelvic inflammatory disease associated with Chlamydia trachomatis infection in pre abortal pelvic abortuses. Br J Vener Dis. 59: 189-92. Heisterberg L, et al. (1987). The role of vaginal secretory immunoglobulins, gardnerella vaginalis, anaerobes, and Chlamydia trachomatis in post abortal pelvic inflammatory disease. Acta Obstetricia et Gynecologica Scandinavica. 66(2): 99-102.

14. Centers for Disease Control and Prevention (2017). Pelvic inflammatory disease (PID) - CDC fact sheet. Atlanta, GA: US Department of Health and Human Services. Centers for Disease Control and Prevention. Retrieved May 2017 from http://www.cdc.gov/std/pid/stdfact-pid-detailed.htm

15. Coleman PK (2011): Abortion and mental health: quantitative synthesis and analysis of research published 1995-2009. Br J Psych. 199: 180-6

# Exhibit E to Amended Complaint

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

FOUR WOMEN HEALTH SERVICES, LLC

            Plaintiff,

       v.

ABUNDANT HOPE PREGNANCY
RESOURCE CENTER INC. d/b/a ATTLEBORO
WOMEN'S HEALTH CENTER, CATHERINE
ROMAN, NICOLE CARGES, and DARLENE
HOWARD,

            Defendants.

---

**AFFIDAVIT OF** Jane Doe 5

I, Jane Doe 5 , hereby declare and state as follows:

1.  I am a resident of the ███████████████.

2.  On October 30, 2023, I did a Google search for abortion care providers near me, which led me to the website of Four Women Health Services, LLC ("Four Women"). I intended to pay for the reproductive healthcare services for which I was searching.

3.  On or about 1:25 p.m. on October 30, I completed the form on Four Women's website to send a message to Four Women asking to schedule an ultrasound.

4.  I communicated with Four Women by sending and receiving messages on the web browser on my cell phone.

5.  At 1:40 p.m., Four Women told me it had appointments on Wednesday, Thursday, or Friday that week.

1

6.   Within minutes, I received a phone call from a phone number I did not recognize, but my iPhone indicated to me that the caller was in Attleboro, Massachusetts.

7.   The phone number calling me was (508) 455-0172.

8.   I answered the phone, believing the caller was Four Women located in Attleboro.

9.   The person on the other end was a woman, and she asked to "speak with ██████"

10.  She directed me to come to her location at 152 Emory Street in Attleboro for an ultrasound.  I asked whether that address was correct, based on my understanding that Four Women was located at 150 Emory Street.  She stated that they were right next door, but they provide ultrasounds there.

11.  I told the woman on the phone that I was seeking a medication abortion.  She did not tell me that they were a separate entity that does not provide abortion services. She asked me about my marital status, if I had other children, and why I wanted an abortion.

12.  I scheduled an appointment with the woman on the phone for Thursday at 9:15 a.m., believing that I had made an appointment with Four Women.

13.  After the call, I sent a message to Four Women stating that I had received a call from someone at their office and that I had scheduled an appointment for Thursday morning.  Four Women then informed me that no one in its office had called me and that they do not see patients on Thursday mornings.

14.  I received a text message confirming my Thursday morning appointment from (774) 340-0502.  It confirmed my appointment with Attleboro Women's Health Center and provided a phone number to reach them: (508) 455-0172.

15.  I immediately provided Four Women with a screen shot of that confirmation message.

2

16. On October 30, 2023 at the time that Attleboro Women's Health Center called me, I believed that I had contacted only abortion providers, specifically Four Women and carafem.com, which provides medication abortion to patients via telehealth.

17. I provided my information to carafem.com on October 29, 2023, the day before I contacted Four Women.  I ultimately did not pursue services with carafem.com because I could not recall the date of my last period.

18. Up until the date of this affidavit I believed that the only entities that I contacted prior to October 30, 2023 were abortion providers. On the date of this affidavit, I was provided documents which show that I completed an intake form for Attleboro Women's Health. If I completed a form on Attleboro Women's Health's website it was because I was misled to believe that it was Four Women an abortion provider.

19. The document attached as Exhibit A is a true and accurate copy of the electronic communications I had with Four Women on October 30, 2023.  The messages listed under " Jane Doe 5 " and/or ▮▮▮▮▮▮ are messages I sent using Four Women's electronic messaging platform.

20. The document attached as Exhibit B is a true and accurate copy of the text message confirmation I received on October 30, 2023 from (774) 340-0502 confirming an appointment at Attleboro Women's Health Center.

21. I did not go to Attleboro Women's Health Center for the scheduled appointment, and to my knowledge, I have not spoken to anyone affiliated with Attleboro Women's Health Center since October 30, 2023.

22. I ultimately received the reproductive healthcare care services I sought from Four Women.

3

23. I have read the complaint filed under the caption <u>Four Women Health Services LLC</u>

<u>v. Abundant Hope Pregnancy Resource Center Inc. d/b/a Attleboro Women's Health Center et al.</u>

and confirm that I am Jane Doe 5 and attest that the facts stated relating to Jane Doe 5 are true

and accurate.

24. I wish to proceed in this matter under a pseudonym in order to protect my privacy, as

I fear for my safety, as the issues raised pertain to my seeking medical treatment, specifically

pertaining to abortion, reproduction, and birth control.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: October 24, 2024

/s Jane Doe 5

Jane Doe 5

EXHIBIT A

Klara Phone Service from Four Women Health Services, Llc created this conversation at 1:25 PM

💬 Message from  1:25 PM    
Text Message

Hello I would like to schedule an ultrasound

Klara Automation from Four Women Health Services, Llc assigned this conversation to Unassigned **at 1:25 PM**

 1:29 PM    ⋮
Office Manager at Four Women Health Services, Llc

Why are you looking for an ultrasound?

Read by Patient

from Four Women Health Services, Llc assigned this conversation to Closed at 1:29 PM

Read by                  at 1:30 PM

I tested positive on a home pregnancy test

Klara Automation from Four Women Health Services, Llc assigned this conversation to Unassigned **at 1:30 PM**

1:34 PM
Office Manager at Four Women Health Services, Llc

When was the first day of your last period?

Read by Patient

Read by ███████████ at 1:36 PM

6 PM

I don't recall

Perhaps around 9/1

1:40 PM
Office Manager at Four Women Health Services, Llc

We have appointments on Wednesday, Thursday or Friday this week.

Read by Patient

Read by Jane Doe 5        at 1:55 PM

Jane Doe 5        1:55 PM
Patient,

Hi          I received a call from someone at your office and I scheduled an appointment for Thursday morning at 9:15

2:17 PM

Office Manager at Four Women Health Services, Llc

No one in our office called you. You must have made an appointment with Attleboro Women's Health which is a crisis pregnancy center next door. We don't see patients on Thursday morning. What number called you?

Read by Patient

Read by ████████████ at 2:22 PM

████████████ PM

She did say she was right next door to you

Hello here is a screenshot of the text that I received from the other health center





Your appointment at Attleboro Women's Health Center has been scheduled for Thursday 11/2/2023 at 9:15am.
Please bring a picture ID. Please call if you are unable to keep your appointment. We are located at 152 Emory Street, Unit #4 in Attleboro. Our telephone number is 508-455-0172. See you then.  Thank you!

Disclaimer:  While all information you share with us is confidential there are inherit risks when submitting information using technology that a third party could read. If you are uncomfortable texting, please call us at 508-455-0172

Nurse Practitioner at Four Women Health Services, Llc

Thank you for sharing that. We will be following up with the AG's office about this

Read by Patient

Read by ███████████ at 2:52 PM

█████████████ 3 PM

The only other place where I provided my contact information was on a website carafem.com

That website provides abortion medicine via an online provider, perhaps they have a way of retrieving that information



2:56 PM
Nurse Practitioner at Four Women Health Services, Llc

Ok. I appreciate all the info. That site should also be secure.

Read by Patient

Read by ████████ at 2:57 PM

EXHIBIT B

2:48



Your appointment at Attleboro Women's Health Center has been scheduled for Thursday 11/2/2023 at 9:15am.
Please bring a picture ID. Please call if you are unable to keep your appointment. We are located at 152 Emory Street, Unit #4 in Attleboro. Our telephone number is 508-455-0172. See you then.  Thank you!

Disclaimer:  While all information you share with us is confidential there are inherit risks when submitting information using technology that a third party could read. If you are uncomfortable texting, please call us at 508-455-0172

# Exhibit F to Amended Complaint

## LAW OFFICE OF THOMAS M. HARVEY

ATTORNEY AND COUNSELOR AT LAW
22 MILL STREET • SUITE 408
ARLINGTON, MASSACHUSETTS 02476

(617) 710-3616
FAX (781) 643-1126
email: tharveyesq@aol.com

June 22, 2022

Marcus Gordon, M.D.
Four Women Health Services, LLC
150 Emory Street, #2
Attleboro, MA 02703

Re: Attleboro Women's Health Center

Dear Dr. Gordon:

I represent the Attleboro Women's Health Center. It has come to my attention that it appears that members of your staff at Four Women Health Services, LLC, have engaged in illegal and libelous activities regarding the Attleboro Women's Health Center. Specifically, these actions include mail tampering, trespass, harassing phone calls, and libelous Google reviews and Facebook posts.

You are hereby forewarned. If there is one more incidence of this type of activity, then the Attleboro Women's Health Center will file the appropriate criminal and / or civil action against you and Four Women Health Services. Further, pursuant to G.L. Ch. 93A, Sec. 11, the Attleboro Women's Health Center will be seeking recovery of multiple damages and its reasonable attorneys' fees in compensation for your unfair business practices.

Very truly yours,

Thomas M. Harvey



*Seaport West*
*155 Seaport Boulevard*
*Boston, MA 02210-2600*

*617.832.1000 main*
*617.832.7000 fax*

Martha M. Coakley
617-832-1129 direct
mcoakley@foleyhoag.com

August 16, 2022

## Via E-mail

Thomas M. Harvey
22 Mill Street, Suite 408
Arlington, MA 02476
tharveyesq@aol.com

Re:    Your June 22, 2022 Letter on Behalf of Attleboro Women's Health Center

Dear Mr. Harvey,

I am writing on behalf of Four Women Health Services, LLC ("Four Women") in response to your letter sent on June 22, 2022 on behalf of Attleboro Women's Health Center ("AWHC"). In your letter, you accused Four Women of engaging in a variety of actions you characterized as "illegal and libelous." This accusation is wholly unfounded: Four Women has not engaged in any of the activities enumerated in your letter nor any conduct that could amount to a violation of applicable law.

Your letter fails to identify any specific information associated with the conduct alleged therein. Your broad claim that Four Women has engaged in activity potentially warranting legal sanction appears calculated to harass, rather than address any legitimate concerns held by AWHC. If you have evidence of specific incidents related to any of the activity described in your letter, I encourage you to provide this information to me at Foley Hoag LLP. In the meantime, however, Four Women has assessed and investigated your generalized assertions and denies them in full.

Four Women has provided essential reproductive health care to its patients for almost 25 years and always seeks to ensure that its patients are able to obtain Four Women's services in a safe environment. Four Women understands well the harm that harassment, threats, and misinformation can cause to patients seeking sensitive and critical health services. To this end, Four Women prioritizes not only complying with all applicable law, but also maintaining a peaceful presence in the community to protect its patients. Four Women hopes that its neighbors follow similar principles.

Thomas M. Harvey
Page 2

Should you wish to discuss this matter further, please direct all future correspondence to me.

Cordially,

*Martha Coakley*

Of Counsel

CC:     Caroline Donovan, Esq.
        Emily Nash, Esq.

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

FOUR WOMEN HEALTH SERVICES, LLC

                    Plaintiff,

         v.

ABUNDANT HOPE PREGNANCY
RESOURCE CENTER INC. d/b/a ATTLEBORO
WOMEN'S HEALTH CENTER, CATHERINE
ROMAN, NICOLE CARGES, and DARLENE
HOWARD,

                    Defendants.

Civil Action No.: 1:24-cv-12283-JEK

<div align="center">

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

</div>

    Pursuant to Fed. R. Civ. P. 15 and Local Rule 15, Plaintiff Four Women Health Services, LLC ("Four Women") respectfully moves this Court for leave to file its Amended Complaint to substitute a new claim and add a new defendant, which were both identified through expedited discovery.[1]

    Abundant Hope Pregnancy Center Inc., doing business as Attleboro Women's Health Center ("Abundant Hope"), is an organization that does not provide abortion care, reproductive healthcare, or any medical services. Abundant Hope nevertheless engages in a marketing scheme designed to deceive women, including Jane Does relied upon in Plaintiff's Complaint, into

---

[1] As detailed in this Memorandum, Plaintiff intends to amend to add a claim for violations of the Lanham Act, 15 U.S.C. § 1125, *et seq.*, while removing claims for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*; Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; and Massachusetts Wiretap Act, M.G.L. c. 272, § 99. The Court's granting of the leave requested to amend would moot Plaintiff's pending Motion for a Preliminary Injunction, ECF 5. Plaintiff reserves the right to seek further relief as necessary to prevent Defendants from continuing to disrupt women accessing reproductive healthcare at Four Women.

<div align="center">1</div>

believing it provides medical services—and specifically abortion care—in an effort to divert patients from licensed medical and abortion care providers like Four Women.

The strength of Abundant Hope's deception led women like the Jane Does identified in the Complaint to believe they had never interacted with Abundant Hope before receiving cold calls from the organization. As detailed in the Complaint, Jane Does reported receiving calls from Abundant Hope without ever previously contacting the organization, and that they received these calls during or immediately following outreach to Four Women, creating the perception that Defendants had improperly intercepted Four Women patient communications to accomplish the initial outreach. Expedited discovery, however, granted by this Court on October 4, 2024, ECF 40, revealed that Defendants have obtained contact information of new or potential clients not through electronic interception of communications, but rather through a deceptive marketing scheme implemented through a partnership with a separate, for-profit entity, Choose Life Marketing, LLC ("Choose Life Marketing"). Choose Life Marketing creates and manages the online promotion and advertising of so-called "medical" services offered by the fictional entity known as "Attleboro Women's Health Center." Its marketing misleads women to such an extent that many women have contacted Abundant Hope without knowing it or while believing they were contacting Four Women.

This new information raises new claims and obviates others. The extent of Choose Life Marketing's role in Abundant Hope's deceptive marketing is now clear. Accordingly, Plaintiff asks that the Court allow it leave to file the Amended Complaint which is attached as <u>Exhibit A</u> to the Motion.

# I.    <u>BACKGROUND</u>

On September 5, 2024, Four Women filed a Complaint alleging, among other claims, that Abundant Hope engaged in technological attacks—including interception of electronic communications between Four Women and its patients—to redirect patients away from Four Women to itself.  *See* ECF 1.  Based on these facts, Four Women asserted Counts I-III, alleging Computer Fraud and Abuse Act ("CFAA") and federal and Massachusetts Wiretap Act violations. ECF 1 ¶¶ 124-50.  In conjunction with the Complaint, Plaintiff filed a Motion for a Preliminary Injunction and requested expedited discovery to provide the Court with a fuller record of Abundant Hope's actions pertaining to these technological attacks.  *See* ECF 3; ECF 5.  The Court granted the motion for expedited discovery.  ECF 40.

Four Women's Complaint relied on women's accounts of experiences in which they received unsolicited contact by Abundant Hope after reaching out to Four Women.  *See* ECF 1 ¶¶ 101-22.  Jane Doe 5 was one such woman.  ECF 1 ¶¶ 101-08.  As detailed in previous filings, Jane Doe 5 was in the middle of messaging electronically with Four Women to schedule an appointment when she received a call from Abundant Hope, and she scheduled an appointment during that call, believing she was speaking with Four Women.  *See id.*; ECF 8-1.  Jane Doe 5 received a confirmation text from Abundant Hope confirming that the appointment she had made was with an entity called "Attleboro Women's Health Center."  *See* ECF 8-1.  At that time, Jane Doe 5 believed that prior to communicating with Four Women, she had "contacted only abortion providers, specifically Four Women and carafem.com."  <u>Exhibit 1</u>, Affidavit of Jane Doe 5 ("Jane Doe 5 Aff.") ¶ 16; *see* ECF 8-1.  Jane Doe 5's account indicated that Abundant Hope obtained her contact information through real-time interception of her communications with Four Women.

It is a testament to the depth of Abundant Hope's deception that Jane Doe 5 was unaware that she had, in fact, provided her contact information through a form that had found its way to Abundant Hope. According to documents produced by Abundant Hope, Abundant Hope received an email from Choose Life Marketing two days before Jane Doe 5 began messaging with Four Women, providing Abundant Hope with a "new lead" email that contained Jane Doe 5's contact information. *See* Exhibit 2, "New Lead" Email; Exhibit 3, 30(b)(6) Deposition of Abundant Hope, by and through designee Kathy Hill ("Hill Dep.") 53:10-15. The contents of the "new lead" email appear to be the result of Jane Doe 5 completing an online form, but it is unclear what website or advertisement led Jane Doe 5 to a form that resulted in this "new lead" email from Choose Life Marketing; Abundant Hope itself is not aware of the source. *See* Hill Dep. 56:12-62:8. Jane Doe 5 still has no recollection of visiting or completing any forms on the Attleboro Women's Health Center website, and she maintains that she only completed inquiry forms on websites she believed were abortion providers. *See* Jane Doe 5 Aff. ¶¶ 16, 18, 19. After reviewing Choose Life Marketing's "new lead" email, Jane Doe 5 testifies that, "[i]f [she] completed a form on Attleboro Women's Health's website it was because [she] was misled to believe that it was Four Women an abortion provider." *Id.* ¶ 18. To the extent Jane Doe 5 contacted any provider outside of carafem.com and Four Women, Jane Doe 5 was not aware of doing so.

Jane Doe 5's belief that she was contacting an abortion provider when she was actually contacting Abundant Hope is a product of Abundant Hope's marketing strategy. Abundant Hope and Choose Life Marketing achieve this objective through a broad marketing scheme through which they publish website content and propagate advertising to mislead abortion-seeking women into making appointments or showing up at Abundant Hope's facility instead of Four Women, a licensed clinic that provides abortion care, located next door.

Attleboro Women's Health Center is a fictional entity that Abundant Hope created to divert customers from licensed abortion care providers like Four Women. Abundant Hope states that Attleboro Women's Health Center is Abundant Hope's "medical arm." <u>Exhibit 4</u>, 30(b)(6) Deposition of Abundant Hope, by and through designee Darlene Howard ("Howard Dep.") 9:21-22. In fact, however, neither Abundant Hope nor its "medical arm," Attleboro Women's Health Center, is a licensed medical clinic. Following the filing of the Complaint, which stated as much, Defendants shut down the Attleboro Women's Health Center website, and the Abundant Hope website now states that they are "not accepting new medical patients at this time." <u>Exhibit 5</u>, Declaration of Matthew Patton, Esq. ("Patton Decl."), Ex. A. According to Abundant Hope, these changes are because "the Department of Public Health told us we had to take it down." Hill Dep. 64:8-10.

Despite failing to adhere to licensing requirements, Abundant Hope advertises Attleboro Women's Health Center as a provider of medical services (including abortions) and has done so for years. Choose Life Marketing has been an active collaborator in this effort. Beyond providing "new lead" emails to Abundant Hope, Choose Life Marketing maintains and promotes the entire Attleboro Women's Health Center website: It wrote the content of the website, developed Google advertisements for Attleboro Women's Health Center, and managed how those advertisements would appear. Howard Dep. 38:1-9. Abundant Hope engages Choose Life Marketing only for its "medical" services provided under the Attleboro Women's Health Center name; it does not use Choose Life Marketing or other advertising to reach women in connection with its non-"medical" services such as its diaper bank and bible study programs, which are under the Abundant Hope name. *Id.* at 14:6-11, 53:13-24. Choose Life Marketing specifically targets "young women, single mothers, and low-income families." Patton Decl., Ex. B.

## II.    ARGUMENT

"Rule 15(a)(2) provides that a district court 'should freely give leave' for a plaintiff to amend their complaint 'when justice so requires.'" *Republic Maximal LLC v. Romulus Cap. Partners II, LLC*, No. 22-CV-10429-MLW, 2024 U.S. Dist. LEXIS 112025, at *18 (D. Mass. June 25, 2024) (quoting Fed. R. Civ. P. 15(a)(2)).  The amendment standard is "liberal" and instructs a court to "'examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations.'" *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 37 (1st Cir. 2022); *see also Milcent v. City of Bos.*, No. CV 14-13347-GAO, 2017 U.S. Dist. LEXIS 63906, at *3 (D. Mass. Apr. 26, 2017) (quoting *Palmer v. Champion Mortg.*, 465 F.3d 24, 30-31 (1st Cir. 2006)).  Leave should only be withheld if "the amendment 'would be futile, or reward, inter alia, undue or intended delay.'" *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004) (quoting *Resolution Tr. Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994)).  The plaintiff's burden in moving to amend "is not a high hurdle, and the dispositive datum often will be the reasonableness of the pleader's actions." *Amyndas Pharms.*, 48 F.4th at 37.  Four Women seeks to amend its complaint to adjust the claims it asserts and add Choose Life Marketing as a defendant, both of which are the result of expedited discovery in this case.  As the amendment would neither be futile nor the product of undue delay, this request is justified.

Four Women's request for leave to amend is reasonable based on the information it discovered about how Defendants are soliciting new clients.  Courts routinely find that the "discovery of new information" is a valid reason to support amending a pleading. *Id.* at 37-38; *see, e.g.*, *Torres-Estrada v. Cases*, 88 F.4th 14, 26 (1st Cir. 2023); *Republic Maximal LLC*, 2024 U.S. Dist. LEXIS 112025, at *18; *E. Moran, Inc. v. Tomgal, LLC*, No. CV 22-1647 (ADC), 2023 U.S. Dist. LEXIS 175561, at *10 (D.P.R. Sept. 28, 2023) (same).  Here, expedited discovery revealed information previously unavailable to Four Women that "substantially alters the viability" of Four

Women's initial CFAA and Wiretap Act claims, *Amyndas Pharms.*, 48 F.4th at 37, and reveals the scope of Defendants' deceptive advertising and marketing efforts, warranting the substitution of a new claim. Courts permit leave in situations where the plaintiff uncovers grounds for the amendment through discovery, even where plaintiff seeks leave to amend late in discovery. *See, e.g.*, *Pollack v. Seamus Crowley Constr., Inc.*, No. 13-CV-12157-MLW, 2019 U.S. Dist. LEXIS 141468, at *7-8 (D. Mass. Apr. 17, 2019); *Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 116-17 (D. Mass. 2001). Four Women's request to amend its complaint directly follows this discovery.

Discovery also revealed an additional party to Defendants' deceptive marketing scheme in Choose Life Marketing, providing a further basis for Four Women's request to amend its complaint. In *Pray v. SMPO Properties, Inc.*, for example, the court granted plaintiff's request for leave to amend his complaint to add a defendant where plaintiff alleged that the new defendant had acted jointly with existing defendants in perpetrating the allegedly unlawful deceptive acts. 746 F. Supp. 2d 317, 324 (D. Mass. 2010). The court granted leave because "in the interest of justice, the new parties should be joined so as to resolve the entire dispute and because the disruption will be relatively insignificant." *Id.* Likewise, Four Women seeks to amend to add a new defendant, Choose Life Marketing, whose role in Defendants' deceptive marketing scheme was only revealed through discovery. As in *Pray*, Four Women alleges that Choose Life Marketing acted in concert with the current Defendants to perpetrate unfair and deceptive acts.

Moreover, there is no delay in this motion. "[T]he longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." *Steir*, 383 F.3d at 12. By contrast, where cases are in their infancy, courts in the First Circuit routinely grant

leave to add new claims and allegations, remove other claims, and add new defendants. *See, e.g.*, *Traincroft, Inc. v. Ins. Co. of Pa.*, No. CV 14-10551-FDS, 2014 U.S. Dist. LEXIS 199623, at *7 (D. Mass. Sept. 5, 2014). Here, the parties have been engaged in only limited, expedited discovery in connection with Four Women's motion for a preliminary injunction; the Court has not issued a scheduling order nor have the parties begun any broader discovery efforts. *Cf. Steir*, 383 F.2d at 12 (explaining "[s]cheduling orders" are viewed as "a cut-off date for amendments" after which a more exacting standard applies). This is also Four Women's first request to amend the complaint. *See generally Amyndas Pharms.*, 48 F.4th at 38 (explaining courts may look to such factors as "whether a proposed amendment is a first attempt" when determining reasonableness). Pursuant to Local Rule 15.1(a), Plaintiff timely moved to add Choose Life Marketing, almost immediately after learning of its identity. Defendants will not suffer any prejudice or unfair surprise by the allowance of Plaintiff's motion.

In sum, Four Women's request to amend its complaint is reasonable and serves the interests of justice. As this case is in its infancy, and no scheduling order has been entered, permitting Four Women to amend to include the new claim and add Choose Life Marketing as a defendant will cause no legal prejudice.

## III.    <u>CONCLUSION</u>

For the reasons set forth herein, Four Women requests that this Court allow it leave to file the accompanying Amended Complaint, attached as <u>Exhibit A</u> to the Motion to Amend, and that the same be deemed filed with the allowance of this motion.

DATED:  December 4, 2024                    **Four Women Health Services, LLC,**

By its attorneys,


/s/ *Matthew Patton*
Matthew D. Patton (BBO No. 703798)
Law Office of Nicholas F. Ortiz, P.C.
One Boston Place, Suite 2600
Boston, MA 02108
(617) 338-9400
mdp@mass-legal.com

/s/ *Emily Nash*
Martha Coakley (BBO #87300)
Emily J. Nash (BBO #696460)
Caroline Holliday (BBO #707301)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
mcoakley@foleyhoag.com
enash@foleyhoag.com

Brenna Rosen (*pro hac vice*)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
brosen@foleyhoag.com

9

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

FOUR WOMEN HEALTH SERVICES, LLC

          Plaintiff,

    v.

ABUNDANT HOPE PREGNANCY
RESOURCE CENTER INC. d/b/a ATTLEBORO
WOMEN'S HEALTH CENTER, CATHERINE
ROMAN, NICOLE CARGES, and DARLENE
HOWARD,

          Defendants.

---

**AFFIDAVIT OF** <span style="background:black;color:red">Jane Doe 5</span>

I, <span style="background:black;color:red">Jane Doe 5</span>, hereby declare and state as follows:

1. I am a resident of the ▮▮▮▮▮▮▮▮▮▮▮▮.

2. On October 30, 2023, I did a Google search for abortion care providers near me, which led me to the website of Four Women Health Services, LLC ("Four Women"). I intended to pay for the reproductive healthcare services for which I was searching.

3. On or about 1:25 p.m. on October 30, I completed the form on Four Women's website to send a message to Four Women asking to schedule an ultrasound.

4. I communicated with Four Women by sending and receiving messages on the web browser on my cell phone.

5. At 1:40 p.m., Four Women told me it had appointments on Wednesday, Thursday, or Friday that week.

1

6.   Within minutes, I received a phone call from a phone number I did not recognize, but my iPhone indicated to me that the caller was in Attleboro, Massachusetts.

7.   The phone number calling me was (508) 455-0172.

8.   I answered the phone, believing the caller was Four Women located in Attleboro.

9.   The person on the other end was a woman, and she asked to "speak with ██████"

10. She directed me to come to her location at 152 Emory Street in Attleboro for an ultrasound.  I asked whether that address was correct, based on my understanding that Four Women was located at 150 Emory Street.  She stated that they were right next door, but they provide ultrasounds there.

11. I told the woman on the phone that I was seeking a medication abortion.  She did not tell me that they were a separate entity that does not provide abortion services. She asked me about my marital status, if I had other children, and why I wanted an abortion.

12. I scheduled an appointment with the woman on the phone for Thursday at 9:15 a.m., believing that I had made an appointment with Four Women.

13. After the call, I sent a message to Four Women stating that I had received a call from someone at their office and that I had scheduled an appointment for Thursday morning.  Four Women then informed me that no one in its office had called me and that they do not see patients on Thursday mornings.

14. I received a text message confirming my Thursday morning appointment from (774) 340-0502.  It confirmed my appointment with Attleboro Women's Health Center and provided a phone number to reach them: (508) 455-0172.

15. I immediately provided Four Women with a screen shot of that confirmation message.

2

16. On October 30, 2023 at the time that Attleboro Women's Health Center called me, I believed that I had contacted only abortion providers, specifically Four Women and carafem.com, which provides medication abortion to patients via telehealth.

17. I provided my information to carafem.com on October 29, 2023, the day before I contacted Four Women.  I ultimately did not pursue services with carafem.com because I could not recall the date of my last period.

18. Up until the date of this affidavit I believed that the only entities that I contacted prior to October 30, 2023 were abortion providers. On the date of this affidavit, I was provided documents which show that I completed an intake form for Attleboro Women's Health. If I completed a form on Attleboro Women's Health's website it was because I was misled to believe that it was Four Women an abortion provider.

19. The document attached as Exhibit A is a true and accurate copy of the electronic communications I had with Four Women on October 30, 2023.  The messages listed under " Jane Doe 5 " and/or ▮▮▮▮▮▮▮ are messages I sent using Four Women's electronic messaging platform.

20. The document attached as Exhibit B is a true and accurate copy of the text message confirmation I received on October 30, 2023 from (774) 340-0502 confirming an appointment at Attleboro Women's Health Center.

21. I did not go to Attleboro Women's Health Center for the scheduled appointment, and to my knowledge, I have not spoken to anyone affiliated with Attleboro Women's Health Center since October 30, 2023.

22. I ultimately received the reproductive healthcare care services I sought from Four Women.

3

23. I have read the complaint filed under the caption <u>Four Women Health Services LLC</u> <u>v. Abundant Hope Pregnancy Resource Center Inc. d/b/a Attleboro Women's Health Center et al.</u> and confirm that I am Jane Doe 5 and attest that the facts stated relating to Jane Doe 5 are true and accurate.

24. I wish to proceed in this matter under a pseudonym in order to protect my privacy, as I fear for my safety, as the issues raised pertain to my seeking medical treatment, specifically pertaining to abortion, reproduction, and birth control.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: October 24, 2024

/s Jane Doe 5

Jane Doe 5

EXHIBIT A

Klara Phone Service from Four Women Health Services, Llc created this conversation at 1:25 PM

 Message from 1:25 PM
Text Message                                                                    

Hello I would like to schedule an ultrasound

Klara Automation from Four Women Health Services, Llc assigned this conversation to Unassigned at 1:25 PM

 1:29 PM                                                     ⋮
Office Manager at Four Women Health Services, Llc

Why are you looking for an ultrasound?

Read by Patient

from Four Women Health Services, Llc assigned this conversation to Closed at 1:29 PM

Read by at 1:30 PM

I tested positive on a home pregnancy test

Klara Automation from Four Women Health Services, Llc assigned this conversation
to Unassigned **at 1:30 PM**

1:34 PM
Office Manager at Four Women Health Services, Llc

When was the first day of your last period?

Read by Patient

Read by ▮▮▮▮▮▮▮ at 1:36 PM

6 PM

I don't recall

Perhaps around 9/1

1:40 PM
Office Manager at Four Women Health Services, Llc

We have appointments on Wednesday, Thursday or Friday this week.

Read by Patient

Read by Jane Doe 5 at 1:55 PM

Jane Doe 5 1:55 PM
Patient,

Hi I received a call from someone at your office and I scheduled an appointment for Thursday morning at 9:15

2:17 PM
Office Manager at Four Women Health Services, Llc

No one in our office called you. You must have made an appointment with Attleboro Women's Health which is a crisis pregnancy center next door. We don't see patients on Thursday morning. What number called you?

Read by Patient

Read by ███████████ at 2:22 PM

PM

She did say she was right next door to you

PM

Hello here is a screenshot of the text that I received from the other health center

PM





Your appointment at Attleboro Women's Health Center has been scheduled for Thursday 11/2/2023 at 9:15am.
Please bring a picture ID. Please call if you are unable to keep your appointment. We are located at 152 Emory Street, Unit #4 in Attleboro. Our telephone number is 508-455-0172. See you then. Thank you!

Disclaimer: While all information you share with us is confidential there are inherit risks when submitting information using technology that a third party could read. If you are uncomfortable texting, please call us at 508-455-0172

Nurse Practitioner at Four Women Health Services, Llc

Thank you for sharing that. We will be following up with the AG's office about this

Read by Patient

Read by ██████████████ at 2:52 PM

3 PM

The only other place where I provided my contact information was on a website carafem.com

That website provides abortion medicine via an online provider, perhaps they have a way of retrieving that information



2:56 PM
Nurse Practitioner at Four Women Health Services, Llc

Ok. I appreciate all the info. That site should also be secure.

Read by Patient

Read by ██████████ at 2:57 PM

EXHIBIT B

2:48



Your appointment at Attleboro Women's Health Center has been scheduled for Thursday 11/2/2023 at 9:15am.
Please bring a picture ID. Please call if you are unable to keep your appointment. We are located at 152 Emory Street, Unit #4 in Attleboro. Our telephone number is 508-455-0172. See you then.  Thank you!

Disclaimer:  While all information you share with us is confidential there are inherit risks when submitting information using technology that a third party could read. If you are uncomfortable texting, please call us at 508-455-0172

Exhibit 2

9/19/24, 9:46 AM    Abundant Life Pregnancy Resource Center Mail - You have a new lead from PPC Unplanned Pregnancy - AWHC!

Case 1:24-cv-12288-DJC   Document 46-1   Filed 12/11/24   Page 117 of 145

 Gmail

help help &lt;help@awhc.net&gt;

## You have a new lead from PPC Unplanned Pregnancy - AWHC!

1 message

**Choose Life Marketing** &lt;notifications@mailserve.io&gt;       Sat, Oct 28, 2023 at 9:12 PM
Reply-To: do-not-reply@chooselifemarketing.com
To: "help@awhc.net" &lt;help@awhc.net&gt;



### Congratulations! You just acquired a new lead.

**Submitted Form Data**

| | |
|---|---|
| **First Name\*:** | ▉▉▉▉ |
| **Email\*:** | ▉▉▉▉ |
| **Phone Number\*:** | ▉▉▉▉▉ |
| **Preferred Method of Contact\*:** | Text |
| **Tell us about your current situation...:** | I'm pregnant |

**Page:** PPC Unplanned Pregnancy     **Variation:** Variation A-mobile

# Exhibit 3

Kathleen Hill - November 1, 2024

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3    _____
                                       )
 4    FOUR WOMEN HEALTH SERVICES, LLC, )
                                       )
 5              Plaintiff,             )
                                       )
 6    v.                               )  Civil Action No.:
                                       )  24-12283
 7    ABUNDANT HOPE PREGNANCY RESOURCE )
                                       )
 8    CENTER INC., d/b/a ATTLEBORO WOMEN'S )
                                       )
 9    HEALTH CENTER, CATHERINE ROMAN,  )
                                       )
10    NICOLE CARGES, and DARLENE HOWARD, )
                                       )
11              Defendants.            )
                                       )
12    _____ )

13

14                  Volume: I

15        VIDEOTAPED 30(b)(6) DEPOSITION of Abundant

16    Hope Pregnancy Resource Center, Inc. through

17    KATHLEEN HILL, a witness called by counsel for the

18    Plaintiff, taken pursuant to the Federal Rules of

19    Civil Procedure before Katherine A. Tevnan, RMR,

20    CSR No. 129093 and Notary Public in and for the

21    Commonwealth of Massachusetts, at the Offices of

22    Foley Hoag, 155 Seaport Boulevard, Boston, MA, on

23    Friday, November 1, 2024, commencing at 11:45

24    a.m.
```

Kathleen Hill - November 1, 2024

Page 53

| | | |
|---|---|---|
| 1 | A.   We have Choose Life Marketing, which is | 01:12:24 |
| 2 | the marketing company that on our website the | 01:12:28 |
| 3 | client will -- if they want to make an | 01:12:31 |
| 4 | appointment, they hit a landing page and then | 01:12:32 |
| 5 | they fill out this form and then I receive the | 01:12:35 |
| 6 | form via my e-mail through Choose Life Marketing. | 01:12:38 |
| 7 | Q.   Okay.  And that's what occurred in this | 01:12:42 |
| 8 | case? | 01:12:44 |
| 9 | A.   Yes. | 01:12:44 |
| 10 | Q.   Is that the first point of contact | 01:12:44 |
| 11 | between Jane Doe 5 and Attleboro Women's Health, | 01:12:46 |
| 12 | is that -- | 01:12:48 |
| 13 | A.   Yes. | 01:12:48 |
| 14 | Q.   -- that Choose Life Marketing e-mail? | 01:12:50 |
| 15 | A.   Yes. | 01:12:51 |
| 16 | Q.   What happened after that? | 01:12:51 |
| 17 | A.   So then I called her to get an | 01:12:53 |
| 18 | appointment or just to see -- to respond.  I | 01:13:02 |
| 19 | always say, "We got your e-mail inquiry, so I'm | 01:13:04 |
| 20 | just calling to see how I can help." | 01:13:07 |
| 21 | Q.   How do you know that you were the one who | 01:13:10 |
| 22 | called her and not the nurse? | 01:13:14 |
| 23 | A.   Because I remember this call. | 01:13:16 |
| 24 | Q.   What do you remember about this call? | 01:13:19 |

Kathleen Hill - November 1, 2024

Page 56

| | | |
|---|---|---|
| 1 | Doe 5, did you take notes during this phone call? | 01:16:29 |
| 2 | A.  No. | 01:16:33 |
| 3 | Q.  Do you typically take notes during phone | 01:16:36 |
| 4 | calls in response to e-mail inquiries? | 01:16:38 |
| 5 | A.  I'll write their names down because I'm | 01:16:40 |
| 6 | not great with names, so I want to make sure I | 01:16:43 |
| 7 | can talk to her by her name. | 01:16:46 |
| 8 | Q.  Okay.  All right. | 01:16:55 |
| 9 | I'm showing you a document now that I'd | 01:16:55 |
| 10 | like to have marked as Exhibit 6, I think -- no. | 01:16:57 |
| 11 | 7. | 01:17:03 |
| 12 | (Exhibit 7 marked | 01:17:13 |
| 13 | for identification) | 01:17:15 |
| 14 | Q.  I can represent to you that the first | 01:17:15 |
| 15 | couple of pages are a legal document.  So it's a | 01:17:24 |
| 16 | response to our requests for production in this | 01:17:28 |
| 17 | case.  If they refer to an exhibit, then that | 01:17:32 |
| 18 | exhibit follows after. | 01:17:36 |
| 19 | I'll let you flip through it, if you'd | 01:17:38 |
| 20 | like. | 01:17:44 |
| 21 | A.  Yup. | 01:17:45 |
| 22 | Q.  Have you seen this before? | 01:17:46 |
| 23 | A.  Yes. | 01:17:47 |
| 24 | Q.  What are these documents? | 01:17:48 |

Kathleen Hill - November 1, 2024

Page 57

| | | |
|---|---|---|
| 1 | A.  So the first, this is the e-mail inquiry | 01:17:50 |
| 2 | that we got from Choose Life Marketing.  And the | 01:17:53 |
| 3 | second is a phone log.  And then this is our | 01:17:57 |
| 4 | appointment confirmation.  And then this is what | 01:18:01 |
| 5 | you would see on our eKYROS system. | 01:18:03 |
| 6 | Q.  Okay.  Is this the full extent of the | 01:18:09 |
| 7 | records that Attleboro Women's Health Center has | 01:18:12 |
| 8 | for Jane Doe 5? | 01:18:14 |
| 9 | A.  Yes. | 01:18:15 |
| 10 | Q.  A few weeks after these records were | 01:18:16 |
| 11 | provided, we received a separate voicemail record | 01:18:19 |
| 12 | for Jane Doe 5 that hadn't been produced.  Where | 01:18:22 |
| 13 | do voicemails live? | 01:18:25 |
| 14 | A.  So they can live on our -- we get an | 01:18:27 |
| 15 | e-mail through the voicemail that says that it | 01:18:33 |
| 16 | came in.  So that's where they live. | 01:18:36 |
| 17 | Q.  Do those voicemails get filed on eKYROS | 01:18:43 |
| 18 | or anywhere else? | 01:18:49 |
| 19 | A.  No. | 01:18:50 |
| 20 | Q.  So how are you able to find voicemails if | 01:18:51 |
| 21 | you're -- if you're looking for them now? | 01:18:56 |
| 22 | A.  So now we know that we can get them.  We | 01:18:57 |
| 23 | would go back to the date that we were looking | 01:19:01 |
| 24 | for, and then -- on our e-mails, and then we | 01:19:05 |

Kathleen Hill - November 1, 2024

Page 58

| | | |
|---|---|---|
| 1 | could click on it there and then get a recording. | 01:19:09 |
| 2 | Q.   Okay.  All right. | 01:19:12 |
| 3 | So looking at this page that's in front | 01:19:14 |
| 4 | of you, it says at the top, "You have a new lead | 01:19:17 |
| 5 | from PPC Unplanned Pregnancy - AWHC!" | 01:19:20 |
| 6 | Do you see that? | 01:19:27 |
| 7 | A.   Yup. | 01:19:28 |
| 8 | Q.   Is the help@awhc.net e-mail address the | 01:19:28 |
| 9 | one that you were referring to earlier? | 01:19:32 |
| 10 | A.   It was.  I'm not sure I said it right.  I | 01:19:34 |
| 11 | might have said "org" or "com." | 01:19:37 |
| 12 | Q.   That's fine.  And who has access to this | 01:19:39 |
| 13 | e-mail address? | 01:19:42 |
| 14 | A.   So it would be myself, Morgan Machado, | 01:19:43 |
| 15 | Karen Levesque, and Darlene Howard.  And Leah | 01:19:47 |
| 16 | Machado. | 01:19:59 |
| 17 | Q.   And what is Choose Life Marketing? | 01:19:59 |
| 18 | A.   As far as I understand, they're a | 01:20:04 |
| 19 | marketing company that does ads, and they have | 01:20:07 |
| 20 | this site that -- where women can click on it and | 01:20:17 |
| 21 | send us their information for an appointment.  I | 01:20:20 |
| 22 | really don't know much more than that. | 01:20:23 |
| 23 | Q.   Okay.  So what is your understanding of | 01:20:25 |
| 24 | where this information came from that's in this | 01:20:31 |

Kathleen Hill - November 1, 2024

Page 59

1    e-mail?                                          01:20:35

2        A.   So my understanding is that, through our   01:20:35

3    website, there's a place where women can make an   01:20:38

4    inquiry for an appointment.  And she fills out   01:20:42

5    this form and then it's generated and it arrives   01:20:45

6    in my e-mail box -- inbox.                        01:20:49

7        Q.   In this subject line at the top --       01:20:55

8        A.   Um-hmm.

9        Q.   -- it says "PPC Unplanned Pregnancy."    01:20:57

10   What does PPC stand for?                          01:21:00

11       A.   I don't know.                            01:21:03

12       Q.   Is there anything that you would be able   01:21:12

13   to look at to help remind you what that stands for?   01:21:15

14       A.   No.                                      01:21:19

15       Q.   Is there anyone who you think would know   01:21:20

16   what that stands for?                             01:21:22

17       A.   I would ask Darlene Howard.  If not, then   01:21:25

18   Choose Life Marketing.                            01:21:30

19       Q.   Okay.  At the bottom here, where it says   01:21:31

20   "Page," it says "PPC Unplanned Pregnancy."  What   01:21:36

21   is the PPC unplanned pregnancy page?              01:21:42

22       A.   I don't know.                            01:21:47

23       Q.   Is that a page that's managed by         01:21:53

24   Attleboro Women's Health Center?                  01:21:58

Kathleen Hill - November 1, 2024

Page 60

| | | |
|---|---|---|
| 1 | A. I don't know. | 01:22:00 |
| 2 | Q. So it's possible that it's a different | 01:22:05 |
| 3 | website and not Attleboro Women's Health Center's | 01:22:08 |
| 4 | website? | 01:22:11 |
| 5 | A. I don't know. | 01:22:12 |
| 6 | Q. You don't know whether it's possible or | 01:22:13 |
| 7 | you don't know if it was on Attleboro Women's | 01:22:15 |
| 8 | Health Center's website? | 01:22:18 |
| 9 | A. I don't know. | 01:22:19 |
| 10 | Q. It says, "Variation A-mobile." What does | 01:22:25 |
| 11 | that refer to? | 01:22:31 |
| 12 | A. Where are you -- where are you looking? | 01:22:32 |
| 13 | Q. To the right of "PPC Unplanned | 01:22:36 |
| 14 | Pregnancy," it says, "Variation." At the bottom. | 01:22:38 |
| 15 | Yes. | 01:22:41 |
| 16 | A. Oh, down here? Oh, I don't know. | 01:22:42 |
| 17 | Q. So what are you able to tell us about | 01:22:49 |
| 18 | what this document says about where -- how Jane | 01:22:52 |
| 19 | Doe 5 submitted her information and inquiry to | 01:22:58 |
| 20 | Attleboro Women's Health Center? | 01:23:01 |
| 21 | A. As most as I know is where it says | 01:23:01 |
| 22 | "Choose Life Marketing." | 01:23:04 |
| 23 | Q. And so again, what is the fact that it | 01:23:05 |
| 24 | says "Choose Life Marketing" tell you about where | 01:23:08 |

Kathleen Hill - November 1, 2024

Page 61

1    she submitted this form?                          01:23:10

2         A.   That it would be online.                01:23:11

3         Q.   Would it have been on Choose Life        01:23:13

4    Marketing's website?                              01:23:16

5         A.   I don't know.                           01:23:17

6         Q.   And so, again, you are the designee to  01:23:21

7    speak about the contact with Jane Doe 5, correct? 01:23:25

8         A.   Right.                                  01:23:29

9         Q.   And that would include this initial     01:23:30

10   inquiry form?                                     01:23:31

11        A.   Right.                                  01:23:32

12        Q.   But sitting here today, you don't know  01:23:33

13   the answers to this?                              01:23:35

14        A.   Well, I know about the client, and I know 01:23:36

15   that she reached out to us through that platform. 01:23:38

16   I'm just the user of the information from a client. 01:23:45

17        Q.   Okay.   But you don't know what platform 01:23:47

18   you're referring to?                              01:23:49

19        A.   I just know it's a Choose Life Marketing 01:23:50

20   program that we pay to do our website and have    01:23:53

21   this function.                                    01:23:58

22        Q.   Okay.   To your knowledge, does Choose   01:23:59

23   Life Marketing manage other websites as well?     01:24:05

24        A.   I believe so, yeah.                     01:24:07

Kathleen Hill - November 1, 2024

Page 62

1      Q.   Is it possible that a different website          01:24:08

2    managed by Choose Life Marketing could result in       01:24:10

3    this form coming to Attleboro Women's Health           01:24:12

4    Center?                                                01:24:14

5      A.   I really don't know.                            01:24:14

6      Q.   Do you know that it's not possible?             01:24:15

7      A.   I don't know either way.  I'm just not          01:24:17

8    dialed in on all that stuff.                           01:24:20

9      Q.   Okay.  So at the top here, it says              01:24:21

10   "9:12 PM."  Does that indicate that Jane Doe 5         01:24:28

11   completed the form at 9:12 p.m.?                       01:24:31

12     A.   Yes.                                            01:24:34

13     Q.   And how do you know that?                       01:24:34

14     A.   Because that's what time I know that it         01:24:35

15   registers that the form has been completed.            01:24:38

16     Q.   How do you know that?  Because I can tell       01:24:41

17   that this is when you received this form, but how      01:24:44

18   do you know that that's when the form was              01:24:48

19   completed?                                             01:24:49

20     A.   Oh, what -- I don't.  I just know that          01:24:50

21   that's when we receive it.                             01:24:53

22     Q.   Okay.  So if there was a time delay in          01:24:56

23   receiving these e-mails, you wouldn't know that?       01:25:02

24     A.   No.                                             01:25:04

Kathleen Hill - November 1, 2024

Page 64

| | | |
|---|---|---|
| 1 | Q.  -- they accessed this from?  Okay. | 01:26:18 |
| 2 | Are you aware that Attleboro Women's | 01:26:27 |
| 3 | Health Center's website is no longer accessible | 01:26:29 |
| 4 | to the public? | 01:26:31 |
| 5 | A.  Yes. | 01:26:32 |
| 6 | Q.  Do you have any knowledge as to why that | 01:26:33 |
| 7 | is? | 01:26:35 |
| 8 | A.  Because, from my understanding, the | 01:26:36 |
| 9 | Department of Public Health told us we had to | 01:26:41 |
| 10 | take it down. | 01:26:44 |
| 11 | Q.  Do you know when Attleboro Women's Health | 01:26:48 |
| 12 | Center took down the website? | 01:26:58 |
| 13 | A.  No. | 01:26:59 |
| 14 | Q.  Okay.  Are there any other ways that a | 01:26:59 |
| 15 | client can make an appointment at this time now | 01:27:05 |
| 16 | that the website is down? | 01:27:09 |
| 17 | A.  No. | 01:27:10 |
| 18 | Q.  Have you received any e-mails like this | 01:27:12 |
| 19 | from Choose Life Marketing since the website was | 01:27:15 |
| 20 | down? | 01:27:18 |
| 21 | A.  No. | 01:27:18 |
| 22 | Q.  All right.  So I'm going to show you a | 01:27:23 |
| 23 | document that's been previously marked Exhibit 5. | 01:27:27 |
| 24 | Looking at this document, do you | 01:27:35 |

Kathleen Hill - November 1, 2024

Page 135

1        COMMONWEALTH OF MASSACHUSETTS)

2                                     )

3        SUFFOLK, SS.                 )

4            I, Katherine A. Tevnan, Registered Merit

5        Reporter, Certified Shorthand Reporter No. 129093

6        and Notary Public in and for the Commonwealth of

7        Massachusetts, do hereby certify that KATHLEEN

8        HILL, the witness whose deposition is hereinbefore

9        set forth, was duly sworn by me and that such

10       deposition is a true record of the testimony given

11       by the witness.

12           I further certify that I am neither related

13       to or employed by any of the parties or counsel to

14       this action, nor am I financially interested in

15       the outcome of this action.

16           In witness whereof, I have hereunto set my

17       hand and seal this 5th day of November, 2024.

18

19                           _Katherine Tevnan_

20                           Katherine A. Tevnan,

21                           Registered Merit Reporter

22                           CSR # 129093

23       Notary Public

24       My commission expires March 10, 2028

Exhibit 4

Darlene Howard - November 1, 2024

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3       _____
                                          )
 4       FOUR WOMEN HEALTH SERVICES, LLC, )
                                          )
 5              Plaintiff,                )
                                          )
 6       v.                               )  Civil Action No.:
                                          )  24-12283
 7       ABUNDANT HOPE PREGNANCY RESOURCE )
                                          )
 8       CENTER INC., d/b/a ATTLEBORO WOMEN'S )
                                          )
 9       HEALTH CENTER, CATHERINE ROMAN,  )
                                          )
10       NICOLE CARGES, and DARLENE HOWARD, )
                                          )
11              Defendants.               )
                                          )
12       _____)

13

14

15         VIDEOTAPED 30(b)(6) DEPOSITION of Abundant

16       Hope Pregnancy Resource Center, Inc. through

17       DARLENE HOWARD, a witness called by counsel for

18       the Plaintiff, taken pursuant to the Federal Rules

19       of Civil Procedure before Katherine A. Tevnan,

20       RMR, CSR No. 129093 and Notary Public in and for

21       the Commonwealth of Massachusetts, at the Offices

22       of Foley Hoag, 155 Seaport Boulevard, Boston, MA,

23       on Friday, November 1, 2024, commencing at 10:11

24       a.m.
```

Darlene Howard - November 1, 2024

Page 9

1    assume you understood the question.  Does that          10:13:11
2    make sense?                                             10:13:13
3        A.  Yes.                                            10:13:13
4        Q.  And then if you need a break at any time,       10:13:13
5    please just let us know and we can take a break.        10:13:16
6    The only thing that we'll ask is if there is a          10:13:19
7    pending question, that you answer that question.        10:13:22
8    Does that make sense?                                   10:13:24
9        A.  Yup.                                            10:13:24
10       Q.  Are you currently employed?                     10:13:26
11       A.  I am.                                           10:13:27
12       Q.  And where are you currently employed?           10:13:28
13       A.  Abundant Hope Pregnancy Resource Center.        10:13:31
14       Q.  And what is your role?                          10:13:33
15       A.  I am the executive director.                    10:13:34
16       Q.  Does Abundant Hope go by any other names?       10:13:37
17       A.  Abundant Hope is the organization that I        10:13:44
18   am employed by.                                         10:13:47
19       Q.  Okay.  Does it also go by Attleboro             10:13:48
20   Women's Health Center?                                  10:13:52
21       A.  It is Attleboro Women's Health Center is        10:13:53
22   the medical arm of Abundant Hope.                       10:13:58
23       Q.  What is your day-to-day involvement with        10:14:05
24   the organization?                                       10:14:07

Darlene Howard - November 1, 2024

| | | |
|---|---|---|
| 1 | supporting our assistance to women in the | 10:19:46 |
| 2 | community, whether it be material resources | 10:19:49 |
| 3 | required by many needy families.  Or free medical | 10:19:55 |
| 4 | services to women who think they are pregnant. | 10:20:02 |
| 5 | Q.   What material resources do you provide? | 10:20:12 |
| 6 | A.   We provide a monthly diaper bank which is | 10:20:15 |
| 7 | open to the community.  We serve about 70 babies | 10:20:20 |
| 8 | a month.  We offer free diapers, wipes, formula, | 10:20:24 |
| 9 | baby food, clothing, blankets, furniture. | 10:20:29 |
| 10 | Anything that a woman needs to take care of her | 10:20:36 |
| 11 | child -- children. | 10:20:44 |
| 12 | Q.   And where is all of that stored? | 10:20:44 |
| 13 | A.   In our location in Attleboro. | 10:20:47 |
| 14 | Q.   At 152 Emory? | 10:20:50 |
| 15 | A.   Yes. | 10:20:52 |
| 16 | Q.   And then you said you provide free | 10:20:53 |
| 17 | medical services? | 10:20:55 |
| 18 | A.   Correct. | 10:20:56 |
| 19 | Q.   For women who think they are pregnant? | 10:20:56 |
| 20 | A.   Correct. | 10:20:58 |
| 21 | Q.   What are those free medical services? | 10:20:59 |
| 22 | A.   We do pregnancy testing, limited | 10:21:02 |
| 23 | ultrasounds, STI testing.  That's it. | 10:21:06 |
| 24 | Q.   When you say pregnancy testing, what type | 10:21:17 |

Darlene Howard - November 1, 2024

| | | |
|---|---|---|
| 1 | They are a marketing firm that maintains our | 10:51:12 |
| 2 | website and does our Google ads.  But other than | 10:51:15 |
| 3 | that -- | 10:51:19 |
| 4 |     Q.   You said that they create and maintain. | 10:51:37 |
| 5 | Do they create the language of the website? | 10:51:39 |
| 6 |     A.   Together we did. | 10:51:42 |
| 7 |     Q.   And with regards to the Google ads, did | 10:51:44 |
| 8 | they create the language of the Google ads? | 10:51:47 |
| 9 |     A.   They do and we approve it. | 10:51:50 |
| 10 |     Q.   And so are clients -- the clients are | 10:51:53 |
| 11 | able to make appointments through the, is it | 10:52:19 |
| 12 | AWHC.net? | 10:52:25 |
| 13 |     A.   No.  They reach out to us through the | 10:52:25 |
| 14 | website.  We make an appointment not on an on- | 10:52:28 |
| 15 | line scheduling platform.  We don't have an on- | 10:52:33 |
| 16 | line scheduling platform. | 10:52:36 |
| 17 |     Q.   If I could show you another document, the | 10:52:38 |
| 18 | AWHC Make an Appointment. | 10:52:44 |
| 19 |         (Exhibit 4 marked | 10:52:49 |
| 20 |         for identification) | 10:53:04 |
| 21 |     Q.   Ms. Howard, do you recognize this | 10:53:04 |
| 22 | document? | 10:53:08 |
| 23 |     A.   Yes. | 10:53:09 |
| 24 |     Q.   Is this an image of that, of Make an | 10:53:11 |

Darlene Howard - November 1, 2024

Page 53

| | | |
|---|---|---|
| 1 | A.   Correct. | 11:24:29 |
| 2 | Q.   And who maintains the Abundant Hope | 11:24:30 |
| 3 | website? | 11:24:31 |
| 4 | A.   We until -- April of this year we | 11:24:33 |
| 5 | maintained it ourself.  But now we have someone | 11:24:42 |
| 6 | that has redesigned, an organization that | 11:24:47 |
| 7 | redesigned the website and they are maintaining | 11:24:50 |
| 8 | the Abundant Hope website. | 11:24:53 |
| 9 | Q.   And what is that organization? | 11:24:56 |
| 10 | A.   That's inConcert Web Solutions. | 11:24:56 |
| 11 | Q.   inConcert Web Solutions? | 11:24:59 |
| 12 | A.   Yes. | 11:25:02 |
| 13 | Q.   And you talked about Google ads, what are | 11:25:02 |
| 14 | the Google ads for? | 11:25:06 |
| 15 | A.   The Google ads are ads we pay for to -- | 11:25:08 |
| 16 | have people find our services. | 11:25:16 |
| 17 | Q.   What services do you pay Google ads for? | 11:25:21 |
| 18 | I'm sorry.  That was a really bad question. | 11:25:25 |
| 19 | What services do you advertise on Google? | 11:25:28 |
| 20 | A.   All the services that Attleboro Women's | 11:25:34 |
| 21 | Health Center provides. | 11:25:39 |
| 22 | Q.   Do you advertise the diaper banks on | 11:25:40 |
| 23 | Google? | 11:25:44 |
| 24 | A.   We do not. | 11:25:44 |

Darlene Howard - November 1, 2024

Page 58

1      COMMONWEALTH OF MASSACHUSETTS)

2                                  )

3      SUFFOLK, SS.                )

4          I, Katherine A. Tevnan, Registered Merit

5      Reporter, Certified Shorthand Reporter No. 129093

6      and Notary Public in and for the Commonwealth of

7      Massachusetts, do hereby certify that DARLENE

8      HOWARD, the witness whose deposition is

9      hereinbefore set forth, was duly sworn by me and

10     that such deposition is a true record of the

11     testimony given by the witness.

12         I further certify that I am neither related

13     to or employed by any of the parties or counsel to

14     this action, nor am I financially interested in

15     the outcome of this action.

16         In witness whereof, I have hereunto set my

17     hand and seal this 4th day of November, 2024.

18

19                          _Katherine Tevnan_

20                          Katherine A. Tevnan,

21                          Registered Merit Reporter

22                          CSR # 129093

23     Notary Public

24     My commission expires March 10, 2028

# Exhibit 5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FOUR WOMEN HEALTH SERVICES, LLC,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>ABUNDANT HOPE PREGNANCY<br>RESOURCE CENTER INC. d/b/a<br>ATTLEBORO WOMEN'S HEALTH CENTER,<br>CATHERINE ROMAN, NICOLE CARGES,<br>DARLENE HOWARD, and CHOOSE LIFE<br>MARKETING, LLC,<br><br>　　　　　　Defendants. | Civil Action No.: 1:24-cv-12283-JEK<br>_____ |

## <u>DECLARATION OF MATTHEW PATTON, ESQ.</u>

I, Matthew Patton, on oath depose and state the following:

1.　　　I am an attorney at the law firm of Law Office of Nicholas F. Ortiz, P.C. and a member in good standing of the bar of the Commonwealth of Massachusetts. I am counsel for Four Women in the above-captioned proceeding. I make this declaration based upon my personal knowledge.

2.　　　Attached hereto as **<u>Exhibit A</u>** is a true and accurate copy of an image capturing Abundant Hope Pregnancy Resource Center's website taken on December 3, 2024.

3.　　　Attached hereto as **<u>Exhibit B</u>** is a true and accurate copy of an image capturing Choose Life Marketing's website taken on December 3, 2024.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY December 3, 2024.

*/s/ Matthew D. Patton*
_____
Matthew D. Patton

1

EXHIBIT A



EXHIBIT B

# NextGen Micro-Targeting

## Revolutionizing Pro-Life Outreach with NextGen Micro-Targeting

At **Choose Life Marketing**, we're committed to helping pro-life organizations reach more abortion-minded women through innovative targeted messaging strategies. Our **NextGen Micro-Targeting (NGMT)** service is designed to meet the unique challenges of today's digital landscape by delivering highly precise, data-driven campaigns that reach the individuals who need your services the most.

## What is NGMT?

NextGen Micro-Targeting (NGMT) uses advanced algorithms and real-time data to engage specific audience segments, including young women, single mothers, and low-income families, across various digital platforms like Google, Connected TV (CTV), and display networks. This approach ensures that your message reaches those most at risk for abortion and those searching for life-affirming resources.

## How is NGMT Different?

Traditional advertising relies on broad demographics and fixed placements, but NGMT is dynamic. It adapts in real-time, allowing us to bid for and secure ad placements in the most effective locations, optimizing every dollar spent. Our method leverages demographic, behavioral, geographic, and psychographic data to craft personalized audience segments for precise targeting.

NGMT seamlessly integrates across multiple platforms, including:

- **Google:** Search Engine Marketing (SEM) and Display Networks.
- **Connected TV (CTV):** Streaming services like Sling, Tubi, and more.
- **Programmatic Display Networks:** Reach users across various websites and properties.

## Why Choose NGMT for Your Campaigns?

- **Enhanced Awareness:** Boost visibility for your pregnancy resource center, adoption agency, or maternity home.
- **Improved Engagement:** Connect directly with individuals actively seeking information and assistance.
- **Higher Conversion Rates:** More precise targeting means better outcomes.
- **Cost-Effective Advertising:** Optimize your ad spend to achieve a higher return on investment (ROI).

## Support and Monitoring

At Choose Life Marketing, we believe in offering unparalleled support. From campaign launch to real-time adjustments, we provide:

- **Real-Time Dashboards:** Track key metrics like impressions, clicks, and conversions.
- **Performance Reports:** Get detailed analytics to measure success.
- **A/B Testing:** Optimize your strategy by comparing different approaches.

## Get Started Today!

Our team will work closely with you to identify your target audience, set clear goals, and create a proposal tailored to your needs. Whether you're a pregnancy resource center, adoption agency, or pro-life organization, **NGMT** can elevate your marketing strategy to new heights, helping you save more lives.

Let's innovate together to make a lasting impact and ensure we reach Her when she needs us most.

REACH HER IN TIME

"For I know the plans I have for you," declares the Lord,"plans to prosper you & not to harm you, plans to give you hope & a future."

JEREMIAH 29:11



CONTACT US

## Latest News



### Leveraging Google Ads to Reach More Expecting Mothers

A strategic marketing plan should include a diverse mix of marketing strategies, including both...

*General Information*



### Creating Engaging Social Media Content for Pregnancy Centers

It's hard to believe it's been over 20 years since Facebook began. Since 2004,...

*Digital Marketing* | *Social Media*



[SEO Strategies for Pregnancy Centers: Boost Your Online Visibility](#)

As a pregnancy center with limited time and resources, choosing which marketing initiatives, tools,...

*SEO*





### WHO WE ARE

Our Mission

Our Work

Our Standards

HIPAA Compliance

### WHO WE SERVE

Pregnancy Centers

Pro-Life Organizations

Adoption Agencies

Christian-Led Businesses

Areas We Serve

### BLOG

### PAYMENTS

573-445-9295

info@chooselifemarketing.com

RECEIVE OUR EMAILS

CONTACT US

CAREERS

  

Reach Her™ is trademark of Choose Life Marketing, LLC.

Copyright © 2024 Choose Life Marketing. All rights reserved.