## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

FOUR WOMEN HEALTH SERVICES, LLC.

          Plaintiff,

v.

ABUNDANT HOPE PREGNANCY RESOURCE CENTER INC. d/b/a ATTLEBORO WOMEN'S HEALTH CENTER, CATHERINE ROMAN, NICOLE CARGES, DARLENE HOWARD, and CHOOSE LIFE MARKETING, LLC,

          Defendants.

Case No. 1:24-cv-12283-JEK

*Leave to file granted on June 3, 2025*

## DEFENDANT CHOOSE LIFE MARKETING, LLC's
## REPLY IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

In its response, Four Women implores the Court to indulge in limitless imaginings, to rely on generous inferences detached from, and even contradicted by, its own allegations (and reality). Four Women does not refute the controlling precedent of the First Circuit and the Supreme Judicial Court of Massachusetts, instead urging this Court to adopt and apply inapplicable and out-of-circuit case law and unpublished state trial court decisions. Four Women's case is meritless and must be dismissed.

### ARGUMENT

#### I.    Legal Standard

Four Women notes that "allegations in the complaint must 'be enough to raise a right to relief above the speculative level.'" Dkt. 81 at 7 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007)). But for many elements of its claims, speculation is all Four Women has. For instance, Four Women can only speculate that appointment no-shows are caused by Defendants' speech, despite having no evidence correlating that speech's time, place, or content with absenteeism and despite there being dozens of competing and powerful reasons why people cancel medical appointments. Indeed, Four Women demands that the Court speculate for it, since Four Women failed to allege any context for the no-shows, such as an allegation that the no-show rate is unusual for its operations, despite having that information in its sole control.

Moreover, Rule 9(b) governs Four Women's claims, because both of Four Women's counts are based on Defendants' purportedly misleading speech.[1] The First Circuit has explained that "[t]he circumstances to be stated with particularity under Rule 9(b) generally consist of 'the who, what, where, and when of the allegedly [misleading] representation.' " *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 91 (1st Cir. 2016) (alteration in original) (applying Rule 9(b) to a Ch. 93A claim).

In a theme that continues through its response, Four Women relies on a misleading quotation to try to escape explicit controlling precedent from higher courts. Four Women's reference to *Timmins Software Corp. v. EMC Corp.*, 502 F. Supp. 3d 595, 604 (D. Mass. 2020) is the first act of many. Four Women states "[w]here a Chapter 93A claim is predicated 'purely' on allegations beyond intentional and false statements, Rule 9(b) applies." Dkt. 81 at 8 (citing *Timmins*). But *Timmins* did not purport to limit Rule 9(b) in this way—the *Timmins* Court was discussing another

---

[1] Four Women argues as to Rule 9(b) that its allegations of "publishing misleading advertising" and "manipulating advertising," and "developing access points on other websites resulting in 'new leads,'" Dkt. 81 at 8, put this case beyond "beyond intentional and false statements." But these are all still speech, merely amplified or delivered in different venues. And Four Women offers no explanation for how Choose Life providing "new leads" to Attleboro would violate either the Lanham Act or Ch. 93A, nor did it raise this in its causes of action (Dkt. 59 at ¶¶ 181-201).

case which it describes "was founded purely on allegations of 'intentional and malicious false statements.'" *Timmins*, 502 F. Supp. at 604. There is no rule that Rule 9(b) only applies if a claim is "purely" based on such statements, contrary to Four Women's imaginings. Rather, Rule 9(b) applies to "[c]ases alleging fraud—and for this purpose, misrepresentation is considered a species of fraud." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). Four Women alleges various "misrepresentations" underly its complaint (*see, e.g.,* Dkt. 59 at Section V, titled "Defendants' Misrepresentations Target Four Women Patients."). Therefore, it must meet the heightened pleading standards of Rule 9(b). But it fails to do so.

Rule 9(b) is designed to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir.1996). "Where multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)." *Loan v. Fed. Deposit Ins. Corp.*, 717 F. Supp. 964, 968 (D.Mass.1989).

Here, though, Four Women does not do the work it must. For instance, the complaint alleges that "Defendants' statements create [a] false impression." Dkt. 59 at ¶ 125. It describes no role played by the individual defendants at all. It blames Choose Life for placing advertisements (*id.* at ¶ 66-72), but says Abundant Hope approved them (*id.* at ¶ 75) and did not provide the court with screenshots or the content of those advertisements.[2] It attributes the website to Choose Life

---

[2] *See Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013). ("A plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings and expect his action to survive a motion to dismiss or, indeed, to escape admonishment.") Four Women offers no explanation for why it misleadingly omitted the Attleboro website disclaimer in its exhibits. Dkt. 68 at 3 n.3.

(*id.* at ¶ 76), but also says Abundant Hope had control over it (*id.* at ¶ 180). And, it never provides

a date for when the advertisements ran. *See id.* at ¶ 121-122.

With these gaps, each defendant is left wondering, "What exactly did *I* say wrong, when

did I say it, and where?" Four Women does not answer these questions and thus does not meet its

Rule 9(b) burden.

## II. Plaintiff's claim under M.G.L. c. 93A fails because Choose Life is not engaged in the "trade" or "commerce" required for that law to apply.

Four Women tries and fails to evade the parallels between this case and *Planned

Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480 (1986).

Here, an abortion clinic has sued a pro-life clinic for providing free pregnancy-related services,

including medical services, just like in *Planned Parenthood*. Here, the abortion clinic asserted a

violation of Ch 93A § 11, just like in *Planned Parenthood*. And here, the Court should reject the

claim, just like in *Planned Parenthood*.

Four Women's first evasive maneuver is to mischaracterize Choose Life's arguments. Four

Women alleges that Choose Life believes nonprofits are *per se* exempt from Ch. 93A. Dkt. 81 at

10. Choose Life never argued this point. *See* Dkt. 68 at 5-8. And the fact that Abundant Hope

threatened suit under Ch 93A is no matter: the First Circuit has already held that a nonprofit organization "engaged in a key part of its core mission" and "not motivated by a desire to make

money" can sue as a plaintiff under § 11. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582

F.3d 156, 193 (1st Cir. 2009); *see also* 52 Mass. Prac., Law of Chapter 93A § 5.7.50 ("A charitable

organization may be a plaintiff under either § 9 or § 11 if it is pursuing its core mission rather than

the desire to make money.") The fact that Abundant Hope threatened suit is entirely consistent

with Choose Life's actual arguments.

The second evasive maneuver is to cite a perfunctory, unpublished—and apparently impounded[3]—trial court order of roughly one page of text with no precedential value, *Doe v. Clearway Clinic*, No. 23-cv-708 (Super. Ct. Jan. 24, 2024). Even if this threadbare order provided some useful insight in this matter, obviously a trial court cannot overrule the Supreme Judicial Court.

The third evasive move is a cavil. Four Women claims that *Planned Parenthood* did not involve false advertising and argues that it did not involve ultrasounds. This is nonsensical. First, Planned Parenthood asserted the same provision of c. 93A at issue here against the pregnancy center in that case, and that section sounds in false advertising and deceptive practices. Moreover, the use of the "PP" mark by the pregnancy center alleged in *Planned Parenthood* clearly falls within the realm of deceptive practices and false advertising, for the use of the "PP" mark was alleged to deceive patients into thinking that the pregnancy center was actually Planned Parenthood—especially in view of the fact that patients had to physically walk past the pregnancy center to get to the Planned Parenthood clinic. Second, the fact that the pregnancy center in *Planned Parenthood* offered "pregnancy tests, pregnancy counseling advice and other services relative to pregnancy" (*id.* at 493)—instead of pregnancy testing, counseling, and limited obstetric ultrasound[4]—is a distinction without a difference. The fact that pregnancy centers over the past four decades have evolved to offer pregnancy confirmation via ultrasound, in addition to traditional confirmation via pregnancy tests and their menu of other healthcare and medical services,

---

[3] Prior to filing the Motion to Dismiss, one of Choose Life's lawyers attempted to access the decision in *Clearway* by contacting the trial court clerk. He was denied access because the case had been impounded. Massachusetts Uniform Rules on Impoundment Procedure 13(c) states "All persons shall protect the confidentiality of the impounded material. During any hearing or trial in public sessions, a filer shall not disclose impounded material, provided that in cases where such disclosure is necessary, a filer shall notify the clerk in advance and shall, in appropriate cases, make such disclosures in a manner which protects the confidentiality of the impounded material." It is unknown how Four Women obtained a copy of that impounded decision, or whether filing that decision on a public docket is a violation of Massachusetts court rules.

[4] See Dkt. 59-1, at 2 ("We offer pregnancy confirmation through free limited obstetrical ultrasound scans.")

does not change the underlying nature of these charitable organizations and their offerings. The Supreme Judicial Court has placed the free, charitable offering of these services outside the reach of Ch. 93A.

Four Women did not quote the Supreme Judicial Court's reasoning in *Planned Parenthood*. And for good reason: the Court did not mince words when it held that "the Legislature intended to exclude the [free of charge] activities engaged in by a corporation such as [defendant pro-life clinic] from the reaches of c. 93A." *Planned Parenthood*, 398 Mass. at 494. The First Circuit is in accord. *See Squeri v. Mount Ida Coll.*, 954 F.3d 56, 73 (1st Cir. 2020) (describing *Planned Parenthood* as "determining that a charitable corporation, which had engaged in advertising of its services, was not engaged in trade or commerce").

Four Women's evasive maneuvers must fail. *Planned Parenthood* governs this case, and this Court must therefore dismiss the c. 93A claim. *See Needleman v. Bohlen*, 602 F.2d 1, 3 (1st Cir. 1979) ("We, of course, are bound by the SJC's rulings on Massachusetts law."); *see also* 52 Mass. Prac., Law of Chapter 93A § 12.8.50 ("[C]ontrolling decisions of the SJC govern in all federal courts.").[5]

Moreover, there is no need for further factual development, because "[a]lthough whether a particular set of acts . . . is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 54 (1st Cir. 1998). This case is ripe for dismissal.

### III. Plaintiff Cannot Sue Choose Life Under M.G.L. 93A § 11 Because They Have No Commercial Relationship.

---

[5] Four Women advances other equally faulty arguments to stretch the bounds of Ch. 93A, including the purported existence of a business context (Dkt. 81 at 12), competition (*id.* at 13), an economic motive (*id.* at 14). Choose Life has aligned this reply with its original motion to dismiss for the Court's convenience and addresses these issues elsewhere.

*Commercial transaction.* Citing *Lantner v. Carson*, 374 Mass. 606, 611 (1978), Four Women asserts that simply operating in a business context is enough for a § 11 claim to survive. Dkt. 81 at 12-–14. Four Women is wrong because it mistakes a necessary condition for a sufficient one. Courts across the board—state trial courts, the Massachusetts Supreme Judicial Court, federal district courts, and the First Circuit—agree: a *transaction* between the parties must be pleaded for an unfair and deceptive business practices claim to proceed.

"[C]laims under § 11 require not only that the defendant's conduct occur in 'trade or commerce' but also that there be a commercial transaction between the parties." *Rafferty v. Merck & Co., Inc*., 479 Mass. 141, 162 n.7 (2018). A commercial relationship between the parties is "an additional fifth element" that plaintiffs must plead. *Liberty Mutual Insurance Company v. Thurber*, 2022 WL 2191692, at *2 (D. Mass. 2022). Without it, § 11 simply does not apply. *Arthur D. Little, Inc. v. E. Cambridge Sav. Bank*, 35 Mass. App. Ct. 734, 743 (1994). The Supreme Judicial Court has stressed that such a relationship is a "precursor to liability." *John Boyd Co. v. Boston Gas Co.*, 775 F. Supp. 435, 440 (D. Mass. 1991).

To establish a commercial relationship, a plaintiff "must allege some sort of transaction" with the defendant. *L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc*., 121 F. Supp. 2d 147, 152 (D. Mass. 2000). Courts routinely dismiss complaints that fail to allege such a transaction. *See, e.g., Laverty v. Massad*, 2009 WL 10730424, at *10 (D. Mass. June 23, 2009); *Breneman v. Wolfson*, 62 Mass. App. Ct. 1115 (2004) ("disregard[ing]" plaintiff's claim because defendants had "no contractual or business relationship with the plaintiffs"). This Court has made clear that transactions are essential. *John Beaudette, Inc. v. Sentry Ins. A Mut. Co.*, 94 F. Supp. 2d 77, 124 (D. Mass. 1999) ("Federal courts . . . require a transactional business relationship between the parties in order to maintain a section 11 claim."). Indeed, this Court has already rejected Four Women's flawed

logic, stating that reading § 11 to not require a pleaded transaction is a "novel argument" that "tests the limits of common sense." *Cash Energy, Inc. v. Weiner*, 768 F. Supp. 892, 894 (D. Mass. 1991).

In the face of this consistent and enduring precedent, Four Women jumps to arguing that Defendants operate in a "business context." But this is an unnecessary burden on the Court. "The applicability of [§ 11] to [an] interaction between two parties requires a dual inquiry: *first*, the court assesses whether the interaction is 'commercial' in nature" because "§ 11 requires that there be a commercial transaction" between them. *Linkage Corp. v. Trs. of Bos. Univ.*, 425 Mass. 1, 22–23 (1997) (cleaned up, emphasis added). "Once it has been established that a commercial transaction exists, *then* the court addresses whether the individuals were acting in a 'business context.'" *Id.* (emphasis added); *see also Stop & Shop Supermarket Co. v. Loomer*, 65 Mass. App. Ct. 169, 175 (2005) (business context is examined "only after" a transaction is shown).

This Court should dismiss Four Women's complaint because there are no facts or inferences establishing the required transactional element. Four Women unambitiously asserts that its allegations are sufficient "at this early stage." Dkt. 81 at 14. But Four Women cannot clear even that bar. To the contrary: Four Women's conspiratorial first complaint flopped, Four Women took discovery and was given a second attempt to clear the bar, only to flop again. The complaint is ripe for dismissal. No further factual development is necessary.

***Business context.*** The absence of a business transaction is dispositive. But even if there were one, Defendants' actions did not occur in a business context. Four Women concedes that "'trade or commerce,' [is] defined as 'those acts or practices which are perpetrated in a business context.'" Dkt. 81 at 12 (citing *Lantner v. Carson*, 374 Mass. 606, 611 (1978)). Yet despite its best efforts, Four Women fails to identify a single controlling authority holding that core nonprofit

activities like those at issue here—or acts in support of such activities—occur in a "business context."

First, in its attempt to show that providing services without an exchange for some consideration can nonetheless fall within a business context, Four Women cites *27th Lancers Drum & Bugle Corps., Inc. v. 27th Lancers Found., Inc.*, 100 Mass. App. Ct. 1116 (2021). Dkt. 81 at 12. But Four Women omits that in *27th Lancers*, the defendant impersonated the plaintiff and competed with it by holding events "identical" to plaintiff, "sold merchandise without the [plaintiff's] permission," "and eventually made a modest profit." *Id.* at *1-2. The court imposed liability not because of competition, but because the defendant was "seeking to profit from unfair practices." *Id.* at *3 (citations omitted). Here, by contrast, Defendants do not compete with Four Women's abortions at all (*see* Dkt. 68 at 18), does not impersonate Four Women[6], and Four Women has no authority supporting its illogical supposition that offering free services can constitute a profitable business model.

Second, Four Women twists authority with its next "business context" theory. Dkt. 81 at 13. There, it egregiously misrepresents both *Graham v. Just A Start Corp.*, 2011 WL 3524405 (Mass. Super. Aug. 4, 2011), and *Planned Parenthood*. In *Graham*, the court found a predicate transaction between the parties, a low-income individual whose home was allegedly structurally damaged by general contracting-type work of a nonprofit employee. *Graham*, 2011 WL 3524405 at *11. Four Women claims that *Graham* supports its argument that, "Massachusetts courts have recognized that the 'provision of no-fee pregnancy related services falls under G.L. c. 93A, § 1's definition of trade and commerce as 'distribution of services.'" This is utterly false. The *Graham*

---

[6] And the pregnancy center in *Planned Parenthood* could fairly be charactered as impersonating Planned Parenthood via the significant confusion it created by misuse of the "PP" mark—but even this was not enough to bring the pregnancy center's activities into a "business context."

Court held the *exact opposite*, recognizing instead the continued effectiveness of *Planned Parenthood* and its teaching that an "organization motivated by pro-life policy that did not charge fees for its pregnancy-related services [is] *not engaged in trade or commerce*." *Id.* (emphasis added). And no Massachusetts court has ever held to the contrary—in fact, the section of Planned Parenthood cited by Four Women was from the *dissent*, not the majority opinion. The Supreme Judicial Court *precisely rejected* Four Women's theory that free pregnancy-related services fall under Ch. 93A. *Planned Parenthood*, 398 Mass. at 495.

Third, Four Women asserts that it alleged only that Abundant Hope *advertises* free services—not that it *provides* them for free—and thus Abundant Hope supposedly maintains a profit motive. Dkt. 81 at 14. This assertion is manifestly false. The Amended Complaint repeatedly references Abundant Hope's offering of free services, and it solely challenges alleged licensure issues, never once questioning the fact that the relevant services are provided at no cost. *See, e.g.,* Dkt. 59 ¶¶ 12, 40, 125, Dkt. 59-1, *passim* (Attleboro website noting all services are free). Moreover, Four Women's complaint cites Abundant Hope's Form 990s from 2022 and 2023. Dkt. 59 ¶¶ 63-64. Those forms report exactly $0 in "program service revenue." *See Butler v. Balolia*, 736 F.3d 609, 611 (1st Cir. 2013) (supplementing facts in complaint "by examining documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice") (cleaned up).

Four Women took three swings and struck out. *Planned Parenthood* remains directly on point. There, the SJC observed that the Legislature had defined the words "trade" and "commerce" in Ch. 93A § 1(b). Those definitions "indicate[] an intent that the services be distributed *in exchange for some consideration* or that there must be other strong indications that the services are distributed in a business context." 380 Mass. at 493 (emphasis added). And since every nonprofit

inevitably interacts with a for-profit enterprise at some point, "a nonprofit defendant will not be considered engaged in trade or commerce when it 'undertakes activities in furtherance of its core mission.'" *Kunelius v. Town of Stow*, 588 F.3d 1, 18 (1st Cir. 2009). As for Choose Life, Four Women offers no authority showing that Ch. 93A liability can apply to a third party assisting a nonprofit in advertising "activities in furtherance of [a nonprofit's] core mission." And "Chapter . . . 93A [does] not explicitly enumerate a private 'aiding and abetting' liability." *In re TelexFree Sec. Litig.*, 358 F. Supp. 3d 98, 103 (D. Mass. 2019). For good reason: this contrived theory results in a limitless expansion of Ch. 93A liability. If it were correct, Four Women could also sue Google for displaying the advertisements, a landlord for hanging the Attleboro sign, and a web host for providing the Attleboro website.[7]

**Injection theory**. Four Women alleges that despite no transaction and no business context, Choose Life nonetheless interfered with trade or commerce. Dkt. 81 at 16.[8] But none of the cases it cites show that Choose Life is liable.

For example, in *Gillette Co. v. Provost*, 2017 WL 2292748 (Mass. Super. Apr. 19, 2017), the court held that filing a baseless claim against an opponent could be an unfair trade practice violating Ch. 93A. *Id.* at \*10. In *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 193 (1st Cir. 2009) the First Circuit affirmed liability under Ch. 93A where a pharmaceutical company published false and inflated prices it knew insurance firms would base their rates on, causing a windfall for the company and its customers. And in *First Enters., Ltd. v. Cooper*, 425

---

[7] Additionally, Four Women invites this Court to follow bad precedent from other circuits (Dkt. 81 at 15), rather than controlling precedent from the Massachusetts Supreme Judicial Court in *Planned Parenthood*. For reasons described elsewhere (*see* Section V.a, *infra*), the Court should reject the invitation.

[8] Implicitly recognizing that the Abundant Hope is a nonprofit lacking profit motives, Four Women only asserts that Choose Life, and no other defendant, has interfered with trade or commerce (Dkt. 81 at 16), despite addressing its arguments against all defendants elsewhere.

Mass. 344, 347 (1997), the Supreme Judicial Court recognized that a defendant could inject itself into trade or commerce by "making a false statement on which another business relied to its detriment," but found no such reliance and vacated the denial of the motion to dismiss. *Id*. at 348.

But Choose Life did not file a baseless lawsuit. Nor did Choose Life orchestrate a price fixing scheme. And Choose Life made no statements that Four Women relied on. Choose Life has not injected itself into Four Women's business, and it thus cannot be held liable under this theory.

***Unfair competition.*** Four Women assumes without arguing that Defendants "compete with for-profit medical providers [Four Women] in the same market." *See* Dkt. 81 at 13. As previously explained (Dkt. 68 at 9), they are not in the same market—Defendants are not in a "market" at all—nor are they commercial competitors. Four Women principally markets its for-profit abortion services, and it provides other pregnancy services on a for-profit basis. Defendants do not provide abortions at all, and Abundant Hope provides all of its services free of charge. And any woman visiting Abundant Hope remains a potential client for Four Women, should its own speech persuade her (*see* Dkt. 59 at ¶ 157, ¶ 171) (Jane Doe 1 visited Abundant Hope and then became a Four Women client). As for Choose Life, it doesn't provide pregnancy services at all.

The First Circuit has held that parties serving different markets are not competitors. *See Ray v. Ropes & Gray LLP*, 961 F. Supp. 2d 344, 361 (D. Mass. 2013), *aff'd*, 799 F.3d 99 (1st Cir. 2015) (rejecting plaintiff's theory that defendant law firm unfairly competed with his future employers by denying him a letter of recommendation, determining that the firm did not compete with the academic institutions or government entities where plaintiff applied to work). Unsurprisingly, Four Women fails to identify a single case in the fifty-year history of Ch. 93A showing that competition exists between parties in unrelated markets, or between a company and an individual. In fact, the Supreme Judicial Court has already considered and rejected the idea that pregnancy

centers compete under Ch. 93A with abortion clinics that offer paid pregnancy services. *See Planned Parenthood,* 398 Mass. at 499 (Abrams, J., dissenting in relevant part because the majority rejected her conclusion that defendant pro-life clinic competed with plaintiff abortion clinic by offering free pregnancy-related services).

Four Women's theory is dangerous as well. An individual could "unfairly compete" by posting a salacious review that a restaurant thinks is false, or a restaurant could "unfairly compete" by playing loud music near a bookstore. "[Four Women's] position, if accepted, would run the danger of converting any tort claim against a business into a Chapter 93A claim." *L.B. Corp. v. Schweitzer-Mauduit Intern., Inc.*, 121 F. Supp. 2d 147, 152 (D. Mass. 2000).

## IV. Plaintiff Fails to Allege that Choose Life Performed Any Unfair or Deceptive Acts Under Ch. 93A § 11.

### a. Choose Life's actions were noncompetitive, fair, and truthful.

Four Women does nothing to counter the simple fact that Choose Life, a marketing agency, does not compete with Four Women, an abortion clinic, since a woman's interest in advertisements (particularly from a firm specializing in pro-life advertisements) is orthogonal to her interest in an abortion. *See infra* Section III. As Choose Life already noted, no statement says Abundant Hope offers abortions (in fact, statements on every webpage says the opposite), and no statement offers a service that Abundant Hope does not truly offer. Dkt. 68 at 12-13. And Four Women still cannot point to any statement that was actually false. *See* Dkt. 81 at 26.

Four Women turns to arguing that the statements are misleading, despite being true. Dkt 81 at 26. It cites *Exxon Mobil Corp. v. Att'y Gen.*, 479 Mass. 312, 320 (2018) (a suit brought by the attorney general under Ch. 93A § 6) and *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381 (2004) (a § 9 class action). Four Women cites no § 11 authority, despite this being a pure § 11 case. Dkt. 59 at ¶ 201. Even so, in *Aspinall,* the SJC clarified that "an advertisement is deceptive

when it has the capacity to mislead consumers, acting reasonably under the circumstances." *Id.* at 396. This Court has already held that reasonable consumers read disclaimers. *DiCroce v. McNeil Nutritionals, LLC*, 640 F. Supp. 3d 182, 188 (D. Mass. 2022), *aff'd* 82 F.4th 35 (1st Cir. 2023) (citing *Aspinall* and dismissing with prejudice plaintiff's claim that labeling was misleading). And here, the Attleboro site clearly states that it does not provide abortions, and its advertisements have a disclaimer as well. Dkt. 68 at 4, 25.

### b.  Plaintiff has only alleged speculative harm.

In its motion to dismiss, Choose Life emphasized a foundational principle: a Chapter 93A claim requires "a separate, identifiable harm arising from the regulatory violation that is distinct from the claimed unfair or deceptive conduct itself." *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 9 (1st Cir. 2017) (cleaned up). Four Women does not dispute this—it quotes it. Dkt. 81 at 27. Four Women concedes as it must that a freestanding (alleged) health code violation cannot sustain a Ch. 93A claim.

Further, Four Women does not even attempt to explain how its harms are anything other than a non-compensable market share loss. *See IDT Telecom, Inc. v. Voice Distributors, Inc.*, 2008 WL 1800102, at *1 (Mass. Super. Apr. 11, 2008). Instead, Four Women pivots to a fallacious legal theory, built on a glaring misreading of precedent.

This case is a business-to-business § 11 claim under Ch. 93A. Dkt. 59 at ¶ 193; *compare* Mass. Gen. Laws Ann. ch. 93A, § 9 (allowing suit by "[a]ny person, other than a person entitled to bring action under section eleven of this chapter, who has been injured…"), *with* Mass. Gen. Laws Ann. ch. 93A, § 11 (allowing suit by "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal."). And in a § 11 claim, a plaintiff may only recover for "loss of money or property." *Id.* This means that the losses must be tangible. In a § 11 claim, "'[m]oney' means money, not time, and 'property' means the

kind of property that is purchased or leased." *Arthur D. Little, Inc. v. Dooyang Corp*., 147 F.3d at 56 (cleaned up). "Loss of money or property does not include . . . false advertising." 52 Mass. Prac., Law of Chapter 93A § 8.3.

Four Women's only retort to this clear teaching is that its harm "need not be quantifiable." Dkt 81. at 27. But Four Women cites only § 9 cases, *not* business-to-business § 11 cases, for that proposition. *See* Dkt. 81 at 27 (citing *Ortiz v. Eversource Energy,* 2025 Mass. Super. LEXIS 19, at *7 (§ 9 claim failing to allege *any* harm distinct from the alleged unfair or deceptive conduct itself) and *Chery v. Metro. Prop. & Cas. Ins. Co.*, 79 Mass. App. Ct. 697, 700 (2011) (§ 9 claim alleging nonquantifiable *emotional distress*)). In a business-to-business § 11 claim, and the notion that a business could recover for unquantifiable harms such as emotional distress is not just unsupported, it is untenable. Although Four Women wishes it could show less (*see* Dkt. 81 at 28 (pointing to its newly alleged Ch. 93A reputational harm)), Ch. 93A requires more. Four Women has not pleaded the harm it must for its claim to survive.[9]

### c. Choose Life did not proximately cause the alleged (speculative) harm.

Four Women quotes *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016), in analyzing causation. Dkt. 81 at 28. It agrees with Choose Life that *Walsh*, which states "[a] plaintiff's failure to establish both factual causation and proximate causation is fatal to her Chapter 93A claim," governs its claim here. *See also Mitzan v. Medview Servs., Inc.*, 1999 WL 33105613, at *9

---

[9] In a footnote, Four Women makes the overreaching assertion that by not discussing harm in the context of the Lanham Act claim, Choose Life somehow admits that harm was sufficiently pleaded there. This is too clever by half. "The elements of a [business-to-business] Chapter 93A claim overlap with those of a Lanham Act false advertising claim." *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 487 (1st Cir. 2022) (cleaned up). Here, since there is no Ch. 93A harm, there is no Lanham Act harm either. Choose Life admitted nothing.

(Mass. Super. June 16, 1999) (holding "[t]hat there may be a causal connection between [defend-ant's] conduct and damage to the [plaintiff] is not itself sufficient to sustain a cause of action under Chapter 93A").

Begging the Court's indulgence for its shortfalls, the most Four Women can muster is the observation that some clients reconsider going through with an abortion and become appointment no-shows. Dkt. 81 at 28. But there are thousands of reasons why a woman may not attend an appointment. Perhaps a woman's First Amendment-protected conversations with her boyfriend or husband, mother, father, doctor, pastor, friend, children, siblings, neighbor, or coworker persuaded her to continue her pregnancy—*i.e.*, she made a free and informed decision to parent her child. Perhaps she read reviews of Four Women versus other area abortion facilities. Perhaps she com-pared prices and insurance coverage and decided to go to another abortion facility. Perhaps it snowed on the day of her appointment, or she fell ill, or she had a work conflict, and rescheduled. There is no well-pled basis for the allegation that Choose Life's internet postings proximately caused whatever no-shows Four Women allegedly experienced.

Moreover, Four Women makes only a bare statement that "on a regular basis, women who have scheduled appointments with Four Women do not show up for their appointments." Dkt. 59 ¶ 178. But this provides no insight to support the inference it demands. How often is "regular"? How many no-shows each time? Were the appointments for services Abundant Hope offers? What was the result of follow-up efforts with these individuals?

Four Women does not even hazard a guess, despite that information being entirely within its own control. As its Amended Complaint notes, the Attleboro website was taken down in Sep-tember 2024. Dkt. 59 at ¶ 92 (n.17), while the Amended Complaint was filed in January 2025. Four Woman has exclusive knowledge of its appointment metrics pre- and post-takedown, and

presented none of it to the court.  "Like Conan Doyle's dog that did not bark, this silence says much." *Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 183 (1st Cir. 2024).

Four Women asks the Court to do the work for it, invoking *IDT Telecom, Inc. v. Voice Distributors, Inc.*, No. 072465, 2008 WL 1800102 (Mass. Super. Apr. 11, 2008). That case allowed an inference of causation among market competitors, but it is inapplicable here. First, Choose Life is not a market competitor. Second, while it's true that some losses may be inferred, that inference is limited to situations "where the defendant is the only competitor in a two-firm market." *Id*. at *2. The court there contrasted a "two-firm market" with ones "where there are other competitors in the market," because in the latter cases, "it cannot confidently be inferred that any customers procured by defendant's false advertising were at plaintiffs' expense." *Id*. Four Women's complaint acknowledges that there are multiple other abortion clinics in its area (Dkt. 59 at ¶ 36), and indeed there is another clinic just fourteen miles away[10] and an OBGYN two miles away.[11] It is far from a reasonable inference to assume that Choose Life and its internet postings are responsible for Four Women's presumed, unquantified, noneconomic, intangible (and thus non-compensable) market share loss, particularly where Four Women has pleaded no basis which could have moved its allegations from speculation to plausibility.

"A pleader is entitled to have reasonable inference drawn in his favor, but he is not entitled to the benefit of speculation unanchored to sufficiently supportive facts." *Alston v. Spiegel*, 988 F.3d 564, 578 (1st Cir. 2021) (adding that allegations that "may be within the realm of possibility"

---

[10] https://tinyurl.com/4xssat3e (showing fourteen miles between Four Women and a nearby Planned Parenthood). Courts regularly take judicial notice of distances calculated using Google Maps. *See United States v. Vick,* 742 F. Supp. 3d 79, 92 (D. Mass. 2024) (calculating distance on Google Maps) (citing *Rindfleisch v. Gentiva Health Sys.*, 752 F. Supp. 2d 246, 259, n. 13 (E.D.N.Y. 2010) as stating that "[c]ourts commonly use internet mapping tools to take judicial notice of distance and geography.")

[11] https://tinyurl.com/2jr5w8d9 (showing two miles between Four Women and a nearby OB/GYN).

did not support a reasonable inference). Four Women's imagination has run wild, and it cannot force Choose Life to exhaust itself playing make-believe too. Four Women failed to allege the required elements of its claims. Because there are no reasonable inferences that can fill the gap, Four Women's complaint must be dismissed.

### V. Choose Life's Speech Is Not "Commercial Advertising or Promotion" Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

In its motion, Choose Life showed that actionable "commercial advertising or promotion" must "(a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce." *Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 19 (1st Cir. 2003). Four Women does not dispute this standard. Dkt. 81 at 18.

#### a. Choose Life's Statements Are Not "Commercial Speech"

Four Women concedes that commercial speech is "speech which does 'no more than propose a commercial transaction.'" Dkt. 81 at 18 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). This simple, straightforward standard is fatal to Four Women's complaint, because its papers confirm that Abundant Hope engages in no commercial transactions, and Choose Life's online speech merely informs others about Abundant Hope's noncommercial services. *See* Dkt. 59 ¶ 40; Dkt. 59-1 at 2 (Abundant Hope website, stating "Our services are free."). Confronted with this fatal contradiction, Four Women resorts to misdirection, because the facts it pleaded are dispositive against it. Even then, Four Women fails to identify a *single case* where a Lanham Act claim has succeeded on this contrived theory.

Four Women grossly misrepresents Choose Life's argument. It attacks a strawman, claiming Choose Life argues that a nonprofit's speech is categorically immune from Lanham Act scrutiny. Dkt. 81 at 18–19. But Choose Life made no such claim. *See* Dkt. 68 at 16–17. In fact, Four

Women's own cases affirm Choose Life's actual (and correct) argument: for the Lanham Act to apply, the speech must be commercial. Four Women's misrepresentation distracts from this clear and controlling principle.

Even so, the cases Four Women invokes support Choose Life. In *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251 (4th Cir. 2017), the court held that a nominally-nonprofit entity acted as a for-profit when it used false statements to divert business to its fee-paying clients. That case simply reaffirms the uncontroversial rule: when a nonprofit acts like a for-profit, its speech may be treated as commercial. At the same time, *Handsome Brook* emphasized that "certainly, the identity of the speaker [as a nonprofit or for-profit] factors into the reasonable recipient's perception of economic motivation." *Id*. at 258.

Four Women goes all-in on *First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017)— an abandoned, anomalous outlier, issued prior to the Supreme Court's repudiation of the Ninth Circuit's pregnancy center speech analysis in *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 585 U.S. 755 (2018). In *First Resort*, a pregnancy center challenged a compelled-speech ordinance. *Id*. at 1268–70. Noting that its employees received bonuses for bringing in clients for free services (*id.* at 1273), the Court held that the center's advertising could be deemed commercial because of its latent economic motivations, including fundraising success tied to client numbers. *Id*. at 1273–74.

But no court in this circuit has followed that aberrant logic from *First Resort.* And the only circuit court citing *First Resort* outside of its home circuit explicitly rejected it. *See Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108 (4th Cir. 2018) (finding that a nonprofit pro-life clinic's "clearest motivation is not economic but moral, philosophical, and religious. It provides free services and collects no fees. And after

extensive discovery, the only evidence the City can muster in support of its contention that the Center is economically motivated is its assertion that the Center's 'fundraising efforts . . . depend on its ability to attract clients.'. . . Without more, the relationship here between clinic patronage and fundraising is too attenuated to amount to 'economic motivation.'").

Even in the Ninth Circuit, *First Resort* is on life support. In *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021), the court summarized *First Resort* only as standing for the limited proposition that "indirect benefits, such as benefits to employee compensation," might transform free-service advertising into commercial speech—making no mention of fund-raising. And Four Women has made no allegations regarding employee compensation here.

District courts in the Ninth Circuit have also shown no appetite for *First Resort*'s reasoning. It has been cited 22 times in district court opinions in that circuit, but never to support the radical idea that nonprofits become commercial actors merely by raising funds based on their mission successes.[12]

There are good reasons for this. First, *First Resort* cannot be reconciled with the Supreme Court's enduring definition of commercial speech. *See, e.g., Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (commercial speech is "expression related solely to the economic interests of the speaker and its audience"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) ("[B]ecause charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information

---

[12] One district court characterized *First Resort* as teaching that a pregnancy clinic's "advertisements to non-paying recipients" were commercial speech "because they were about the provision of medical services." *Nat'l Inst. of Fam. & Life Advocs. v. Bonta*, 2025 WL 1140450, at *5 (C.D. Cal. Mar. 6, 2025). That court acknowledged that *First Resort* may be wrongly decided but was nonetheless binding. Plaintiff has appealed**.** *Nat'l Inst. of Family & Life Advocs. v. Bonta*, No. 2:24-cv-08468, Dkt. No. 52 (C.D. Cal. Apr. 7, 2025).

about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech.").

Second, *First Resort* is irreconcilable with *Becerra*. In *Becerra*, the Supreme Court upheld the speech rights of pro-life clinics without labeling their speech "commercial," even though they "advertis[ed] or solicit[ed] patrons with offers to provide prenatal sonography, pregnancy test, or pregnancy options counseling." *Id*. at 762. The Court warned that restricting these centers' speech "can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *Id*. at 771 (cleaned up). The logic of *First Resort* in this regard cannot survive *Becerra*.

Plaintiff's contrived theory—that a nonprofit's public advocacy transforms it into a commercial actor and converts its messages offering charitable assistance into commercial speech—defies logic and public policy. Nonprofits request donations because that is how they operate. Donors naturally respond to mission success. Yet under Four Women's dangerous rule, any nonprofit that reports its impact would become vulnerable to Lanham Act liability. Imagine a women's shelter that advertises its success in housing vulnerable women. A nearby landlord, resentful at losing income, could sue the shelter for "stealing" tenants he believes are rightfully his, citing even trivial misstatements by the shelter or trifling building code violations coupled with the shelter's fundraising efforts. A supermarket, too, could sue a food pantry on a similar theory. This would dismantle sorely needed charitable services.[13]

---

[13] *See also* Meagan Burrows, *The Cubbyhole Conundrum: First Amendment Doctrine in the Face of Deceptive Crisis Pregnancy Center Speech*, 45 Colum. Hum. Rts. L. Rev. 732, 924 (2014) ("Even if the CPCs harbor the tangential economic motive of increasing availability of funds by attracting clients to support their underlying ideological purpose, this is not their 'sole' motivation for advertisement and the Supreme Court has not found charitable solicitation to be a 'variety of purely commercial speech.' Such an expansion of the definition of commercial speech to include all that which offers services that have commercial value in the market place would threaten to subsume expression rightly protected under the First Amendment within the commercial exception. Such an expansion could result in diminished constitutional protection for the valued ideological and political speech of religious, nonprofit, or charitable organizations.")

This Court must reject Four Women's invitation to import a discredited theory that other circuits have spurned. The Supreme Court has spoken clearly. Its reasoning—not that of an isolated and rejected outlier case—must prevail.

None of Defendants' speech "proposes a commercial transaction." It is not commercial as a result, and the Lanham Act cannot touch it. Indeed, it could not be otherwise, or the country's rich tradition of nonprofit organizations will become mere history.

### b.   The Speech Is Not Made For the Purpose of Influencing Consumers to Buy the Defendant's Goods or Services

Four Women somehow believes that the word "purchase" is a nullity in *Podiatrist*. Dkt 81 at 23. But that case observes that the speech must persuade "potential customers to purchase the speakers' goods or services." *Podiatrist,* 332 F.3d at 19. Aside from complaining about italicization, Four Women's sole argument is that *Podiatrist* does not distinguish between free and paid services. Dkt. 81 at 23.

Four Women's *ipse dixit* refutation adds nothing. *Podiatrist* is clear: "To constitute advertising or promotion, commercial speech *must at a bare minimum target . . . purchasers*." *Podiatrist,* 332 F.3d at 19 (emphasis added). *Podiatrist* does not specify that the purchase must involve payment for the same reason it does not specify that speaker must be a person: there's just no need.

### c.   The Parties Are Not in Commercial Competition

Four Women's arguments jump between allegations about abortion services and offering free ultrasounds, pregnancy diagnosis, and STD testing. Dkt. 81 at 23-24. But Four Women's complaint includes no allegations from women who were deceived by Abundant Hope's statements regarding the free services it does offer: Four Women alleges that Jane Does 5 and 8 do not recall contacting Abundant Hope (Dkt. 59 at ¶¶ 133, 139), and so it is impossible to know why they did so. Jane Doe 1 allegedly contacted Attleboro to schedule an abortion. *Id*. at ¶ 154. Jane

Does 2, 3, and 4 had no interaction with any of the challenged statements. *Id.* at ¶¶ 173-174. Not a single one of them interacted with the true statements regarding free pregnancy testing, ultrasounds, and STD testing, and so Four Women has not alleged any competition.

Moreover, at no point does Four Women suggest that Choose Life, a marketing company, or the individual defendants provide any of these services. In fact, Four Women presents nothing at all regarding Choose Life or the individual defendants in its rebuttal. Dkt. 81 at 23-24. It did not because it did not plead them.

Its pleading failure notwithstanding, Four Women could find no case showing liability when the plaintiff and purported competitor does not offer the same services. Four Women refers the Court to *McGrath* (Dkt. 81 at 23), but in that case, the court recognized that competition existed because both parties "offer[ed] nearly identical project management services for companies engaged in major construction projects." *McGrath & Co., LLC v. PCM Consulting, Inc.*, 2012 WL 503629, at *5 (D. Mass. Feb. 15, 2012). The same is true of Four Women's other case, *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 502 (7th Cir. 2009), which involved laxative manufactures who made the same chemical under different brand names.

Even after Four Women had a chance to explain its legal theory, that theory remains unclear. If the competition arises from abortion services, the claim fails because no defendant offers abortion services. If competition is in offering ultrasounds, pregnancy testing, and STD testing, the claim fails the materiality requirement (*see* Section VI, *infra*) because Four Women offers no non-speculative allegations that it lost customers for those procedures due to Defendants' statements. And in no case does its claims survive against Choose Life and the individuals, because none of them offer any health services.

None of the challenged speech is commercial, because it does not meet three elements of the controlling test in *Podiatrist*. Therefore, the Lanham Act does not apply, and the claim must be dismissed.

### VI. Plaintiff has Failed to Allege that Defendant's Statements are Material, as Both the Lanham Act and Ch. 93A Require.

Choose Life showed that its statements were not material to Four Women's (wholly speculative) loss. Dkt. 68 at 19-20. Four Women's soft refutation does nothing to undermine that conclusion.

Both parties agree that *Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue*, 284 F.3d 302 (1st Cir. 2002) informs this motion. *See* Dkt. 68 at 20, Dkt. 81 at 24. There, the First Circuit held that "[m]ateriality focuses on whether the false or misleading statement is likely to make a difference to purchasers." *Id.* at 312. But Four Women ignores that a more recent case, *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479 (1st Cir. 2022), further clarified Four Women's obligations under both the Lanham Act and Chapter 93A. "[W]hen the plaintiff is pursuing a claim based on a statement's misleadingness, the plaintiff must show how consumers have actually reacted to the challenged advertisement, rather than merely demonstrating how they could have reacted." *Id.* at 487 (emphasis added).[14]

Four Women's complaint points to two types of allegedly misleading statements: Abundant Hope's name, and online statements on the Abundant Hope website and advertisements. But for both, Four Women alleges that women "actually reacted" by ignoring or forgetting Abundant

---

[14] The First Circuit considered a Lanham Act and Ch. 93A claim in *Azurity*. Citing *Cashmere*, the Court maintained that "elements of a Chapter 93A claim 'overlap[ ]' with those of a Lanham Act false advertising claim." *Id.*

Hope and instead giving Four Women their business. In no case do these show that the statements were material to the harm.

First, take the name "Attleboro Women's Health Center." Four Women does not allege that Choose Life had any role in selecting the name, which Four Women itself calls "anodyne"[15] (Dkt. 59 at ¶ 6) and which the State of Massachusetts considers unremarkable. *See* Dkt. 68 at 19. Even so, Four Women has no evidence of a woman who declined Four Women's services because she saw the name "Attleboro Women's Health Center."

Second, the online statements. Four Women largely complains that Choose Life uses commonplace, legal advertising methods that are equally available to Four Women. *Id.* at ¶ 66-71. Four Women also alleges that "[p]rospective patients, *perhaps* aware that the only abortion care provider in the region is in Attleboro, Massachusetts, are reasonably misled" by the website and advertisements. Dkt. 59 at ¶ 154 (emphasis added). But Four Women's own complaint contradicts its speculative conclusion. For example, Jane Doe 5 has no memory of interactions with Abundant Hope and obtained an abortion at Four Women. Dkt 53-1 at ¶ 22.

At base, Four Women has produced no woman claiming she 1) saw the website or advertisements and as a result 2) "actually reacted" by not paying Four Women for an abortion or other services. If Four Women's allegation were based on anything beyond rank speculation (*see, e.g.,* Dkt. 59 at ¶ 177) (alleging that Defendants statements "*perhaps* even prevented Four Women's patients from accessing Four Women and obtaining services there") (emphasis added),[16] it would

---

[15] *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/anodyne ("anodyne" means "not likely to offend or arouse tensions.").

[16] Four Women's implicit presumption is that every woman entering Abundant Hope is actually a Four Women patient. This rigid predisposition blinds it from considering that sometimes, a woman decides she wants to continue her pregnancy, even after contacting Four Women, and that Abundant Hope can help her in her choice.

have produced actual patients who could link a business impact to the statements. Four Women's Response fails to identify any additional support beyond its Amended Complaint. Its Response points to Jane Does 5, 8, and 9. Dkt. 81 at 25. None of these women show the materiality Four Women's claim needs. Jane Doe 5 cannot link the online statements to a business loss because she 1) does not remember seeing them and 2) paid Four Women for an abortion. Nor can Jane Doe 8 remember seeing them (Dkt. 59 at ¶ 139), and she does not claim that she was unable to purchase Four Women's services. And while Jane Doe 9 alleges finding Abundant Hope online, she, too, does not allege that doing so made her deny Four Women business. Dkt. 59 at ¶ 176.

Four Women's silence means it can only speculate how consumers "*could* have reacted." *Azurity,* 45 F.4th at 487. But that is not enough for the claim to survive. Four Women has not pleaded materiality.

### VII.    Four Women's Claims are Barred by the First Amendment.

Four Women does not seriously engage with Choose Life's First Amendment arguments, instead characterizing discussions of the protections of the First Amendment as a "lecture." Dkt. 81 at 21.

Critically, Four Women's response entirely fails to grapple with the First Amendment's requirement of a culpable mental state in this important context. The Supreme Court recently confirmed that "a *mens rea* requirement provides breathing room for more valuable speech," and "without such a subjective mental-state requirement, the uncertainties and expenses of litigation will deter speakers from making even truthful statements." *Counterman v. Colorado*, 600 U.S. 66, 75, 76 (2023) (cleaned up). The First Circuit also recently vacated the denial of a preliminary injunction against enforcement of a buffer zone in the Karen Read trial, given the zone's lack of a *mens rea* requirement. *Grant v. Trial Ct. of Commonwealth of Mass.*, 2025 WL 1355193, at *4 (1st Cir. 2025).

Four Women makes no allegation that Choose Life's speech was knowingly or even recklessly misleading or false. Abundant Hope's website promoted quintessentially protected pro-life information, and it allowed scheduling appointments to learn more *information* about abortion and to receive some health services provided by credentialed health care professionals. Even assuming *arguendo* that Abundant Hope was out of compliance with Massachusetts regulation, Four Women does not and cannot allege that Choose Life knew or recklessly ignored Abundant Hope's compliance status.

Four Women cannot sidestep the fact that governments would "suppress unpopular ideas or information" but for the First Amendment. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 770 (2018) (cleaned up). Through its case, Four Women is attempting to hijack commercial laws to suppress information: Four Women does not want "the speaker and the audience"—an audience of pregnant women that Four Women imagines it possesses monopoly over—to be free to "assess the value of information provided" in "a commercial marketplace . . . where ideas and information flourish." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566, 579 (2011). While Four Women is not a government entity, it cannot ask this Court to suppress information in a manner prohibited by the First Amendment. *See Org. for a Better Austin v. Keefe,* 402 U.S. 415, 415 (1971) (rejecting injunction prohibiting distribution of pamphlets on tort theory as an unlawful "prior restraint" that failed to meet the "heavy presumption" against its constitutional validity). Worse still, Four Women runs roughshod over the fact that the government is prohibited from and incompetent in adjudicating "legitimate ongoing scientific disagreement." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013).

Four Women also refuses to acknowledge that even commercial speech is protected by the First Amendment. "The First Amendment requires heightened scrutiny whenever" speech is suppressed because of its content, and "[c]ommercial speech is no exception." *Sorrell*, 564 U.S. at 566. But here, there is simply no commercial speech by Choose Life or Abundant Hope, because none of the broadly challenged alleged statements (few of which are actually quoted, and several of which are misleadingly stitched together in serial one-word snippets) propose exchanging money for a service. Since Defendants' speech is not commercial speech, it enjoys the highest level of constitutional protection. *Central Hudson Gas*, 447 U.S. at 563. Further still, even though there is not a single false statement in the challenged speech (*see* Dkt. 68 at 12-13, 26-28 (discussing the truthfulness of the speech)), the First Amendment even protects the right to be wrong, subjecting bans on falsity as such to heightened scrutiny. *United States v. Alvarez*, 567 U.S. 709, 717–18 (2012) (plurality opinion); *see also id.* at 730–32 (Breyer, J., concurring).

In sum, Choose Life's statements are protected by the First Amendment. That protection would only reduce (and never disappear) if the statements were commercial speech, which they are not. Choose Life's speech is protected, and the complaint must be dismissed.

## **CONCLUSION**

For the reasons set forth herein, the Court should grant the motion to dismiss.

Respectfully submitted, this 2nd day of June, 2025.

/s/ Peter Breen
/s/ Nathan Loyd
Peter Breen†
Martin Cannon†
Michael McHale†
Nathan Loyd†
Thomas More Society
309 W. Washington Street
Suite 1250
Chicago, IL 60606
(312) 782-1680
pbreen@thomasmoresociety.org
mcannon@thomasmoresociety.org
mmchale@thomasmoresociety.org
nloyd@thomasmoresociety.org
† admitted *pro hac vice*

/s/ Ryan P. McLane
Ryan P. McLane
(BBO# 697464)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

*Attorneys for Defendant Choose Life Marketing LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2025, I served a copy of the foregoing document upon the

following counsel of record via CM/ECF:

Matthew D. Patton (BBO No. 703798)
Law Office of Nicholas F. Ortiz, P.C.
One Boston Place, Suite 2600
Boston, MA 02108
(617) 338-9400
mdp@mass-legal.com

Martha Coakley (BBO # 87300)
Emily J. Nash (BBO #696460)
Caroline Holliday (BBO #707301)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
mcoakley@foleyhoag.com
enash@foleyhoag.com

Brenna Rosen (pro hac vice)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
brosen@foleyhoag.com

*Attorneys for Plaintiff*

Thomas M. Harvey
Law Office of Thomas M. Harvey
22 Mill Street, Suite 408
Arlington, MA 02476
Tel: 617-710-3616; Fax 781-643-1126
tharveyesq@aol.com

*Attorney for Defendants Abundant Hope Pregnancy Resource Center, d/b/a Attleboro Women's Health Center, Catherine Roman, Nicole Carges, and Darlene Howard*

Dated: <u>June 2, 2025</u>          <u>/s/ Nathan Loyd</u>
                                                Nathan Loyd
                                                *Attorney for Defendant Choose Life Marketing, LLC*