```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2


 3                                      )
 4   FOUR WOMEN HEALTH SERVICES,        )
     LLC,                               )
 5                                      )
             Plaintiff,                 )
 6                                      )   Civil Action
     v.                                 )   No. 1:24-cv-12283-JEK
 7                                      )   Pages 1 to 79
     ABUNDANT HOPE PREGNANCY            )
 8   RESOURCE CENTER, INC., et al.,     )
                                        )
 9           Defendants.                )
                                        )
10

11

12           BEFORE THE HONORABLE JULIA E. KOBICK
                 UNITED STATES DISTRICT JUDGE
13

14                      MOTION HEARING

15

16                      July 29, 2025
                        10:00 a.m.
17

18        John J. Moakley United States Courthouse
                    One Courthouse Way
19              Boston, Massachusetts 02210

20

21

22              Linda Walsh, RPR, CRR
                Official Court Reporter
23        John J. Moakley United States Courthouse
                    One Courthouse Way
24              Boston, Massachusetts 02210
                  lwalshsteno@gmail.com
25
```

1    APPEARANCES:

2    On Behalf of the Plaintiffs:

3        FOLEY HOAG LLP
         By: Emily J. Nash, Esq.
4        155 Seaport Boulevard
         Seaport World Trade Center West
5        Boston, Massachusetts 02210
         617-832-3067
6        enash@foleyhoag.com

7        LAW OFFICE OF NICHOLAS F. ORTIZ P.C.
         By: Matthew Patton, Esq.
8        One Boston Place, Suite 2600
         Boston, Massachusetts 02108
9        617-338-9400
         mdp@mass-legal.com

10

11   On Behalf of the Defendants Abundant Hope Pregnancy Resource
     Center, Inc., Catherine Roman, Nicole Carges, and Darlene
12   Howard:

13       LAW OFFICE OF THOMAS M. HARVEY
         By: Thomas M. Harvey, Esq.
14       22 Mill Street, Suite 408
         Arlington, Massachusetts 02476-4744
15       617-710-3616
         tharveyesq@aol.com

16

17   On Behalf of the Defendant Choose Life Marketing, LLC:

18       THOMAS MORE SOCIETY
         By: Peter Breen, Esq.
19           Nathan Loyd, Esq.
         309 West Washington Street, Suite 1250
20       Chicago, Illinois 60606
         312-782-1680
21       pbreen@thomasmoresociety.org
         nloyd@thomasmoresociety.org

22

23

24                   Proceedings reported and produced
                      by computer-aided stenography.
25

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              Thank you so much.
 4              Have a seat.
 5              This is Civil Matter 24-12283, Four Women Health
 6    Services, LLC versus Abundant Hope Pregnancy Resource Center,
 7    et al.
 8              Will counsel, starting with the plaintiff, please
 9    state your name for the record.
10              MS. NASH:  Good morning, Your Honor.  Emily Nash from
11    Foley Hoag for Four Women Health Services.
12              THE COURT:  Good morning, Ms. Nash.
13              MR. PATTON:  Good morning, Your Honor.  Matthew Patton
14    from Ortiz & Moeslinger for the plaintiff.
15              THE COURT:  Good morning, Mr. Patton.
16              MR. BREEN:  Good morning, Your Honor.  Peter Breen and
17    Nathan Lloyd from the Thomas More Society for the defendant
18    Choose Life Marketing.
19              THE COURT:  Good morning, Mr. Breen and Mr. Lloyd.
20              MR. HARVEY:  Good morning, Your Honor.  Thomas Harvey
21    for the defendants Attleboro Women's Health Center, Catherine
22    Roman, Nicole Carges, and Darlene Howard.
23              THE COURT:  Okay.  Good morning to you as well,
24    Mr. Harvey.
25              Okay.  We're here for a hearing on Choose Life's
```

motion to dismiss and the remaining defendants' motion for
judgment on the pleadings.

What I think makes sense is to have Choose Life go
first and then I'll hear from Mr. Harvey and then I'll hear
from the plaintiff and then a brief rebuttal from the
defendants.

So Mr. Breen or Mr. Lloyd, go ahead.

MR. BREEN:  Thank you, Your Honor.  And I want to
thank you for hearing us this morning.

THE COURT:  Of course.  And thank you, both sides, for
your flexibility with the timing on the hearing.

MR. BREEN:  Sure.  No, no.  I appreciate it.  And Your
Honor, I think it makes sense to go back to the basics on this.
We put a lot of paper in front of Your Honor.  Plaintiff is a
business active in a commercial market that's providing
abortions for profit.  Defendants are not competitors, none of
the defendants are competitors or participants in that market.
Instead, they oppose --

THE COURT:  Can I stop you there?

MR. BREEN:  Go ahead.

THE COURT:  I think one of the questions in this case
is how to define the market, and Four Women defines it as the
market for I guess women's reproductive health services.  You
had defined the market more narrowly.  I guess at this stage in
the case, is that, in your view, a legal question for me or

1    something I need to draw inferences in favor of the plaintiff

2    on?

3              MR. BREEN:  Well, Your Honor, I think that's a legal

4    question because you're just looking at the framing of the

10:04 5    case.  But also, we are in a First Amendment context so there's

6    always extra sensitivity on the part of the Court.

7              THE COURT:  Sure, yes.

8              MR. BREEN:  But the unique thing here is -- and this

9    is the way you can help define the relevant market.  The

10:05 10   defendants oppose the existence of the market.  So they are not

11   asking folks to go from the Ford dealership to the Chevy

12   dealership.  They're saying don't buy a car at all.  And they

13   have sincere moral and religious beliefs on that.  And

14   sometimes, in some other cases, that might be up for grabs, but

10:05 15   the other side in their complaint alleged, hey, very clearly,

16   you know, that, you know, the defendants are there because of

17   their objections to abortion.  So when you are looking at that

18   relevant market, it's really been defined that way, I would

19   say, by the parties.  You know, and again, whatever overlap

10:05 20   there might be, its advocacy, you know, so principally what

21   does Abundant Hope exist to do.  It exists to help pregnant

22   women so that they don't have to have abortions and to convince

23   them to not have abortions, to not engage in that market.

24             THE COURT:  There are other allegations about the

10:06 25   other services that both entities provide, right?  It's not

just abortion or no abortion.  There is counseling, other

reproductive health services, which strikes me as sort of

favoring their view that the market is broader than just a

market for providing abortions.

10:06    MR. BREEN:  At the same time, so, Your Honor, without

maybe going into cases that aren't ours, we're not dealing with

a broad-based OB-GYN practice that happens to do abortions.  I

mean, you've got a -- it's a facility that's identified as an

abortion facility.  You have got a pregnancy center which is

10:06 very limited, does not provide anything but the pregnancy

testing, the limited obstetric ultrasound.  I believe they did

STD testing or STI testing as well, but that's it.

They're not there for continuing care, Four Women.

They are really there to engage in that moment of decision and

10:06 then to provide material assistance for those who are

continuing to carrying their pregnancy to term, and then to

connect them to other resources.

So they really do have -- you know, in so far as this

overlap, boy, it's minimal, and it's really not the focus of

10:07 the issues in front of us.  I mean, if we were here arguing

about something a little less sensitive than abortion, we

probably would not be in federal court.  I think that's

something that folks can agree on.

But again, so this -- that's why when, Your Honor, we

10:07 look at this as an ideological case that's being -- trying to

be shoehorned into a business tort case, and those are very

important business torts.  They need to be there to protect

consumers from fraudulent business practices and the like.

But I also -- there is an overarching point that when

a woman decides to continue her pregnancy, that is not a

commercial decision, and I know that is considered a lost

profit or at least, you know, alleged to be a lost profit or

lost commerce point, but there's no reason for the Court to

accept that framing.  Because this is -- we're talking about a

constitutional right of that woman to bear a child.  You are

also talking about someone who is, again, not going from the

Ford dealership to the Chevy dealership.  She's exiting the

market altogether and taking a different path as is her right.

And so that is an independent decision that maybe is influenced

by folks on both sides, by their rhetoric, by their counseling,

by their offering of assistance, and what have you, but that is

not part of the market.  She is now out of the market.

So again, so I think that is something -- and again, I

just -- trying to ascribe a woman's decision whether to

terminate her pregnancy, carry her pregnancy to term as a

commercial decision, it just doesn't feel right, Your Honor,

and it seems like something deeper than is connected to a lot

of different things than raw commerce and raw choosing between

the two --

THE COURT:  Can I push you on that?  Because one of

the arguments that you make, Four Women has failed to

sufficiently allege harm, and you fault them for not including,

you know, more specifics about lost dollars, the number of

patients that they lost to the allegedly false advertising.

10:09  Those arguments strike me as somewhat inconsistent; that is,

you're saying they have to make those allegations in order to

get over the pleading hump.

        MR. BREEN:  Yeah, and I think -- and so I might maybe

put it back on the plaintiffs or on the plaintiff, that that is

10:09  their burden, and we might urge that the way these laws are

structured in the business tort laws trying to be applied to a

situation that doesn't fit, and so that might be the tension

here, Your Honor.  But we know that they have to allege actual

damages, they have got to allege some tangible harm, which --

10:09  you know, they didn't sue us for defamation, they have not

taken advantage of some of those others, they have not used

common law fraud or anything like that.  They are bringing

these very specialized business torts.

        And I might add, I don't know of any other Lanham Act

10:10  case against a pregnancy health organization -- at least, I

don't think the parties have even cited the Court on any

decisions on that front, and there's a reason for that.

Because that is not an act that is used in these circumstances

or proper to these circumstances.  We do have a few state

10:10  Deceptive Practices Act cases which we've been involved in and

1    we can talk about.

2        THE COURT:  One other threshold question for you is

3    all the other defendants answered the case and admitted a

4    number of allegations in the complaint.  So I take those -- you

10:10  5    know, I would assume they were true in any event but now

6    they're kind of settled as true.  And I guess my question to

7    you is do those admissions bind your client as well?  And I'll

8    just put it out there.  The way that I'm thinking about it is

9    to the extent that the knowledge of the allegations is within

10:10 10   the scope of what the pregnancy clinic would know, that it

11   makes sense for me to say, okay, those allegations are now

12   true.  But I'm interested in your views on that and whether you

13   have any case law either way.

14        MR. BREEN:  That's a good question, Your Honor.  I

10:11 15   mean, as I had understood the way, as a broader principle, when

16   you assert a complaint against my client, I'm only bound to

17   what is in the complaint, what is in my papers, and then, you

18   know, we attach the websites which are properly incorporated

19   into the complaint and that's it; that I don't have to worry

10:11 20   about what other defendants have answered or not answered, I

21   mean, at least in representing my client.  As much as it's our

22   fiction that you're suing just me -- you know, you might be

23   suing seven of us but --

24        THE COURT:  Right.  This strikes me as a somewhat

10:11 25   unique situation where I haven't seen this situation where one

1    defendant will admit a bunch of things, the other -- you know,

2    I would have to assume them as true anyway, so I'm not sure it

3    actually makes much of a difference, but I just wanted to give

4    both sides an opportunity to address that question.

10:12  5         MR. BREEN:  Sure.  And Your Honor, I would say more

6    broadly -- and it doesn't need to be said, but you know, we

7    would urge -- the Court doesn't have to lose its common sense

8    in dealing with this.  Because I know there was some things --

9    there was an allegation we didn't allege in the complaint, that

10:12 10   you're actually providing the services for free, and I'm

11   sitting there going...  All the websites says it's free,

12   everything in the complaint says free services, free services.

13   And we're going, we don't have to argue about that when it's

14   clear these services are free, and they have got 591 people or

10:12 15   what have you, not one of them said the services were somehow

16   paid for or, you know, remuneration was made.

17        THE COURT:  Sure.  Why don't you move into the 93A

18   claim, and then we'll go to the Lanham Act after, although I

19   know there's some overlapping arguments.

10:12 20        MR. BREEN:  I will say, Your Honor, what is unique

21   about the Massachusetts Deceptive Practices laws is we actually

22   have a case on point.  I mean, that is litigated, this, all

23   over the place.  This is very unique, and it's not just -- it's

24   a case from 40 years ago, but it's a case from 40 years ago

10:13 25   that is still being cited today as good law, adopted by the

1    First Circuit, even expanded a little bit.

2        And so that *Planned Parenthood* case -- and, if

3    anything, the course of conduct there as alleged was much more

4    egregious than anything you see here where literally they set

10:13   5    up down the hall, so every single patient has to walk past --

6    they took their trademark, you know, used the trademark to try

7    to draw people in, and then what are they doing when they draw

8    them in?  Counseling, pregnancy testing, you know, material

9    assistance, as I understand it.

10:13  10        So when you look at that and you go, okay, the

11    allegations against Abundant Hope are?  Well, you set up at the

12    neighboring building.  So I think it's 150 and 152 I think were

13    the addresses, roughly.  They are maybe 100 feet apart.  And

14    so -- but you didn't use their name, you know, you're not even

10:14  15    close.  Attleboro Women's Health Center, that's nothing like

16    Four Women.  You didn't do anything like that.  And for my

17    client who's looking at web ads, what are we looking at?  We

18    are looking at things that talk about free services,

19    counseling, get your information.  And what are we talking

10:14  20    about, ultrasounds, pregnancy tests, STI testing I think they

21    were also offering at the time, very similar sorts of things.

22        Again, moved forward in time 40 years from where

23    pregnancy centers were in the 1980s but much less egregious,

24    they didn't take the trademark.  They are not -- at least you

10:14  25    don't see that kind of attempt to cause confusion in the

1    marketplace.  But what is the behavior that you see of Abundant

2    Hope and then of my client, which is responsible for posting

3    approved messages to the Internet, those messages are not

4    directed at -- they never mention Four Women.  What do they do?

10:15  5    They're directed to women who may be considering abortion to

6    help urge them to take the same position that my clients -- my

7    client and the other defendants have taken, which is, please

8    exit this market, don't participate in this market.  So there's

9    nothing specific to Four Women.

10:15  10    And so that's another issue here that you look at, as

11    you're looking at trying to frame up what is this claim and how

12    does it fit.  We're not directed at the other side at all.  You

13    know, again, and from Choose Life Marketing's perspective, Four

14    Women didn't even know Choose Life Marketing existed, you know,

10:15  15    eight months ago.  It was only after discovery they go, oh,

16    what's this thing, out in Missouri that does some Internet work

17    for them, independent contractor doing some Internet work.

18    So that's part of why the claims don't make sense as

19    well --

10:15  20    THE COURT:  So their response, I think, or one of

21    their responses is that this case is not exactly like *Planned*

22    *Parenthood* because of the ambulatory services that are alleged

23    to have been advertised, including the ultrasounds and

24    pregnancy diagnoses.  And, you know, I guess my question to you

10:16  25    is that those are differences between *Planned Parenthood* and

1    this case on the one hand.  On the other hand, as I understand

2    the SJC's case law where the nonprofit is acting in furtherance

3    of its core mission, you presume it's not subject to 93A

4    liability, so I take that as something of a presumption that

10:16  5    their complaint needs to rebut.

6          And then I take another principle, which is that we're

7    here on a motion to dismiss, and virtually all of these cases

8    that the parties cite, including *Planned Parenthood*, decided

9    much further along in the case.  *Planned Parenthood* was after a

10:16 10   trial.  I think *27th Lancers* was after a trial, and so I have

11   these competing considerations.

12         And I guess my question to you is where we're so early

13   in the life of the case and there are factual differences

14   alleged between *Planned Parenthood* and this case, why shouldn't

10:17 15   I at least send it into discovery?  And you might very well

16   prevail at summary judgment but why now?

17         MR. BREEN:  Well, a couple of reasons, Your Honor.

18   And first off, I might urge that, again, we are in the First

19   Amendment context.  We are in an incredibly -- we're talking

10:17 20   about one of the most contentious social issues of our time.

21   And you're dealing with a small amount of profit.  For us, we

22   have a small for profit, but again, it's called Choose Life.

23   You know, the scope of clients is relatively limited.

24         And so the -- I would urge that, you know, some

10:17 25   clients have to go to trial in order to get a decision that

1    then sets precedent so that we don't have to go to trial 100

2    times thereafter.

3         So I think we can take those lessons -- and here, you

4    have not just got the *Planned Parenthood* case but then you've

10:18  5    got the *Linkage* case after it where the SJC showed what are you

6    going to have to do to overcome the presumption that they set

7    forth in *Planned Parenthood*.  And you have got Boston

8    University, they're in a contract with the other party.  I

9    mean, they are sticking it to them.  They are doing all these

10:18  10   terrible things.  There was a monetary motive in making a

11   profit, all of this.

12        And so we sit there and go, we don't have any of those

13   allegations, we're not anywhere close, we're not in the

14   ballpark, and it's conceded -- I believe it's paragraph 10 of

10:18  15   the complaint -- that they had conceded that it was the core

16   mission of Abundant Hope to dissuade people from having

17   abortions.  So there's no -- there's no bad faith alleged.

18        I mean, certainly as a significant difference on the

19   ideological issue whether you're right or wrong, but that's not

10:18  20   the government's or the Court's job.  You know, the Court is

21   not a referee on the social issues today, you know, in that

22   way.

23        But I might say, *Linkage* shows you what you have to

24   do, and then *Linkage* said it's presumed you're within the core

10:19  25   mission, you're okay.  So there shouldn't be a need to force

1    small entities to go into discovery on this -- to go into

2    discovery when we haven't had the base allegations.  I mean, if

3    they want to replead their allegations and they have a

4    good-faith basis to do it, well, then, good luck trying.

10:19 5    That's fine.

6         But at this point, you're right squarely within where

7    the SJC has said for 40 years, this is not a case that you

8    can -- this is not a case you can bring.  It's just not trade

9    or commerce.

10:19 10         And again, Your Honor, ultrasound versus pregnancy

11    tests, I mean, my goodness.  It's the same point, it's to

12    confirm and then to confirm anew and do a little more detail on

13    the confirming of the pregnancy.  I mean, the ultrasound can do

14    more in terms of the viability of the pregnancy.  And I know --

10:19 15    on that word, we mean is it ectopic, is it intrauterine, that

16    sort of thing, which is a reasonable procedure in the case.

17         And so it's conceded that Abundant Hope is seeking to

18    dissuade women from abortion.  So that's -- and that's part of

19    their core mission.  I mean, that's conceded, that's pled.  So

10:20 20    you have got that.  You have got the line of cases which seem

21    very clear on this.  The First Circuit has adopted it I think

22    it was as recently as 2020.

23         THE COURT:  In the *Squeri* case.

24         MR. BREEN:  In the *Squeri* case, yes.  And just -- you

10:20 25    know, charitable companies can advertise their services, and

1    that's not trade or commerce.  And so that -- I would say that

2    is unique to Massachusetts.  That's not every state's deceptive

3    practices laws.  But here you have got a very long history of

4    this.  And then you have the *Hebrew Senior Life* case from 2021,

10:20  5    the Massachusetts Appellate Court, they are actually charging

6    people rent, but they said, well, you're not making a profit

7    off of it, so that's still covered.  If that's not -- that

8    doesn't break it, I mean, you've really got to go all the way

9    to *Linkage* to break this presumption.

10:21 10          THE COURT:  Okay.  Can I then -- assume for this

11    question that I agree with you as to Abundant Hope, but then my

12    question is where does that leave Choose Life?  Because you're

13    a for profit entity, you know, made money in connection with

14    the advertising that I guess Abundant Hope commissioned, and so

10:21 15    this argument just doesn't apply.

16          And then I guess I'm left with can you have the

17    advertiser for a nonprofit organization be -- that might be

18    exempt from Section 11 of Chapter 93A be subject to liability

19    if it sort of knowingly participated in the allegedly false or

10:21 20    deceptive advertising.  And I'm interested in both sides' views

21    on this.  I didn't see case law cited either way for this

22    question, and perhaps it's a novel one, but I'm interested in

23    your view on this as well.

24          MR. BREEN:  As a practical matter, Your Honor, whether

10:22 25    Abundant Hope has an employee or an independent contractor push

1    the button to go up with the material on the web, I don't see

2    how that could be different.  If the underlying services are

3    not in trade or commerce, the advertising of those services is

4    not trade or commerce under this act, how a Missouri

10:22  5    corporation that is only here in Massachusetts just to push the

6    button, and really, I mean, is not physically present here, is

7    only here as an auxiliary of Abundant Hope, how could that then

8    somehow be trade or commerce, just that mere --

9         THE COURT:  The case law focuses again on, like you

10:22 10   said, was there consideration, was there money exchanged, what

11   is the motivation of the company, and I think where you've got

12   a for profit organization, right, the motivation is making

13   money.  That's just what a for profit company does.

14        MR. BREEN:  And my client, though, I don't think they

10:23 15   make a lot of profit.  They make enough to pay the bills.

16        THE COURT:  Fair enough.  But I guess, I don't know if

17   you found a case on this, but I'm interested, if you're aware

18   of any case with this set of circumstances, where you have got

19   kind of the primary speaker as a nonprofit that's alleged to

10:23 20   not be with -- subject to liability under 93A, but also there

21   is the advertiser or maybe other for profit entities that work

22   with the nonprofit, and where do they stand vis-a-vis 93A

23   claims?

24        MR. BREEN:  We're not finding that case, and to some

10:23 25   extent it's because this line of case law in Massachusetts is

1  somewhat unique nationally.

2         THE COURT:  Yes.

3         MR. BREEN:  And there might be a case, but I don't --

4  I haven't seen it specifically, except if you go back -- I

10:23  5  think it's *Begelfer*, they say look at the transaction.  And so

6  if the case were Choose Life against Abundant Hope or vice

7  versa, under section -- under Chapter 93A, that would be an

8  interesting transaction.  It would be a contractee, you know,

9  the contract relationship.  If there was something going

10:24 10  sideways there, then there would be an argument.

11         But here you've got Choose Life against Four Women, an

12  entity it's never seen.  Four Women didn't even know that

13  Choose Life existed eight months ago, and there's no contract

14  between them, no commercial relationship.  All Choose Life is

10:24 15  here to do is to amplify the message of Abundant Hope, again,

16  as a contractor, just to push the button that an employee would

17  otherwise be pushing.

18         And part of the problem, too, if you don't read it

19  that way, well, what happens if they hire the 17-year-old kid

10:24 20  for the summer who does the web services for them, and all of a

21  sudden, oh, they're a contractor, you lose.  And he was making

22  money or she.  You know, you made a few hundred bucks.  Guess

23  what?  Now you're being dragged into federal court.  That

24  doesn't make a ton of sense as these things go.

10:25 25         Again, the underlying -- the advertising itself is

1    that -- that is not trade or commerce, then how can just

2    amplifying the advertising a bit be trade or commerce?  How can

3    it convert from one to the other just for that then entity?

4         And again, Your Honor, I am sure there is some edge

10:25  5    cases where it could -- you don't have to set a rule forever

6    here in this case.  It's just in this case, you're looking at,

7    again, this small company out of Missouri who gets haled into

8    Court in Boston going, we just put some things on the website

9    which were fully approved, and that's pled.  It's in the

10:25 10    complaint.  Because they needed to have Abundant Hope adopt

11    what Choose Life, you know, hit post on.  So that's, to some

12    extent, there, and you've got that identity of interest there.

13         And so that's the answer.  Again, it's a little bit of

14    common sense, but it's also transaction, look at the

10:26 15    transaction between Choose Life and Four Women.  It's not of

16    that nature where they're commercial -- and we'll talk about

17    this later -- commercial competitors.  They're not directly --

18    they don't have any contact really.  They didn't even know each

19    other prior to this.  So that -- and that does go into the

10:26 20    commercial relationship, that commercial transaction that is a

21    requirement, and it's a separate requirement.  You have got to

22    get over the commercial transaction hump before you even get to

23    the business context test within, you know, within the statute.

24         And again, that may be, as we're sitting here trying

10:26 25    to figure out, wait, where does Choose Life fit into this,

maybe we fit in there.  You know, you can hit us on this isn't

even trade or commerce, so you're not even getting in the door.

But now, you know, where's the commercial transaction between

Choose Life and Four Women?  There's just nothing there.  And

we've talked about this with the *Linkage* -- the *Linkage* case

discusses that.

THE COURT:  But the SJC has also said companies don't

need to be in privity in order to be subject to 93A, that you

have advertising cases all the time, and in those cases there's

not a direct transaction between, you know, maybe the plaintiff

and the defendant, but that's okay for purposes of a 93A claim.

MR. BREEN:  Well, except in those particular cases,

there does have to be something between the parties.  So

they've got to be somewhere in that same market.

THE COURT:  Right.  Right, it comes back to the

market.  Right.

MR. BREEN:  But again, a market assumes buying and

selling.  And you've seen that, how does the SJC define trade

or commerce, how are they doing this?  They're saying, you have

got to be buying or selling something in order to even get in

the ballpark.  So that's the problem we're bumping into here.

They're trying to drag noncommercial conduct, again, no profit

motive, not even an exchange of consideration at all, into

these business torts.

And so, because of that -- you know, Four Women has

1   provided no authority saying that providing services without

2   consideration can be in that business context and are in this,

3   you know, commercial transaction context.  So again, you know,

4   and the cases that they had cited on, you know, where there was

10:28   5   maybe the commercial transaction was weak or it was, okay, how

6   did that happen?  If you're looking at the *27th Lancers Drum*

7   *and Bugle Corps*, well, that was a registered nonprofit using

8   another's name to sell merchandise.  There's still a connection

9   to commerce.  There was an exchange of value.

10:28  10   And so, also, too, and I don't think this is

11   conceded -- sorry.  I don't think this is contested, rather.

12   Under Chapter 93 there's no aiding or abetting liability.  So

13   you have got hit Choose Life directly.  And, again, there's

14   this Missouri company that only put up these web statements --

10:29  15   I know we'll talk later about the fact that those are mostly

16   just informational.  There's a couple that then ask you to make

17   an appointment.  But if there's information, then you're

18   dealing with information on a contested issue of public

19   dispute, so you start having heightened scrutiny issues and all

10:29  20   that under the First Amendment.

21   And so I might say this, there's no authority showing

22   that the competition can be between companies in unrelated

23   markets or where they're not competing at least in some

24   respect.  So now we -- I think the Ropes & Gray case, which I

10:29  25   think the parties disputed as to how it should be interpreted,

1    but it was an interesting case because it was a gentleman who

2    had been -- you know, who had left the law firm, private law

3    firm, and was alleging, well, I'm losing opportunities in

4    academia or going to go into government service, that even

10:29  5    that, those two were not close enough to the private practice

6    to be enough to establish a Chapter 93A claim.  In fact, they

7    said, well, if you came back to private practice, that will be

8    enough.  But not just these two adjacent places, which, of

9    course, lawyers can bounce between them all along, but the

10:30  10   Court held that was enough of a distinction.

11         THE COURT:  Just I know there are a few other

12   arguments that the parties make on 93A.  I'm happy to hear you

13   on those, but I'm also interested in the Lanham Act argument,

14   so if you want to move to those.

10:30  15        MR. BREEN:  Sure.  Well, and I did -- I wondered about

16   getting into this issue of -- so we're clear on the

17   nonprofit/for a profit, as I think the Court -- we've put a lot

18   in front of the Court.

19         The issue of the clinic and the Department of

10:30  20   Health -- the Department of Public Health regulation, whether

21   there was actually a false statement here, we would contend

22   that that clinic definition under Section 52 of Chapter 111, so

23   kind of jumping over.  Yeah, so this really goes to the main --

24   one of the principal alleged misrepresentations from the other

10:31  25   side.

1          That clinic definition doesn't apply to a vast swath

2     of health care providers across Massachusetts because it has an

3     exception which you can drive a truck through, which is that,

4     if the practitioners are engaged in a solo or group practice,

10:31 5     as long as the practice is wholly owned and controlled by one

6     or more of the practitioners, you are not subject to that

7     clinic definition, you do not have to register with the state

8     of Massachusetts.  So that's every doctor's office.  It was

9     every urgent -- or was nearly many urgent cares.

10:31 10          In fact, Your Honor, I was preparing for oral

11     argument, and one of the examples that I've seen used was

12     urgent care because urgent care doesn't have a doctor on site.

13     You take a kiddo in there, they sprain a knee, the tech gives

14     them the x-ray.  It's either a PA or nurse practitioner or what

10:31 15     have you.  You go home.  You get the results because they send

16     it off to a doctor.  Those aren't typically registered with the

17     Department of Public Health except the state just changed the

18     law.  As of July 1st of this month, now urgent care centers

19     have their own section under the code.

10:32 20          Why do they have their own section of the code?

21     Because they're not clinics.  But what are they?  They don't

22     operate under the doctor's name.  They operate, you know,

23     Midwest -- sorry, not Midwest.  The East Urgent Care Center.

24     But it's run through a doctor's license, so that's how they

10:32 25     organize or had been organized, and the state said, oh, we want

to cover them.  They're not covered.  Let's cover them over
here.  The same thing for the pregnancy centers.  The doctors
are not on site but you are operating under the license as a
standard matter of course.

10:32   THE COURT:  Can I stop you there, though, because I
think the statute that you quoted, it says, you know, the solo
or group practice, whether conducted for profit or not for
profit, however organized, and then it says so long as such
practice is wholly owned or controlled by one or more of the
10:33   practitioners so associated, and we don't have those
allegations here that the pregnancy -- AWHC, if I get my
acronym right, was wholly owned by any physician, right?  I
mean, I think it was --

MR. BREEN:  Right.

10:33   THE COURT:  -- owned by the individual defendants or I
don't know if there are allegations about that.

MR. BREEN:  So Your Honor, we would contend that --
this is an exception that swallows the rule, and pretty much
any physician's office that you go to, if it's owned by the
10:33   doctors, they're covered by this.  Again, it's large numbers of
Massachusetts health care providers.  They have to plead.

I mean, there's two ways this set of facts can read.
One is, Abundant Hope is operating perfect -- or was.  They've
shut it down now.  They had a medical director.  It was
10:33   operating perfectly legally under that person.  They had full

```
         1   control and ownership -- again, a nonprofit provision, you
         2   know, volunteer provision of medical services, limited.  Or
         3   Abundant Hope was doing something terrible.  But the mere fact
         4   that they don't have a license and that they were doing this
10:34    5   doesn't indicate necessarily Abundant Hope was doing something
         6   terrible because you can make the same allegation against every
         7   doctor's office in the state.  So that's the problem -- or
         8   every pregnancy center.
         9        THE COURT:  And maybe this comes back to my question
10:34   10   about what's admitted and what's not -- but correct me if I'm
        11   wrong -- but I understand it to be admitted that they were
        12   providing ultrasounds and pregnancy diagnoses and that they
        13   were not licensed, right?  And then so the question is, did you
        14   need to be licensed to provide those services?  And, you know,
10:34   15   that's sort of a legal question.  But correct me if I have my
        16   facts wrong on that.
        17        MR. BREEN:  Your Honor, that is the point, that you're
        18   not necessarily licensed.  You've got to allege the next set of
        19   facts, which is you were operating without -- you didn't have a
10:34   20   doctor owning and controlling the medical side of the practice.
        21        THE COURT:  How would they know that at this stage in
        22   the case?  I mean, that strikes me as something, you know, you
        23   would just easily discover in discovery.
        24        MR. BREEN:  But why would they make that very
10:35   25   significant allegation:  You're violating the law.  I don't
```

1       have the information to show you are violating the law.  I have

2       no indication that it's material to the actual decisions, to

3       the people who got the services, which were all provided by

4       licensed health care providers.  Your Honor, they're coming

10:35 5  into court on a fraud allegation, and you've got Rule 9(b) in

6       terms of alleging it with particularity.  They've missed a

7       significant allegation.

8              And the way pregnancy centers in Massachusetts

9       operate, as I understand it as a general matter, they have

10:35 10  medical services agreements with a physician who owns that side

11      of the thing and then -- and so that is how those services are

12      provided to ensure that you don't run afoul of this particular

13      center.

14             THE COURT:  I understand the argument.

10:35 15         MR. BREEN:  That's just something there, Your Honor,

16      to take into account.  But again, the fact that the legislature

17      just added urgent care centers when they were not a clinic

18      shows for the most part the pregnancy centers aren't clinics,

19      the fact they added urgent care centers and did not add a

10:36 20  section for pregnancy health centers, so that was just I think

21      something that's very important.

22             The other issue here when you're looking at some of

23      the other allegations, they are saying, well, you're saying

24      abortion is dangerous, and you're spreading too much fear about

10:36 25  the risk of ectopic pregnancy or things like that.  You're not

```
 1    saying the right thing about ultrasounds.  Those are all at
 2    worst statements of opinion.
 3         Now, my client and the other defendants think they're
 4    true.  They've got studies and things, they have citations for
 5    it, but they're certainly not materially false.  And again, at
 6    worst they're statements of opinion.  At best they're true.  So
 7    we would also indicate, you know, that's not part of -- that
 8    should not be part of a deceptive practices claim here, and
 9    again, that goes to the alleged harms, things like that.  So I
10    did want to just kind get to that, that does also play in the
11    Lanham Act, the materiality of the statements.
12         THE COURT:  Yes.  Why don't you move to the Lanham Act
13    argument, then.
14         MR. BREEN:  Sure.  Thank you.
15         So when we're dealing with the Lanham Act, both sides
16    agree that the Podiatrist Association is the governing
17    authority, and so we've got -- it's got to constitute
18    commercial speech, big issue, and then with the intent of
19    influencing potential customers to purchase the speaker's goods
20    or services.  Part C was by a speaker who is a competitor of
21    the plaintiff in some line of trade or commerce, and then
22    there's Part D.
23         And so that -- when you look at the way the Courts
24    have defined, you know, commercial competitors, you know,
25    you're looking at -- I think we had cited you a number of
```

1    out-of-circuit precedents.  I think those were some of the

2    better ones that we could find.  The one in-precedent that I

3    think that had been cited between the parties, which was

4    *McGrath & Company*, but in *McGrath*, apparently the parties

10:38  5    offered nearly identical project management services for

6    companies engaged in major construction projects.  So not

7    really an issue of them being in separate markets in any way,

8    shape, or form.

9         And of course, going back to the commercial speech,

10:38 10    this is a big issue.  It's the *Bolger* test, which, you know, is

11    speech that does no more than propose a commercial transaction,

12    but here you've -- and the other side will cite *First Resort*,

13    and we have attacked *First Resort*.  It's only in the Ninth

14    Circuit.  It's only been percolating there with numerous cases

10:38 15    where it's up.  We'll see what the Ninth Circuit does with it.

16    But the Ninth Circuit since then has not -- whether they've

17    taken maybe a different tack from the *Eric's* case where they

18    discuss the economic motive needs to be the primary motive for

19    the speech, in order for the speech to be commercial.  And that

10:39 20    really, I think, is another way of stating the *Bolger* test, you

21    have to do no more than propose a commercial transaction, and

22    you're not seeing that anywhere here.

23         But in particular, so my client is solely on the

24    website.  They're putting up informational articles about you

10:39 25    need an ultrasound, this or that, that sort of thing, make an

appointment, get all your options, come and do this counseling,

what have you.  Those aren't -- they're all free services.

Every single page of the website, as far as I could tell, and

I've sent -- we put in the archive.org for the Court instead of

10:39  the printout that plaintiff had.  On every page it says, we

don't do abortions, everything is free.  There's a clear

separation between the services offered and then the options,

which were abortion, adoption, and parenting, as I recall.  And

I'm not sure about that third word.  I think that was

10:39  "parenting."

But clearly I assume an offer -- you know, clients

don't offer adoption and parenting or, you know, or abortion

for that matter.  So there's a clear distinction.  Your Honor

doesn't have to take -- well, the website indicates this when

10:40  you have got the website in front of you, and you can just take

a look at it.

So when you're looking at is that commercial, it's

doing a lot -- it's not only proposing a commercial

transaction.  And so we would urge, too, that the plaintiff has

10:40  pled itself out of court on this because even if it were trying

to rely on *First Resort*, it would have to plead you're getting

employee of the month and bonuses because of excess clients.

They didn't plead that.  They pled the core point of Abundant

Hope, at least, the core mission was to dissuade people from

10:40  having abortions, totally noncommercial, a moral and religious

1   belief and standing.

2          THE COURT:  So I'll just -- you know, reading these

3   cases again, it's similar to the 93A cases where virtually all

4   of the cases call this question of, is it commercial speech or

10:41  5   not, highly fact dependent, they all go at least to summary

6   judgment, often to trial.  And it does depend on these kind of

7   highly nuanced questions about what was the market, what was

8   the motivation, you know, and I guess I'll just put it back to

9   you again that my concern here is that this is an argument that

10:41 10   might eventually win the day, but it's awfully early in the

11   case to be making it.

12          MR. BREEN:  Sure.  Except, Your Honor, there are 3,000

13   pregnancy health centers in the country, and I represent some

14   of them.  We should be able to rely on the precedent, though,

10:41 15   to cut these things off if they're not going to be meritorious.

16   If you've got allegations that show, hey, you have got this,

17   this, and this that fit within some of the contours of the

18   exceptions, I can understand the point.  But I don't know of

19   any other Lanham Act case that has ever been brought, and

10:42 20   again, maybe something has and I'm just not seeing it, against

21   a pregnancy health organization.

22          Again, state deceptive practices, a little different,

23   but I have never even seen that.  And anyway, whether it's

24   because it gets tossed out or not considered to be brought

10:42 25   because of the commercial speech part, which maybe that's a

1    tougher place to go than going to that Section B, which is that

2    you have to have the intent of influencing potential customers

3    to purchase the speaker's, goods or services.  I mean, that is

4    the First Circuit's law on this issue.  And so, there's no

10:42  5    purchase and they're not customers, at least not to us.

6    They're customers to Four Women, I understand that, but they're

7    not customers to us.  Again, they're folks that are exiting a

8    market.  They're no longer customers at all.

9            And, again, you get this competitor of the plaintiff

10:42  10    in the line of trade or commerce and, Your Honor, I understand,

11    but in the principal line of trade or commerce was still --

12    we're counseling against abortion, which is a constitutional

13    protected activity, and the other side is providing the service

14    for profit.  It's very, very different.  I mean, whether it's,

10:43  15    you know, animal rights folks standing outside of Pet Smart and

16    saying don't shop at this puppy mill, and I don't mean to

17    suggest Pet Smart is a puppy mill.  But if they were, come over

18    to our rescue shelter instead.  We'll get you a free dog.

19    Would Pet Smart be able to sue the rescue shelter because maybe

10:43  20    they didn't have quite the right licensing in the state of

21    Massachusetts if there's nothing wrong with the dogs and no one

22    has ever complained about the dogs?  I don't think they should.

23    I hate to argue too much from analogy.

24            THE COURT:  Yes, yes.

10:43  25            MR. BREEN:  The problem is, you get these contentious

1    social issues, and you go, well, folks doing boycotts and

2    things.  They cause economic issues for the folks they are

3    boycotting, and here we don't even have that proof or not an

4    allegation of it in a concrete way.  But we just say, well, you

10:43  5    can't sue for that.  That's not appropriate.  And we're not

6    going to sit there and police the speech of the people that are

7    urging a boycott or urging others to act in this particular

8    way.

9          THE COURT:  We'll give you two more minutes, and then

10:44 10    I want to move to Mr. Harvey.

11          MR. BREEN:  Sure.  Let's see.  Let me make sure.  I

12    would say on this point where the other side had said, well,

13    your compelled speech cases don't work, so *NIFLA v. Beccera*

14    being the big one.  The point of the compelled speech was --

10:44 15    the Court did analyze it, which they said, is this area of your

16    speech as a nonprofit of a commercial nature, and that then

17    tells the government whether it can regulate it or if you're

18    going to be at heightened scrutiny on that.  So it's the same

19    analysis here.  I mean, that's how the courts analyzed it.

10:44 20          That's what the Fourth Circuit looked at in *Greater

21    Baltimore Center for Pregnancy*, but it's nothing to say really.

22    I mean, look at the Supreme Court, and they absolutely trashed

23    that opposing view with respect to my learned opponents.

24          And we talked about materiality a bit.  But as to

10:45 25    Choose Life, it is a fair stretch to say that reading -- the

1    mere act of reading things on a website or on Google caused

2    Four Women direct harm or material harm.  I mean, that is

3    information, and maybe they made an appointment, but at that

4    point Choose Life Marketing is out, and there's no aiding or

10:45    5    abetting liability, at least under 93A, and we don't -- Choose

6    Life Marketing is not alleged to have any knowledge of anything

7    else in terms of what happens after they go to Abundant Hope.

8    So how you keep Choose Life in just for what went on a website,

9    that is, we would urge, a tough thing.

10:45    10    And *Azurity Pharmacy versus Edge Pharma*, I believe --

11    I think that was the case -- was talking about an actual

12    reaction.  There's an actual reaction.  Because the actual

13    reaction, as far as we could tell from the complaint, was

14    totally forgetting Abundant Hope or Attleboro Women's Health

10:46    15    Center.

16    Also, the Jane Does didn't go, oh, yeah.  I forgot I

17    even signed up there.  But then when we went into discovery,

18    oh, no, I did.  We had the evidence.

19    First Amendment, we talked about First Amendment all

10:46    20    the way through, but I would say the commercial speech -- so if

21    you decide not -- if this is not commercial speech, the whole

22    case has to go out.  If it is commercial, though, it's

23    commercial on an issue of significant public concern, and you

24    see that in their complaint.  I mean, they're alleging that

10:46    25    we're overstating the risk of abortion.  All of these things

1   are asking this Court to adjudicate a social issue which is not

2   within the province of the Court, we would submit.  Our First

3   Amendment just doesn't allow it.

4            THE COURT:  Can I ask you about that.  As I understand

10:47 5   the case law -- and correct me if I'm wrong -- but the First

6   Amendment and commercial speech question are kind of two sides

7   of the same coin.  That is, if they plausibly alleged

8   commercial speech here, there may not be a First Amendment

9   defense, sort of, that is, you can permissibly bring these

10:47 10   claims consistent with the First Amendment if there's

11   commercial speech.  Do I have that right in your view?

12            MR. BREEN:  So this is -- and this is a common -- it's

13   a delicate point.  When you are talking -- when a commercial

14   speaker is talking about -- is speaking on an issue of

10:47 15   significant public concern, you still have heightened -- or

16   there can be heightened scrutiny, and there's still First

17   Amendment scrutiny.

18            So you have got the *Sorrell* case where you've got

19   the -- you know, the comment from the Court was that the

10:47 20   commercial marketplace, the general rule is the speaker and the

21   audience, not the government, assess the value of the

22   information provided.

23            THE COURT:  Isn't that when you've got a government

24   actor, though?  Here, we've got two private entities, and so it

10:47 25   feels like a strange case to be even talking about the First

1    Amendment.  But as I understand the case law, you've got, you

2    know, this question, if they plausibly allege commercial speech

3    here, we move forward, but then also that kind of weakens the

4    First Amendment defense because you can bring a Lanham Act

10:48  5    claim where you've got commercial speech alleged.

6            MR. BREEN:  Well, except in a case like this -- and

7    so, for instance, you know, *Snyder v. Phelps*, I mean, the First

8    Amendment is a defense in a private tort suit.  And Your Honor,

9    the government actor in this particular case is Your Honor.

10:48  10           THE COURT:  I understand.

11           MR. BREEN:  So the First Amendment does apply fully

12    here, and also, too, even for false speech, you have got the *US*

13    *v. Alvarez* because there's got to be a compensable harm there.

14    That's the Stolen Valor case from the Supreme Court.

10:48  15           THE COURT:  I understand.

16           MR. BREEN:  So, and that's still there.  You know

17    what?  Also, the *Illinois ex rel. Madigan versus Telemarketing*

18    *Associates*, that was about a charitable solicitation.  The

19    Court applied a very stringent test looking at -- and it

10:49  20    allowed the Illinois law to proceed because they had exacting

21    proof requirements, because the defendants knew -- they had to

22    show the defendants knew the representations were false, acted

23    with the intent to mislead the listener, and succeeded in doing

24    so.

10:49  25           THE COURT:  This is a challenge to an Illinois

```
 1    statute?
 2           MR. BREEN:  It was an Illinois fraud statute, and so
 3    the Court allowed it but only because it had all these things.
 4    And Your Honor is familiar with the Counterman case, which we
 5    cited.  A big deal in First Amendment law because it held if
 6    you are going to be held liable for that speech, you have got
 7    to have some element of mens rea, and recklessness was
 8    sufficient in Counterman, but you have got to have something
 9    there.  And so that's part -- this is on the First Amendment
10    side.  A lot of the First Amendment protections are built into
11    the statutes, but you do have some base protections that may
12    come into play because you can't -- strict liability does not
13    fly under the First Amendment if you're dealing with issues
14    like this of significant importance.
15           THE COURT:  Okay.  Thank you, Mr. Breen.
16           I'll turn to you, Mr. Harvey.
17           And of course, I understand that you've adopted many
18    of the arguments that Choose Life has made.  No need to repeat
19    those, but if you have additional points, I'm happy to hear
20    you.
21           MR. HARVEY:  Yes, Your Honor.  I'll be fairly brief.
22    I want to focus on two issues.  One is the lack of trade or
23    commerce involving my clients, and second, the liability of the
24    individual defendants.
25           As far as the first issue, trade or commerce, Planned
```

*Parenthood versus Problem Pregnancy* I think is right on point
here.  You noticed the distinction as far as in that case there
were no medical services, whereas here there are.  But the
bottom line is there was no trade or commerce.  That's the way
10:50  the Court ruled in that case.  Since there's no trade or
commerce, there's no 93A liability, and it's the same thing
here.

I think that the plaintiff did not allege with
specificity the trade or commerce.  It's just one big
10:51  statement, if I could quote from their amended complaint,
paragraph 191, defendants' activities arise in a business
context and thus they are engaged in trade or commerce.  I
would submit that's insufficient.

And bear in mind, Your Honor, they took -- the
10:51  plaintiff already took about three and a half hours of
depositions of two members of the staff, and yet, in the
amended complaint in January, there's no specific allegation as
far as what exactly they did as far as trade or commerce.  I
would also note that -- well, the Lanham Act also requires the
10:51  same thing, trade or commerce.  But I would point out that the
letter that I wrote in 2022, which they cite as far as sort of
bootstrapping, and therefore -- because I threatened a 93A
Section 11 violation, therefore I'm admitting that this is a
business, I think that a lawyer's threatening letter is not
10:52  sufficient reason to all of a sudden say that where there's a

1    lack of trade or commerce now there is.  I would submit that's

2    not sufficient.

3          THE COURT:  I understand them not to be making a kind

4    of -- well, maybe they are making a strict waiver argument, but

10:52  5    another view of their argument is that it shows your client's

6    sort of awareness that you are operating in a business context

7    and that 93A does apply to both of these entities.  So do you

8    want to respond that?

9          MR. HARVEY:  Yeah.  But a business context always

10:52 10   requires consideration.  There is no evidence anywhere that

11   there is ever any consideration, a give or take, money,

12   something in exchange.  That's what the *Planned Parenthood* case

13   said, there's got to be some type of consideration there.  And

14   there wasn't there and there isn't here.  I think it's rare

10:52 15   that you get a case so closely on point.

16          As far as the Lanham Act, again, a requirement of

17   trade or commerce.  The caption of that chapter is commerce and

18   trade.  I submit there's no commerce and trade here by my

19   clients.  In fact, the statute says the intent of this chapter

10:53 20   is to regulate commerce.  Again, there's no commerce here.  And

21   the allegation of commerce is an extremely vague business

22   context.

23          As far as the individual defendants, Your Honor, again

24   in the amended complaint -- again, this is after these

10:53 25   depositions, and one of the depositions was one of the named

defendants, Darlene Howard, again, very vague.  You know,
the -- if I could read from the amended complaint, "At all
relevant times defendants Roman, Carges, and Howard have
controlled and directed the actions of defendant Hope."  That's
it.  You take a deposition of one of the named defendants and
you still come up with these vague allegations.  What exactly
did she do wrong?  I submit that you have got to be a lot more
specific on that if you want to keep these named individuals as
defendants in this case.

Your Honor, I cite Chapter 93A, a charitable
organization may be a plaintiff under either Section 9 or
Section 11 if it is pursuing its core mission rather than the
desire to make money.  The fact that Abundant Hope threatened
suit is entirely consistent with Choose Life's actual
arguments.

And the mere fact that they held offices as president
or treasurer is not good enough.  I think there's plenty of
case law, and I cite that in my brief.  Similarly, under the
Lanham Act, individual corporate officers should be, I quote,
the moving, active, conscious force behind the infringement.
They're just not.  It's not alleged here.  Therefore, I would
ask that the individual defendants be dismissed from this case,
and the motion for judgment on the pleadings should be granted
because there's just not enough sufficient allegation or trade
or commerce.

```
 1              Thank you, Your Honor.
 2              THE COURT:  All right.  Thank you, Mr. Harvey.
 3              Ms. Nash or Mr. Patton.
 4              MS. NASH:  Good morning, Your Honor.
 5              THE COURT:  Good morning.  I think we're still
 6    morning.
 7              MS. NASH:  Yes, I know.  With the Court's permission,
 8    I intend to speak about Choose Life Marketing's motion to
 9    dismiss, and then my colleague Mr. Patton will speak briefly on
10    the specific issues raised by the motion for judgment.
11              THE COURT:  Sure.  Absolutely, yep.
12              MS. NASH:  Throughout my discussion I intend to refer
13    to specific statements made in the defendant's advertising, and
14    I brought copies of the advertising -- the exhibit actually
15    that they submitted, which I'm happy to accept the images.  If
16    the Court would like to refer to those, I have extra copies.
17              THE COURT:  Sure.  Any objection, Mr. Breen?
18              MR. BREEN:  No.
19              THE COURT:  Sure, I'll take a look at those.  That's
20    fine.  You can hand them up.  Do you have a copy for Choose
21    Life?
22              MS. NASH:  Yes.  We have several copies, one for
23    Choose Life.
24              MR. BREEN:  Are you referring to docket 65-3?
25              MS. NASH:  Yes.  And 68-2.
```

10:55 5
10:55 10
10:55 15
10:55 20
10:56 25

1          MR. BREEN:  And 68-2.

2          MS. NASH:  They are the same websites.  As counsel for

3     Choose Life Marketing explained, they used the Wayback Machine.

4     We have no issue with that.  Perfectly printer friendly.

10:56   5          So this is a case about false and deceptive

6     advertising of medical services.  This is not a case about

7     defendants' views on abortion.  You've heard counsel for Choose

8     Life Marketing call this an ideological case.  We disagreed

9     with that.  This is a case about advertisements for medical

10:56  10    services, purportedly provided by an entity called Attleboro

11    Women's Health Center, that advertised services that this

12    entity cannot legally provide.  Through these advertisements

13    they target women.  They call them abortion-minded women, women

14    seeking abortion services or other reproductive health care

10:57  15    services, and they misdirect them from Four Women, which is the

16    only abortion clinic in Attleboro and the only provider in that

17    region that can provide the full slate of abortion services, to

18    instead go to an entity next door that they call Attleboro

19    Women's Health Center.

10:57  20         To the extent Abundant Hope provides counseling or

21    even talks about that counseling on its website, that is not

22    what is at issue in this case.  We have not raised that in our

23    complaint, and it is not the subject of this motion.  The

24    informational articles that Mr. Breen referred to, that is not

10:57  25    what we are referring to here.  We're referring to specific

1    characterizations of services provided along with the "Book an

2    appointment" button next to those services.  And indeed, we

3    also refer to advertisements beyond the AWHC website, including

4    on Google and elsewhere, that simply invite women to make an

10:58  5    appointment.  And through those links, we assert, women provide

6    their contact information to Choose Life Marketing, and then

7    Choose Life Marketing sends that contact information to

8    Abundant Hope saying you have a new lead.  Here is this person

9    who's looking for, you know, whatever services they identify

10:58 10   when they completed that form.

11          THE COURT:  So let me stop you there.  So I understand

12   that to be part of your allegations of false and deceptive

13   advertising as well as the issues that we talked about with

14   advertising services that require licensure, but I wonder if

10:58 15   you can go to the threshold argument, which is, you know, this

16   question of are the parties operating in a business context.

17   And I have this on point decision, *Planned Parenthood* from the

18   SJC, that I put the question to Mr. Breen, but I'm interested

19   in your views on it, too.  It strikes me as quite on point, but

10:59 20   there is some differences in that the Crisis Pregnancy Center

21   advertised additional services, the ultrasounds, and the

22   pregnancy diagnoses, but I still have this presumption that

23   where it's acting in furtherance of its core mission, it's

24   acting as a nonprofit not in trade or commerce.  So why don't

10:59 25   you turn to that issue.

```
          MS. NASH:  Certainly.  So Planned Parenthood did not
1
    give Crisis Pregnancy Centers carte blanche to say whatever
2
    they want about the services they provide.  Planned Parenthood
3
    was decided on the facts before it.  And the cases including by
4
10:59  5  the SJC since then have made that clear, that it is a highly
    fact-dependent inquiry.  It was not a bright line rule that a
6
    Crisis Pregnancy Center or the for profit advertising firm
7
    speaking about that Crisis Pregnancy Center can never be held
8
    liable under Chapter 93A.
9
10:59 10      THE COURT:  Sure.  It is operating in a business
    context, right?
11
          MS. NASH:  Exactly.
12
          MR. HARVEY:  I think everyone agrees with what you
13
    said so far.
14
11:00 15      MS. NASH:  Yes.  And so, for -- to make that
    assessment, you look at the factors that Planned Parenthood
16
    itself cited, which arise from Begelfer, and those were three
17
    factors.  One is the character of the parties, the nature of
18
    the activity, and the motivation for the parties.  As Your
19
11:00 20  Honor acknowledged, this is a highly fact-intensive inquiry,
    but we submit that we've well exceed the plausibility standard
21
    on all three.  There are key distinctions between our case and
22
    the Planned Parenthood case on all three factors.
23
          So on the character of the parties, in that case you
24
11:00 25  had nonprofits on both sides of the v.  Here we have a for
```

1    profit entity as a plaintiff, and we actually have a for profit

2    entity as a defendant and so --

3        THE COURT:  Yes, I appreciate that, and I guess maybe

4    for purposes of this question, let's set aside Choose Life

11:00  5    because I think it's a different analysis for them, but just

6    for Abundant Hope, it is a nonprofit here, and I need to look

7    at its character, right?

8        MS. NASH:  Yes.  But it is true, also, that the factor

9    itself does not say just the character of the defendant.  It

11:01 10   says the character of the parties, and there are three parties

11   here, two of which are for profit entities.  So that's just one

12   of the three factors.  The most significant factor is the

13   nature of activity and here we have significant distinctions.

14        The one factual finding, which, yes, was also after

11:01 15   trial in the *Planned Parenthood* case, the one factual finding

16   there was that the services that *Problem Pregnancy* offered were

17   urine pregnancy tests and counseling.  Here, the focus of our

18   case is not on those services.  It is on the separate category

19   of services that Abundant Hope purports to provide and that

11:01 20   their advertisements focus on, which are these ultrasounds and

21   diagnoses related to those ultrasounds, and that is not a

22   distinction without a difference.  That's an important

23   distinction.  It's significant enough that it is the reason why

24   Massachusetts requires licensure for clinics like this.  It

11:02 25   puts them into the ambulatory services category.

11:02

11:02

11:03

11:03

11:03

1    You know, it is the reason why you need a doctor or an

2    advanced practice registered nurse in order to read that

3    ultrasound, and we know, both because we've pled it and because

4    the Abundant Hope defendants have admitted it, that they don't

5    have a physician or advanced practice registered nurse on site.

6    And we also know that through our Jane Doe 1, for example, that

7    people receive these diagnoses when they are there without any

8    involvement of any of these people.  So it is an important

9    distinction that puts the services in a separate category.

10   THE COURT:  So can I -- I mean, I know you know the

11   SJC and the First Circuit have both said, you know, when a

12   nonprofit is acting in furtherance of its core mission, it's

13   kind -- I don't think they used the word "presumptively," but

14   basically in most circumstances it is not acting in trade or

15   commerce, and it sounds to me like your argument is -- and tell

16   me if I have this right -- if you're violating a regulation or,

17   you know, something that's -- you're in a regulated industry,

18   you're not complying with the regulation, that you're sort

19   of -- that's enough to rebut, in a sense, the presumption that

20   you're acting in furtherance of your core mission?

21   MS. NASH:  It certainly contributes to that

22   assessment.  I wouldn't say that there's any one fact alone

23   that is inherently dispositive, but I would say that it puts it

24   in an entirely separate category, certainly from the facts that

25   were before *Planned Parenthood*.  And yes, I certainly agree

1    that there is this presumption against liability under 93A for

2    a charitable organization, but that presumption is rebuttable,

3    as the *Linkage Corporation* case itself shows, which talked

4    about that, that in most circumstances a charitable institution

11:03   5    will not be engaged in trade or commerce.  But when the facts

6    establish -- and this is what they said, and they were -- when

7    the institution has inserted itself into the marketplace in a

8    way that makes it only proper that it be subject to rules of

9    ethical behavior and fair play, and that is the case here.

11:04  10        We submit that in addition to the differences in the

11    services that they advertise, the actual advertisements

12    themselves are activity that this Court can consider when

13    assessing these factors of whether it's operating in a business

14    context.  In the *Planned Parenthood* case, you had an instance

11:04  15    of a sign on a door.  And yes, that sign was certainly

16    misleading, and the SJC affirmed judgment against *Problem*

17    *Pregnancy* on a different count for that sign.  Here, this goes

18    well beyond a sign on a door.  This is advertising, the scope

19    of which, you know, we think we've only gotten the tip of the

11:04  20    iceberg so far because all we're aware of is the AWHC website

21    and some Google advertisements but we also know that it goes

22    beyond that.  There are women whose contact information has

23    ended up with Abundant Hope, and they do not know how it has

24    gotten there and nor does Abundant Hope.

11:05  25        So advertising that's disseminated on line, on Google

1   speaks specifically to the services offered, and those

2   services -- and those descriptions are false.  That goes well

3   beyond a misleading name on a door.  They also have a

4   misleading name on their sign here as well.

11:05   5        It contains descriptions of both the services that

6   you'd receive at that facility and who would provide it, both

7   of which are false, and it puts that communication into the

8   pockets of women wherever they are.  It forces them to confront

9   this false advertising if they are just starting out on their

11:05  10   search for reproductive health care.

11        THE COURT:  Okay.  So I wonder if you could address

12   the *Squeri* case because I think that one is -- it's hard for

13   you because many of the cases, as I said to Mr. Breen, are

14   resolved after summary judgment or a trial.  *Squeri* was up on

11:06  15   appeal after the district court granted a motion to dismiss and

16   the First Circuit addressed -- you know, affirmed.  And there

17   you had similar or maybe, I don't know -- tell me if you agree.

18   There are similar allegations of failing to disclose key

19   information.  I think the college didn't disclose that it was

11:06  20   experiencing financial distress to its students.  And *Squeri*

21   also kind of talks about *Planned Parenthood* as a case involving

22   advertising.  So I wanted to just give you the chance to

23   address that case as it's binding here.

24        MS. NASH:  Thank you, Your Honor.

11:06  25        Yes, that is a case in which the Court affirmed the

1    motion to dismiss.  There, again, I will go back to how

2    factual -- how fact-specific this inquiry is.  So there were no

3    bright line rules that this Court must follow from the *Squeri*

4    decision.  It is affirming a fact-based decision in that case,

11:07  5    and there are, again, significant differences between the facts

6    in that case and our case, one of which is that there it

7    occurred in the educational context, which the Court repeatedly

8    emphasized is a separate category in which, I would submit,

9    that the presumption is even higher against finding that that

11:07 10    charitable organization was operating --

11              THE COURT:  Why?

12              MS. NASH:  Well, there I believe it was also a college

13    that was authorized by statute, and that is a category that has

14    been considered separate under SJC case law.

11:07 15              THE COURT:  Separate than health -- the health context

16    for purposes of 93A liability?

17              MS. NASH:  Yes, because it was a specific statutorily

18    created entity which the Court viewed as separate from other

19    nonprofit entities.

11:07 20              THE COURT:  Okay.

21              MS. NASH:  But additionally, they don't have -- you

22    don't have this same interference with the marketplace that you

23    have here.  You have advertising that's directed towards

24    students, but here you have specific attempts to put a separate

11:08 25    entity out of business.  And it's true that we don't dispute

1    that that was their motivation.  That motivation is a Chapter

2    93A motivation.

3            THE COURT:  Wait.  Sorry.  Where have you alleged that

4    they were trying to put Four Women out of business?

11:08  5            MS. NASH:  I don't have the specific paragraph cite,

6    but we have alleged that they have a motivation to interfere

7    with the reproductive health care market and prevent women from

8    receiving services from Four Women.

9            And today, counsel for Choose Life Marketing has

11:08 10    accepted that motivation, that they have a motivation to stop

11    women from obtaining the services that Four Women provides.

12            THE COURT:  Yes.

13            MS. NASH:  So I think, going back to the standard that

14    *Linkage* established in -- the *Linkage* Corporation established

11:09 15    that it's the question of whether the defendants have inserted

16    themselves into the marketplace in a way that makes it only

17    proper that they be subject to the rules of ethical behavior

18    and fair play.  That is the standard, and that standard applies

19    here.

11:09 20            THE COURT:  They also argue, and there's some support

21    for this in the case law, that you need some exchange of money

22    in order to put this into trade or commerce under 93A, that,

23    you know, the services can't be provided for free.  And you

24    know, the BU case, you had money exchanged, it was a contract,

11:09 25    and here we don't have allegations that the services that

1    Abundant Hope provides are -- the clients have to pay for them.

2    In fact, it's alleged to be the opposite.  So do you want to

3    address that argument?

4         MS. NASH:  That is -- it's not a requirement under the

11:09  5    *Begelfer* test or any other test.  I think it is that exact

6    issue that leads to the presumption that we've been talking

7    about thus far.  So I would agree that the lack of exchange of

8    money would contribute to the application of this presumption

9    that, you know, agreeing that that presumption exists.  We

11:10  10    submit that we have also alleged a substantial amount of

11    movement of money that is dependent on these advertisements.

12    For example, I know we're focusing on Abundant Hope for the

13    purpose of this argument, but the fact is that they've paid

14    tens of thousands of dollars to Choose Life Marketing to craft

11:10  15    advertising to bring people in the door.  And also they tout

16    these advertisements and these supposed medical appointments,

17    which are not actually medical appointments, when they are

18    raising money for their own organization.  And there are cases

19    that we've cited in our brief that recognize that that

11:10  20    fund-raising element is itself also an economic connection

21    sufficient for the business context to apply.

22         THE COURT:  Okay.  And then I'll ask you the same

23    question I asked Mr. Breen, which is, this question about is

24    there any case law where you've got a nonprofit who's kind of

11:11  25    doing the advertising, but they're working with a for profit

1    entity, and assuming for the sake of argument, I think that

2    Abundant Hope isn't subject to 93A, where does that leave

3    Choose Life where they are a for profit entity, and you know,

4    as you say, operating in a commercial or business-like context,

11:11  5    is there case law that addresses how to think about that

6    situation?

7         MS. NASH:  We did not brief this issue because they

8    did not raise it.  We -- I cannot think of a specific 93A case

9    that addresses that point, but I'll say two things in response

11:11 10    to that.  First, under the Lanham Act, yes, there is case law

11    from around the country recognizing that an advertising agency

12    can be held liable for the false advertisements that it

13    perpetrates on behalf of a client.

14         There is one case before the Court in the briefing --

11:12 15    in the myriad cases cited in this briefing, the *Nestle Purina*

16    case speaks to that.  But additionally, I would just disagree

17    with this notion that we've sued Choose Life Marketing under an

18    aiding and abetting theory.  This is not the case of putting

19    out a shingle.  This is the case of the advertising firm

11:12 20    actually wrote the content that is being disseminated.  It

21    placed the advertisements -- in fact, it did so to such a

22    degree that there are certain locations that Abundant Hope is

23    not aware of.  It has control over those things, and it is the

24    one that is putting that false language into the marketplace to

11:12 25    interfere with women's access to reproductive health care.  So

1    that is a direct interference with the marketplace, not an

2    aiding and abetting theory.

3         THE COURT:  Go ahead.

4         MS. NASH:  And finally, on the 93A point, and then I'm

11:12  5    happy to move on to the Lanham Act, if the Court would

6    appreciate that.

7         THE COURT:  Sure.

8         MS. NASH:  I'll just note that the only Massachusetts

9    case to have addressed facts like these since *Planned*

11:13 10   *Parenthood* is in that *Clearway Clinic* case that we cited and

11   the Court declined to dismiss at that point.

12        THE COURT:  I saw that.  There's no analysis in that

13   case.  I guess I'll ask you if there is an order of impoundment

14   in that case.  You know, it sounds like the defendants tried to

11:13 15   get the documents from that case and couldn't.

16        MS. NASH:  Yes.  I'm happy to let my colleague speak

17   to that a bit more specifically since he was lead counsel on

18   that *Clearway Clinic* case, but I can answer it.  The entire

19   case was not impounded.  There was an affidavit that was

11:13 20   impounded, and the clerk had inadvertently like made it so you

21   couldn't access the whole file.  We were unaware of that until

22   we saw the reply that had been filed.  It wasn't raised with us

23   before that even though we had provided the documents, and

24   clearly Mr. Patton was counsel of record on that case.  But my

11:13 25   understanding is that it's fully available now, and certainly

1    we made the opinions available to opposing counsel through this

2    case.  I certainly understand there was not much analysis in

3    that opinion.  However, the principle is still there, which is

4    that a Court is not prevented from holding a Crisis Pregnancy

5    Center liable for its false advertisements by *Planned*

6    *Parenthood*, and it's a fact-intensive inquiry that should not

7    be decided and resolved in a motion to dismiss case.

8            But there are also courts elsewhere from around the

9    country that have recognized this same principle.  And the

10   *Fargo* case from North Dakota is especially relevant here

11   because it also involved a private lawsuit.  And in that

12   case -- and also, I think I would direct the Court to that case

13   as well for some of this First Amendment discussion because

14   there the Court, you know, addressed the same argument, and in

15   relying in the *Zauderer* case recognized that advertising --

16   this is just the quote from the *Zauderer* case, "Advertising

17   which links a product to a current public debate is not thereby

18   entitled to the constitutional protection afforded

19   noncommercial speech.  Advertisers should not be permitted to

20   immunize false or misleading product information from

21   government regulation simply by including references to public

22   issues."  And so similarly here, this idea that we're in a big

23   First Amendment case just because we're talking about abortion

24   is not the case.  We're talking about medical services and the

25   description of those medical services.

1           To go to the Petco example, for example, if those

2    animal rights activists were out there saying, you know,

3    speaking their beliefs about animal rights and saying Petco is

4    violating those animal rights, come inside and we'll talk to

11:15  5    you about it, that would be a First Amendment case.  If they're

6    saying come inside and we'll give you a dog for free but that

7    dog is not actually a real dog, that's more in line with the

8    case we have here.  We're trying to solicit people to come to

9    get our services but those solicitations make false

11:16 10    representations about what those services are.

11           Turning to the Lanham Act, if the Court is interested.

12           THE COURT:  Sure, yes.  Oh, actually -- sorry.  I'll

13    just -- one more question, which is, just on this point about

14    the allegations about whether the clinic had to be licensed --

11:16 15    I'll pull up the statute -- I think Mr. Breen had argued that

16    you would have the burden of saying that Abundant Hope is not

17    wholly owned or controlled by the practitioners, and I just

18    wanted to give you a chance to respond to that.

19           MS. NASH:  Thank you, Your Honor.

11:16 20           And we submit that we've certainly met that burden.

21    We've pled that it operates as a clinic, and it is not licensed

22    as a clinic.  It has admitted -- Abundant Hope has admitted

23    that it is not and it's never been licensed by the state to be

24    a clinic or provide ambulatory services.  And we have pled in

11:16 25    defining the parties here, that this is nonprofit, and we've

1    pled the directors and officers of that nonprofit.  And in

2    fact, there is -- not only is there not a physician owner,

3    there's no physician on site, and they've admitted to that.

4         So we submit that we've provided enough to make it

11:17  5    pretty clear that they are not a wholly owned business run by a

6    doctor, and our allegations suffice to show that.  If they want

7    to present evidence through discovery that they are in fact

8    that, you know, that's a defense of theirs, and they want to

9    show that they are somehow owned and operated by a physician

11:17 10    even though they are owned and operated otherwise based on our

11    pleadings, they are free to show that through discovery.  I

12    don't expect that to bear out.

13         THE COURT:  Go ahead.

14         MS. NASH:  So the advertising -- we've identified

11:17 15    statements that are both false and misleading.  There are

16    certain statements that we identify as literally false and then

17    other statements that we identify as misleading.  And so I'm

18    happy to go through those a little bit and point the Court to

19    those specific -- the specific language in the advertisements.

11:18 20         THE COURT:  Sure.

21         MS. NASH:  So with respect to the actual falsity, they

22    make statements in their advertisements about their ability to

23    provide pregnancy diagnoses through ultrasounds and for that I

24    would point the Court to pages 2, 4, and 10 of the exhibit.

11:18 25         On page 4 they -- on page 4 and 10 they really define

what an ultrasound is.  And they say ultrasounds will give you

the critical information you need to stay safe, including your

pregnancy's gestational age, how far along you are, its

location growing in your uterus, if it's viable, if there's a

11:18  heartbeat.  They say again, the ultrasound reveals the location

of your pregnancy.  On page 10 there's a big bold warning on

this saying an ultrasound will show you the following, the

location of your pregnancy, the viability of your pregnancy,

the age of your pregnancy, that's a pregnancy diagnosis.  Those

11:19  three things are pregnancy diagnosis.  And then they say make

an appointment -- we provide free ultrasounds, make an

appointment for an ultrasound.  Those are literally false

statements about the services that they provide because they

cannot provide an ultrasound, they do not have a physician or a

11:19  advanced practice registered nurse on site, nor are they a

licensed clinic.

        THE COURT:  Can I ask -- I mean, I thought it's also

alleged that in fact they did provide ultrasounds.  I know you

say that they weren't allowed to under the law because they

11:19  weren't licensed but didn't one of your Jane Does receive an

ultrasound?

        MS. NASH:  Yes, and she also received what she

believed to be a pregnancy diagnosis.  So she believed that

diagnosis to be wrong.

11:19          THE COURT:  So I guess my question is how is that

1    false when in fact they were providing these services?  I know
2    you say maybe that's not a lawful action.

3             MS. NASH:  Yes.

4             THE COURT:  But --

11:19  5             MS. NASH:  So I would say, you know, two answers.  One
6    is just a quick analogy and the other is I'll point to a case.
7    For the quick analogy, I would just let's say I decided one day
8    I wanted to try dentistry.  If I put a sign outside of my house
9    and said we provide dental services here and I put a website up
11:20 10   saying make an appointment for your dental services, make an
11   appointment for your teeth cleanings, and then you came and I
12   brushed your teeth and flossed your teeth and I polished your
13   teeth, that advertising would be false.

14             THE COURT:  What is the best case for that?  I mean,
11:20 15   just sort of intuitively, that strikes me as not false.  Like,
16   you're literally providing the services that you're advertising
17   but you are subject potentially to consequences for not
18   complying with the licensure or the Board of Registration in
19   Dentistry requirement.

11:20 20             MS. NASH:  That is all true, that I would be liable
21   for those things, but I would submit I would also be liable
22   under the Lanham Act.  The *Cashmere and Camel Hair*
23   *Manufacturers Institute* case is the one that I would point the
24   Court to.  There the First Circuit recognized that a tag on a
11:21 25   blazer that said cashmere was literally false because it didn't

1    say recycled cashmere.  And it also pointed to the fact that

2    there is regulation out there saying that if you have a -- if

3    you have recycled material, whether it's cashmere or a few

4    other categories, it needs to say so on a blazer.  That is

11:21  5    similar to this situation.  If you say ultrasound, people read

6    that, and they understand what ultrasound means based on their,

7    you know, common sense, based on the fact that there are

8    regulations that define who can perform those things and based

9    on the definitions also on the website.  The website itself

11:21 10    defines ultrasound as providing all these diagnoses.

11          I, as a consumer -- a consumer should be able to read

12    that and read those words for what they actually mean rather

13    than say, okay, but, you know, when you say ultrasound, do you

14    really mean just like you happen to own an ultrasound machine?

11:22 15    It's not up to the consumer to have to probe that way.  They

16    should be able to accept the words.

17          THE COURT:  Just to be clear, I mean, it is

18    undisputed, right, that in fact they provided ultrasound.  It's

19    not just that they owned an ultrasound machine.  They were

11:22 20    actually giving women ultrasounds and confirming -- providing

21    pregnancy diagnoses, right?

22          MS. NASH:  Yes, they were, but they were not licensed

23    or qualified to do that.

24          THE COURT:  So it sounds like you're arguing that for

11:22 25    purposes of false speech consumers would expect if you're

getting a service that requires a certain level of licensure

that the organization providing the service has that level of

licensure, is that --

MS. NASH:  If it's advertising it provides that

service, yes.

THE COURT:  Okay.

MS. NASH:  Similar to the fact that the recycled

cashmere blazer is still cashmere, but we have this requirement

that if you're going to say cashmere and not include the word

"recycled," the consumer is going to read that to mean this is

pure cashmere and not recycled cashmere.  I would say that

applies with even greater force here when we're talking about

health care.  You know, if I have a Doppler scan and that

Doppler scan is supposed to assess whether the nutrients are

going to my baby, that that baby should be receiving, I want a

doctor to read that Doppler to me to tell me if that's the case

or not.  That's an important distinction:  Who's reading the

ultrasound matters.  It's not just a pregnancy test.

THE COURT:  Okay.  I understand the argument.

MS. NASH:  Additionally, you know, they make factually

false statements about their personnel.  On page 2 they

describe their staff, they say your care team consists of

physicians, nurses, and ultrasonographers who will provide you

with compassionate and accurate medical information free of

charge.  And they talk throughout about the care team and their

licensed medical personnel.  When in fact they admit that they

do not have a physician or advanced practice registered nurse

on site, and as we've alleged in this case, they provide

pregnancy diagnoses without the involvement of such personnel.

11:23    THE COURT:  So is your argument that that's false or

misleading?  Because I think it's also alleged that later they

do work with a doctor, maybe not licensed in the state, but

there are medical personnel that are involved at some point.

It's just not in the physical office itself.

11:24    MS. NASH:  I guess with that one, I would submit that

it's false, but it is at least misleading as well.

THE COURT:  Okay.  All right.

MS. NASH:  As far as the advertisements that are

misleading, they're misleading in two primary respects.  One is

11:24    that they mislead women into believing -- into believing that

they provide actual abortion care there, and the other one is

misleading women into believing that they are -- that an

ultrasound is required in order to get an abortion, meaning

that this is something they need to do in order to get the

11:24    abortion here they want, which is common in health care, you

might need to go to a different place to get a scan before you

go to the doctor who's going to read that scan.  That's what

many women are led to believe here.

And sometimes it does that through, you know, silence

11:25    through the Google advertisements that say, you know, if

somebody searches abortion near me, Attleboro, Massachusetts,

and then this Attleboro Women's Health Center comes up and says

make an appointment, that is misleading.  But also on the

website itself it has, you know, big bold font saying, thinking

11:25  about abortion, and then a link under it saying book an

appointment, that's also misleading.

As far as the second category, they repeatedly say on

the website that it is critical to confirm your pregnancy

before you get an abortion.  It's vital in Massachusetts to get

11:25  an ultrasound before you get an abortion, and that's on pages

4, 7, and 10 of that exhibit before you.  And this makes women

believe that they must have an ultrasound to get an abortion,

and so they should go to Attleboro Women's Health Center where

they can get one for free.

11:26  The unfairness of this expectation is exacerbated by

the fact that Choose Life Marketing and the other defendants

are through Choose Life Marketing's own words specifically

engaging in micro-targeting, which is targeting young women in

low-income families, which is a market of women who may not be

11:26  sophisticated enough or speak English well enough to do this

extra diligence and understand the subtext when looking for

health care services.

And actually, you know, in paragraph 86 of the

complaint, we specifically -- you know, we just quoted an

11:26  example from their own website, from the Attleboro Women's

1    Health Center website that, quote, a client story saying, I had

2    an appointment scheduled at the abortion clinic on a Saturday

3    morning.  I don't speak English very well, and I was so

4    nervous, I got confused and walked into Abundant Hope instead

11:26  5    of the abortion clinic.  That's a success story from their

6    perspective, but that just goes to show that they are

7    intentionally targeting and misleading women who may not

8    understand English fluently and using that in order to get

9    women into their facility when they are intending to go to Four

11:27 10    Women instead.

11        I'm happy to speak a little bit as to why this is

12    commercial speech, if the Court would like me to.

13        THE COURT:  Sure.  Yeah, I think that makes sense to

14    move to that point.  Yes.

11:27 15        MS. NASH:  Okay.  In the -- like in the 93A context,

16    the fact that Abundant Hope is a nonprofit and it is not

17    charging for these services means that it is less likely to be

18    commercial speech.  We don't dispute that.  But it is not

19    dispositive of the question.  It can still meet the definition

11:27 20    of commercial speech established in the *Bolger* case, *Bolger v.*

21    *Youngs Drug Products Corporation* which identified three

22    qualities of commercial speech, whether it's an advertisement,

23    whether it promotes a specific product or service and whether

24    it's economically motivated.  It's not required that all three

11:28 25    be present for the speech to be considered commercial.  These

are just characteristics often found in commercial speech.  We

submit that they're met here.

THE COURT:  But what is -- what is the best case for

that point you just made, that it's not required that all three

11:28  factors be present.

MS. NASH:  I would have to look through the briefings

to get that cite for you.

THE COURT:  Sure.

MS. NASH:  So the other additional standard that we

11:28  would submit as part of the inquiry, other courts have

recognized this, or at least in factually analogous

circumstances this has been a helpful guidepost, which is

whether the message is placed in a commercial context and

directed at the providing of services rather than toward an

11:28  exchange of ideas.  And that was articulated in the *Fargo* case

that I referred to earlier as well as in *Handsome Brook Farm*

and *First Resort*.  So this speech is promotional in nature.

It's intended to attract clients for services in a commercial

marketplace, the reproductive health care marketplace, and they

11:29  placed it in interstate commerce.  It speaks to the specific

services.

And as I discussed earlier in the context of Chapter

93A, we submit that there is an economic motivation, both for

the, you know, specific money exchanged for -- as Choose Life

11:29  Marketing was paid for its services, the fundraising efforts

1    that Abundant Hope makes, and it really -- it's not ancillary

2    to the fund-raising efforts, it's central to the fund-raising

3    efforts.  I mean, their core mission is to prevent women from

4    receiving abortion care and they do so through these,

11:29 5    quote-unquote, medical appointments, and without those medical

6    appointments, they are not doing their work.  That's central to

7    their whole mission.

8         Just speaking a little bit to this question of

9    competition, Choose Life Marketing argues that defendants

11:29 10    should not be held liable under either statute because they are

11    not supposedly in the same marketplace.  We vehemently dispute

12    that both because they offer services that overlap with the

13    services that my client offers with these ultrasounds of

14    pregnancy diagnoses, but also, as I said throughout, they are

11:30 15    motivated to destroy the business of Four Women.  That is a

16    standard that has been recognized in the context of

17    competition.  And the facts here illustrate that really

18    Abundant Hope opted into this two-party marketplace by moving

19    next door to Four Women in 2018, putting Attleboro in the name,

11:30 20    setting search parameters to be the first entity that shows up

21    when somebody searches abortion care near me or abortion

22    Attleboro.  It's not a coincidence.  It's their entire strategy

23    to confuse women seeking services from Four Women into making

24    appointments or entering the premises of Abundant Hope under

11:30 25    the name of AWHC.

1          We have a few specific examples of this with the Jane

2     Does in the complaints, but as I said earlier, it's just the

3     tip of the iceberg.  In one year alone, there were almost 600

4     women who had been in touch with Four Women who were also

11:31  5     contacted by Abundant Hope.  We --

6          THE COURT:  Do you want to -- so the parties dispute

7     whether, you know, that figure -- well, I know you rely on that

8     figure to show harm here.  And Choose Life argues that that's

9     not enough to even raise an inference of harm to survive a

11:31 10     motion to dismiss because you need to put meat on the bones of

11     that allegation; that is, you know, you lost a certain amount

12     of clients, you lost a certain amount of dollars because those

13     women were also contacted by Abundant Hope.  So I would like

14     you to respond to that.

11:31 15          MS. NASH:  I concede that that will not be enough at

16     summary judgment.  We will have -- we will have to bear that

17     burden of showing lost profits in this case.  There are a few

18     different ways a party can show lost profits.  It can be shown

19     through the loss of actual business, it can be shown through

11:32 20     the business wrongfully obtained by the defendant.  We have a

21     monetary amount in the complaint that they associate with

22     these, quote-unquote, medical appointments of over $100,000,

23     over $150,000, which is paragraph 90 of the complaint.  So I

24     expect that will be part of it, and we will have to make that

11:32 25     factual showing once we've engaged in discovery in this case,

1    but we've certainly gotten over the plausibility threshold.

2            THE COURT:  Okay.  All right.

3            MS. NASH:  Finally, I want to note that -- I know

4    we've been talking about both parties here, but just going back

11:32  5    to Choose Life Marketing, Choose Life Marketing is uniquely

6    situated among the defendants here.  It tries to wear Abundant

7    Hope's potential defenses as its own but it cannot.  Choose

8    Life Marketing is not a nonprofit organization.  It is a for

9    profit marketing firm based in Missouri that is doing business

11:33 10    in Massachusetts and targeting Massachusetts residents through

11    the Internet.

12            To the extent that Abundant Hope's nonprofit status

13    provides any protection from its own liability here, which we

14    vigorously dispute, it does not extend to the for profit

11:33 15    marketing firm that is profiting off of these false

16    advertisements it's drafting and publishing.

17            THE COURT:  Can I just ask you, I know you had cited a

18    case from Missouri in your brief that for purposes of the

19    Lanham Act there's not a knowledge requirement; that is, you

11:33 20    don't have to plead or demonstrate that Choose Life Marketing

21    knew that the advertisements it was writing for Abundant Hope

22    were, as you allege, false or misleading.  I just wondered if

23    there's comparable case law for 93A, and I'd be interested in

24    hearing from them on rebuttal as well.  But just in this

11:33 25    situation, what is the kind of -- is there any mens rea

```
 1   attached at all to an advertiser who or any other, you know,
 2   business that supports that kind of primary actor doing the
 3   false advertising.
 4        MS. NASH:  So focusing on 93A, because I think that's
 5   what you're interested in, we -- similar to my argument -- my
 6   response earlier, I'm happy to do another look at the 93A
 7   specifically for advertising firms, but I would submit that,
 8   you know, discovery will bear this out.  We will be able to
 9   assess through discovery the degree to which Choose Life
10   Marketing did know and engage in this conduct willfully for the
11   purpose of treble damages in the 93A context, but we've pled
12   that they did this knowingly for the purposes of this
13   complaint.
14        THE COURT:  Okay.  All right.
15        MS. NASH:  Chapter 93A was designed to encourage more
16   equitable behavior in the marketplace and impose liability on
17   persons seeking to profit from unfair practices.  The Lanham
18   Act prohibits false and misleading descriptions of products and
19   services in interstate commerce.  That is what this case is.
20   That's what Choose Life Marketing's conduct is.  It falls
21   squarely within the taxing purpose of these statutes.
22        THE COURT:  Thank you, Ms. Nash.
23        Mr. Patton.
24        MR. PATTON:  Thank you, Your Honor.
25        I'm going to be brief and not repeat my eloquent
```

colleague's argument, but I think to just kind of deal with a

couple of kind of postural issues that came up.  First on the

Clearway impoundment, the only thing that was impounded, the

only thing that was asked to be impounded is the case was

brought by a woman and she wanted to proceed under a pseudonym.

In order to do that, she needed to submit an affidavit.  We

requested at the beginning, and the court granted, that she

proceed under a pseudonym.  The only thing filed -- I filed

it -- was a request to impound that affidavit.  I did not

become aware that everything else had been impounded until

Choose Life Marketing filed their opposition.  At no point did

they ask if that -- if everything was impounded.  I'll also

note that the documents that are pertinent were attached to our

motion.  You can also Google the documents and they're

available.  So I immediately called the clerk, got the issue

resolved.  The clerk admitted there was just a mistake made and

that's all taken care of.

THE COURT:  Okay.  Thank you.

MR. PATTON:  Yes.  The other piece is Mr. Harvey

referenced the depositions.  As you know, those were limited

depositions.  We could not take discovery on anything we wanted

there.  And I would note that during the depositions Mr. Harvey

objected to some of our questions of going past the scope that

you permitted.  So to say that we should have gotten evidence

there to put in our amended complaint is just not in line with

1    what happened.

2            And then, finally, I would note that I think

3    Mr. Harvey just raised a new argument under 93A citing that

4    nonprofits under Section 11 can bring a lawsuit even if they're

11:36  5   not engaged in trade or commerce.  I did not see that in his

6    brief.

7            THE COURT:  I think that was in Choose Life

8    Marketing's brief.  That argument sounded familiar to me.

9            MR. PATTON:  Okay.

11:37 10           THE COURT:  Yes.

11           MR. PATTON:  So I think, you know, what we've heard

12    today and what is in Abundance Hope's brief is kind of

13    misrepresentation and misdirection.  The only thing that really

14    matters today, right, on this motion and the pleading is the

11:37 15   complaint and the answer, right, and what we pled and what was

16    admitted.  And if we have pled something that the nonmoving

17    parties that cannot -- that we can put facts forward that we

18    can actually prove sufficient, then they have not met their

19    standard under the motion on the pleadings.

11:37 20           And so what I would submit to you is they've admitted

21    they're not licensed under the Massachusetts Department of

22    Public Health.  They've admitted, right, that they don't have a

23    doctor or an advance nurse practitioner on site.  They've

24    admitted that they do -- and that these are medical services.

11:38 25   And they've admitted that they provide these medical services,

1    right?

2         And so it is unclear to me, right, how they're now

3    saying that they haven't done all of that, is what they're kind

4    of putting forward, and they're jumping to this conclusion

11:38 5    that, well, we're not involved in commerce, but they're

6    skipping the steps.  They're just holding up *Planned Parenthood*

7    and saying we're not liable.  But if you actually look at the

8    case of *Planned Parenthood* and facts there as opposed to the

9    facts that have been alleged here, they have admitted they are

11:38 10    starkly different.

11         I understand that Choose Life Marketing thinks that a

12    urine pregnancy test and an ultrasound are the same thing but

13    they're not.  Ambulatory medical services in Massachusetts you

14    have to be licensed for.  Those were not at issue in *Problem*

11:38 15    *Pregnancy*.

16         THE COURT:  No, I understand the argument.  I think

17    it's just kind of what we talked about before is have you pled

18    enough to get over the presumption that when an entity, a

19    nonprofit entity is acting in furtherance of its core mission

11:39 20    that it's not subject to 93A and -- but I understand this

21    argument.

22         MR. PATTON:  And I would also for -- their motivation

23    is still a question of fact, right?  So that, and if you

24    actually look at the *Clearway* case that is one of the things

11:39 25    that the Court relied on, and I agree that that was not an

1    in-depth decision, right?  It's a page and a half.  But it

2    clearly states that the motivation is a question of fact.  And

3    if you compare what we've alleged and what was alleged there,

4    we clearly have met that burden.

11:39  5         And so I think when you look at those with regards to

6    93A and with regards to the Lanham Act, we have, you know,

7    clearly crossed the threshold.  And what I would point to,

8    which is kind of an in-depth analysis, is *Mother & Unborn Baby*

9    *Care* out of Texas.  They have almost the identical statute.

11:40 10   And there the Court found that if the consumer is seeking to

11   pay for the services, then that meets the threshold of

12   commerce.

13        Here, not only have we alleged that some of the Jane

14   Does were seeking to pay for these services, we have alleged

11:40 15   that when Jane Doe 1 walked in, Abundant Hope asked for her

16   health insurance information.  So there's a question of fact of

17   whether they are charging.  Just because they have written it

18   on their website is not conclusive.  I understand that Choose

19   Life Marketing wants the Court to just jump to that conclusion,

11:40 20   but we've made allegations from women that say that they have

21   asked for health insurance.  So that is a question of fact that

22   has to be dealt with.

23        And when you look at that case, it also talks about

24   ads being published.  I think a significant difference between

11:40 25   *Problem Pregnancy* and this case is it wasn't something written

1    on a door.  They are putting ads out into the marketplace to

2    manipulate that marketplace to put those ads on women's phones

3    in the women's pocket, right?  They are going out and trying to

4    manipulate those women and manipulate the health care

11:41  5    marketplace that Four Women is a for profit entity.

6             So I think when you look at those distinguishing

7    factors, it is clear that there are significant differences

8    between *Problem Pregnancy* and what we have here.

9             And then with regards to the individuals, what I would

11:41  10   first say is our entire complaint has allegations about the

11   individuals, if you look at how we've defined the different

12   entities that we talk about there.  And then I would also

13   submit that in their answer the individuals are answering and

14   admitting, right, all of the things because they're answering

11:41  15   collectively.  And so when you look at that, there are

16   sufficient pleadings against the individuals that they

17   controlled this entity, that they helped put out these

18   advertisements.  So we have met that pleading standard that

19   they are participating in the false advertising and in the

11:42  20   misleading acts.

21            So with that, like I said, I'm not going -- we've been

22   here for a while so I don't want to speak for the sake of

23   speaking, but I'm happy to answer any questions pertaining to

24   Abundant Hope.

11:42  25            THE COURT:  Thank you, Mr. Patton.  So what I'll do is

1   give Choose Life and other defendants a brief rebuttal, so I

2   would say five minutes.

3          MR. BREEN:  So, what, take a lunch break and come back?

4          THE COURT:  I want to let everyone go for lunch.

11:42  5    MR. BREEN:  Fair enough.  I love the First Amendment

6   and all of these issues, so I hope everyone else is enjoying

7   this, too.

8          I would say this, my learned colleagues keep talking

9   about false advertising in their pocket.  And the problem is

11:42 10  when you actually look at these websites, they're very clear,

11  you're not paying, and they don't offer abortions.  So this

12  idea it's false advertising -- you know, they're alleging it's

13  false, it's deceptive, it's misleading, but we're in a fraud

14  case where you've got that additional requirement of pleading,

11:43 15  and when you look at the words, you go, well, it says right

16  here I'm not going to pay anything, and it says right here we

17  don't do abortions.

18         THE COURT:  Can I ask you about the point that

19  Mr. Patton just made that it is alleged that Abundant Hope

11:43 20  asked women for their health insurance information when they

21  came in, and how does that jibe with the view that the services

22  are free?

23         MR. BREEN:  As I understand it, and I think it was

24  just Jane Doe 1, had the insurance allegation and the

11:43 25  allegation that she had a diagnosed pregnancy on site?  Am I

1  correct, it was Jane Doe 1?  I'm sorry.  I don't mean to --

2          THE COURT:  That's okay.

3          MR. BREEN:  Your Honor, I have got to tell you, the

4  allegations of Jane Doe 1 don't sound right to me as someone

11:43  5  who represents both Heartbeat International and NIFLA.

6          THE COURT:  But I have to accept them as true.

7          MR. BREEN:  But I would say that, hum, that doesn't

8  comport, at least as far as I understand.  So that may or may

9  not be true but it was certainly interesting to hear that.  But

11:44 10  either way, when you're looking at the -- I mean, the form 990

11  says no service revenue.  So we know they're not billing

12  insurance, they're not collecting insurance, and there's no

13  allegation that they actually billed insurance for anybody.

14  But again, I don't think it actually happened, but we'll see if

11:44 15  we have to see.

16          But there is a fundamental question here that still

17  hasn't been answered.  Again, what was actually false about the

18  advertising in women's pockets other than being informative,

19  informing of an alternative which is constitutionally

11:44 20  protected.  And frankly, I have got to say when I hear the

21  example, you might have had someone who didn't understand

22  English well enough, so they came to Abundant Hope and they

23  decided to have -- carry through seven or eight more months of

24  pregnancy and have a child, I have to ask myself the question,

11:44 25  are you kidding me?  In an hour visit, over -- if that, that a

1    person decided to change their mind on something so significant

2    as having a child, I mean, a constitutional right, all of these

3    deep things, I just -- it doesn't ring true, and there is this

4    question, how does the licensing status of Abundant Hope

11:45  5    materially influence a person's decision to obtain an abortion

6    at Four Women.  Because you've got no examples of people who

7    went to Abundant Hope, didn't go to Four Women and felt

8    deceived.  You have got no examples of it.  There's no

9    allegation of it.  Well, it might have.  I got some no shows,

11:45 10   but no shows can happen for a variety of reasons.  It's an

11   abortion facility, no shows all the time for a variety of

12   reasons.

13        And two, they keep talking about a requirement of an

14   onsite doctor.  There's no such requirement, and they have not

11:45 15   pled a requirement of an onsite doctor.  It's not pled.

16   There's no citation to a statute that requires an onsite

17   doctor, and it doesn't.  There's no requirement of that.

18        A nurse can take the ultrasound.  A nurse does not do

19   the diagnosis, so that's a little bit of an issue, but that is

11:46 20   not a requirement that is inherently per se illegal.

21        I also would note, they did concede in paragraphs 160

22   and 166 of their complaint that there are people that are there

23   who are described as licensed health care professionals, and

24   they have not pled anything to say that those were not -- that

11:46 25   those people misrepresented themselves, which would be an

1    entirely different issue.

2        THE COURT:  Well, I mean, 160 says a self-identified

3    ultrasound technician and a self-identified registered nurse.

4    That doesn't allege licensed.

11:46  5        MR. BREEN:  Well, they're self-identified, and there's

6    no basis -- they're not alleging a basis, oh, these people lied

7    because they need to do that.  They brought this into our

8    complaint.  They wanted to put it in front of Your Honor.  And

9    then we've got the Levis Guzman who, again, just based on a

11:46  10   quick Internet search, appears to have a license to practice in

11   Rhode Island, Massachusetts license maybe lapsed or appears to

12   be lapsed.  But those are licensed health care professionals.

13   As Your Honor noted, you know, if you have a retired physician

14   who didn't have a license active and gave you an ultrasound,

11:47  15   you did get an ultrasound from a licensed physician, but yeah,

16   it's odd and you can bring it up to the Board of Medicine, if

17   you'd like.  Again, there's plenty of remedy for these folks

18   but it's not a 93A or Lanham Act.

19        I would also note that the *Shaelis*, S-H-A-E-L-I-S,

11:47  20   decision -- we've argued this.  You know, the stand-alone

21   regulatory violation is not sufficient.  You've got to have

22   additional harm.  Just the fact of violating the regulation --

23   because that is the issue here.  Oh, well, your facility didn't

24   have that right license with the Department of Public Health.

11:47  25   However, if you're properly organized, you didn't need a

1      license.  So you're actually, as long as you're using licensed

2      health care professionals, you're okay.  So that point has not

3      been made here.

4           Okay.  And then -- and Choose Life Marketing placing

11:48 5      ads in a variety of places, that's just putting it on the

6      Internet and other places.  That's not changing the content.

7      It's still approved content.  Again, it's the same thing a

8      contractor or employee can do as well.

9           I don't like -- again, I respect my learned

11:48 10      colleagues -- this idea that no one can come near an abortion

11      facility, you opted into the marketplace.  I don't think --

12      it's a marketplace of ideas.  It is a moral marketplace.  And

13      yes, there is a for profit component that Four Women is engaged

14      in.  But there's nothing wrong that.  My goodness.  We can do

11:48 15      that, and our democracy can sustain that.

16           So again, those were some of the issues that I just

17      wanted to follow up on replies.  Thank you, Your Honor.

18           THE COURT:  Thank you, Mr. Breen.

19           Mr. Harvey, anything you would like to add?

11:48 20           MR. HARVEY:  Your Honor, just one point on the

21      depositions that were taken on November 1, 2024, the topics

22      were raised, I would just like to read a couple of the topics.

23      I'm reading from the deposition notice with the Exhibit A.

24      AWHC's -- number 1, AWHC's interactions and communications with

11:49 25      Jane Doe 5, Jane Doe 6, Jane Doe 7, or Jane Doe 8, including

1    but not limited to, initial points of contact, phone calls,

2    text messages, appointments, or other in-person interactions

3    and sources of information retained in files produced by

4    defendants in this action.

11:49  5    Number 4, AWHC's intake and new client procedures,

6    including but not limited to web-based intake or appointment

7    forms, the sources of and process by which AWHC receives

8    outreach from potential clients and the role of Choose Life

9    Marketing.  I would submit that somewhere in that area it would

11:49 10    be talking about payment.  You bring in a new client, if in

11    fact this was a commercial transaction, where is the evidence

12    of that they paid.  And yet they drafted this amended complaint

13    after this deposition, and there's no mention of it.

14    THE COURT:  Okay.  All right.  So I want to thank both

11:50 15    sides.  This was a lengthy argument.  You've given me extensive

16    briefing, and I thought the briefing was very well done and the

17    argument as well.  And this cases touches on complex and

18    sensitive issues, and I want to thank both sides for just their

19    professionalism in addressing all of those issues and bringing

11:50 20    the arguments to the Court today.

21    As you probably anticipate, I'm going to take both

22    motions under advisement.  We will stand in recess, and I wish

23    everyone here a good rest of your day.  Thank you.

24    THE CLERK:  All rise.

11:50 25    (Adjourned at 11:50 a.m.)

1              CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9          Dated this 18th day of August, 2025.

10

11

12          /s/ Linda Walsh

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25