**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FOUR WOMEN HEALTH SERVICES, LLC. <br><br> Plaintiff, <br><br> v. <br><br> ABUNDANT HOPE PREGNANCY RESOURCE CENTER INC. D/B/A ATTLEBORO WOMEN'S HEALTH CENTER, CATHERINE ROMAN, NICOLE CARGES, DARLENE HOWARD, AND CHOOSE LIFE MARKETING, LLC, <br><br> Defendants. | Case No. 1:24-cv-12283-JEK <br><br><br> The Hon. Julia E. Kobick <br> U.S. District Judge |

## <u>CHOOSE LIFE MARKETING'S MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION</u>

**INTRODUCTION**

Five days after this Court's order denying Choose Life Marketing's ("CLM") motion to dismiss, the Supreme Court issued a landmark First Amendment ruling in *Chiles v. Salazar*, 607 U.S. ---, 146 S. Ct. 1010 (March 31, 2026). Because *Chiles* is controlling authority that postdates this Court's order, it could not have been raised earlier and is quintessentially a basis for reconsideration based on an intervening change in controlling law. Independently, the Order should be reconsidered because it does not address the First Amendment protection required for Defendants' information concerning statistically significant links about abortion danger.

*Chiles* confirmed that *NIFLA v. Becerra*, 585 U.S. 761 (2018) applies to content-based *prohibitions* on healthcare-related speech, not just to compelled speech. *Chiles* also confirms that content-based restrictions on medical speech *even in a commercial context* trigger rigorous First Amendment scrutiny *and* require meeting "exacting proof requirements," including proof of injury and *mens rea*. Because Four Women has never even attempted to satisfy heightened scrutiny and exacting proof requirements, its claims seeking content-based censorship of CLM's speech must be dismissed.

As such and for the reasons set forth more fully below, CLM respectfully requests that the Court reconsider its March 26, 2026 Order to the extent it denied CLM's motion to dismiss and to dismiss Counts I and II against CLM with prejudice.

**ARGUMENT**

Motions for reconsideration are appropriate under Rule 59(e) of the Federal Rules of Civil Procedure "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." *Allstate Ins. Co. v. Fougere*, 79 F.4th

172, 197 (1st Cir. 2023) (internal quotation marks omitted); *accord Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 81-82 (1st Cir. 2008). Although "the Federal Rules of Civil Procedure do not specifically provide for the filing of motions for reconsideration of interlocutory orders," the standards of Fed. R. Civ. P. 59(e) "are commonly applied to motions for reconsideration." *Stonecrest Managers, Inc. v. Schreffler*, No. 1:22-cv-11167-PGL, 2023 WL 11826595, at *1 (D. Mass. 2023); *Courtemanche v. Motorola Solutions, Inc.*, 793 F. Supp. 3d 279, 284 (D. Mass. 2025). Reconsideration is appropriate here on both intervening-law and manifest-error grounds, for the following reasons.

## I.      Intervening Precedent.

### A. *Chiles* confirms this Court cannot *prohibit* Defendants' speech based on content without applying heightened scrutiny.

This Court's Order rejected Choose Life's constitutional defense based on *NIFLA*, 585 U.S. 761, on the grounds that *NIFLA* involved only "government-compelled speech." (Order at 29 n.4.) Five days later, however, the Supreme Court decided *Chiles*, which squarely applied *NIFLA* to a content-based prohibition on healthcare-related speech. *See* 146 S. Ct. at 1026 (*prohibition* on "talk therapy" "regulates 'speech as speech'") (quoting *NIFLA*, 585 U.S. at 770). That reaffirmed a longstanding First Amendment principle that the "difference between compelled speech and compelled silence" is constitutionally insignificant since the First Amendment concerns "both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988). Put simply, *NIFLA* (as clarified by *Chiles*) restricts attempts to *censor*—not just compel—speech based on content.

3

Four Women asks this Court to do just that.[1] It seeks a judicial order censoring Choose Life's speech precisely based on its alleged falsity, which is quintessentially content-based. *See United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality); *id.* at 733 (Breyer, J., concurring). Indeed, *Chiles* expressly relied on *Alvarez*, noting that our nation's long tradition of allowing prohibitions on "fraud and defamation" does not thereby permit "content-based restrictions on any 'false statements.'" *Chiles*, 146 S. Ct. at 1027 (quoting *Alvarez*, 567 U.S. at 718-722 (plurality)). Thus, even assuming "Four Women's claims do not target any speech the defendants wish to make, or have made, about their pro-life *viewpoint*" (Order at 29) (emphasis added), *Chiles* makes clear that prohibiting Choose Life's speech based on content—including because of its alleged "falsity"—still regulates "speech as speech" and triggers heightened scrutiny. *Chiles*, 146 S. Ct. at 1026.[2] Moreover, content-based restrictions on allegedly "false" speech trigger heightened scrutiny because of the "*risk*" that they reflect "censorious selectivity"—not because they are *necessarily* viewpoint discriminatory. *Alvarez*, 567 U.S. at 736 (Breyer, J., concurring) (emphasis added); *see also id.* at 723 (plurality) (authority to restrict allegedly "false" speech "absent any evidence that the speech was used to gain a material advantage . . . would give government a broad censorial power"); *accord R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) ("content discrimination raises the *specter*" of viewpoint discrimination) (emphasis added).

---

[1] The fact "Four Women is not a government entity" (Order at 29 n.4) is of no moment since *judicial* orders in private suits must abide the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *Shelley v. Kraemer*, 334 U.S. 1, 18 (1948); *see also* Doc. 92 at 35 ("MR. BREEN: . . . the government actor in this particular case is Your Honor.").

[2] While *Chiles* found Colorado's law to be *viewpoint* discriminatory, its analysis expressly relied on principles enunciated in *content*-discrimination cases. *See Chiles*, 146 S. Ct. at 1021-23.

The same is true here. Four Women's request that this Court censor Choose Life's speech based on its alleged falsity—without evidence the speech is used to "gain a material advantage," i.e., "to effect a fraud or secure money or other valuable considerations"— creates a "*risk*" of "censorious selectivity" in this highly "political context." *Id.* at 723 (plurality); *id.* at 736 (Breyer, J., concurring) (cleaned up).

Relatedly, *Chiles* recognized the importance of refraining from content-based censorship where the targeted speech "is presently the subject of a fierce public debate." 146 S. Ct. at 1029. The same concern exists here. The way "pregnancy service centers address abortion . . . at the beginning of their contact with their potential clients" is a form of "political speech" given that abortion is inherently a "controversial political topic[]." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249-50 (2d Cir. 2014). As such, abortion—and the way pregnancy centers talk about it—is naturally "the subject of a fierce public debate" and censoring it based on content interferes with Americans' inalienable right to "speak freely . . . in the free marketplace of ideas." *Chiles*, 146 S. Ct. at 1029.

Accordingly, after *Chiles*, prohibiting Choose Life's speech based on content must undergo heightened scrutiny,[3] which Four Women made no attempt to meet. (Docs. 81, 89.)

### B. *Chiles* also confirms that Choose Life's speech is not entitled to lesser protection even in a commercial context.

This Court's Order held that Choose Life's speech is plausibly false *commercial* speech that receives no First Amendment protection. (Order at 29.) But *Chiles* clarified that even *for-*

---

[3] Justice Breyer's concurrence in *Alvarez* calls for intermediate scrutiny, whereas the plurality would require "the most exacting scrutiny." *Alvarez*, 567 U.S. at 732 (Breyer, J., concurring); *id.* at 724 (plurality). The Supreme Court's *Chiles* decision relies on *both* opinions. *See Chiles*, 146 S. Ct. at 1027 (citing *Alvarez*, 567 U.S. at 718-22 (plurality), and *id.* at 736 (Breyer, J., concurring)).

*profit* medical speech is a critical part of the "marketplace of ideas" and thus is entitled to the highest protections of the First Amendment. 146 S. Ct. at 1029. So too here.

This Court deemed Choose Life's speech commercial and therefore lacking First Amendment protection under *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272-74 (9th Cir. 2017). (Order at 29.) But the pin-cited portion of *First Resort* found pregnancy center speech to be commercial (and unprotected) because it was allegedly "related to the provision of certain medical services, not the exchange of ideas." *First Resort*, 860 F.3d at 1273. That proposition is outdated after *Chiles*, which recognized that "the dangers associated with censorship . . . are no less acute in the fields of medicine and public health than they are anywhere else," even in a commercial context.  *Chiles*, 146 S. Ct. at 1023 (internal quotes omitted). Indeed, *Chiles* recognized that *medical counseling* is a core part of the "free marketplace of ideas," and that protecting it under the First Amendment is "the best means for discovering truth." *Id.* at 1029. That was true even though Ms. Chiles speaks in the context of providing paid medical services in a commercial setting.[4] Accordingly, it is no longer true that speech "related to the provision of medical services," even in a commercial context, is mutually exclusive with "the exchange of ideas." *First Resort*, 860 F.3d at 1273.[5]

For similar reasons, the remaining pin-cited portions of *First Resort* are likewise outdated after *Chiles*. Specifically, *First Resort* found that pregnancy centers' advertising was commercial to the extent they "solicit[ed] a patient base." 860 F.3d at 1272. But again, speech about "medical

---

[4] The Supreme Court did not limit or condition its opinion on whether Ms. Chiles or others provide their medical services for free. *See Chiles*, 146 S. Ct. at 1017-1029. Ms. Chiles herself is a *for-profit* provider. https://thedeeperstories.clientsecure.me/request/service.

[5] *Chiles* also supersedes this Court's reliance on *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176 (N.D. 1986), which *First Resort* relied on, for the same reason. (*See* Order at 29, citing *Larson*, 381 N.W.2d at 181 (stating pregnancy center's speech is "placed in a commercial context and" is "directed at the providing of services rather than toward an exchange of ideas").)

services" (which necessarily involves services *to patients*) is not subject to lesser protection after *Chiles*. 146 S. Ct. at 1023, 1029. *First Resort* also held that pregnancy centers are commercial in part to the extent that soliciting a client base "directly relates to [their] ability to fundraise and, in turn, to buy more advertisements." 860 F.3d at 1273. But *Chiles* held that medical speech itself is protected, period, regardless of whether it is spoken in exchange for money. 146 S. Ct. at 1024-25 (recognizing the "dangers" of "censorship" with respect to "the content of doctor-patient discourse" and "in the fields of medicine and public health" more broadly—which often involves significant monetary exchanges).

And even if the commercial speech test did apply here, fundraising nexus alone is insufficient to show that a "speaker acted *primarily* out of economic motivation, not simply whether the speaker had *any* economic motivation." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) (emphasis in original). *Ariix* characterized *First Resort* as a case about "benefits to employee compensation"—not organizational fundraising—and the Ninth Circuit has not since reaffirmed *First Resort*'s fundraising-nexus language. *Id.* Reading commercial speech to cover any nonprofit whose speech generates donations would conflict with controlling Supreme Court authority protecting charitable solicitation and the advocacy it funds. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *Riley,* 487 U.S. at 795-96; *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943) ("It is plain that a religious organization needs funds to remain a going concern. . . . Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way."); *In re Primus*, 436 U.S. 412, 428-31 (1978) (prospect of substantial attorney's fees and donations that may have resulted from ACLU solicitations offering free legal services to potential clients was not "for

7

pecuniary gain"; Court rejected "any suggestion that the level of constitutional scrutiny in this case should be lowered because of a possible benefit to the ACLU").[6]

Next, *First Resort* deemed pregnancy centers commercial to the extent their services "have monetary value." 860 F.3d at 1274. Again, however, *Chiles* held that commercially valuable medical speech is a core part of the search for "truth" in the "marketplace of ideas," thus entitling it to full First Amendment protection. *Chiles*, 146 S. Ct. at 1029; *accord NIFLA v. James*, 160 F.4th 360, 377 (2d Cir. 2025) (that non-profit services "will inevitably have some commercial value" does not mean speech about those services is less protected); *accord In re Primus*, 436 U.S. 412, 429-30 (1978) (provision of commercially valuable legal services did not reduce First Amendment expression and association protections for ACLU's client solicitations).

Accordingly, *First Resort* is unquestionably outdated after *Chiles*, and Plaintiff's many arguments relying on it must necessarily fail.

*Chiles* also conflicts with this Court's conclusion that Choose Life's speech plausibly constitutes "deceptive and unlawful *conduct*." (Order at 29 (citing *Commonwealth v. Source One Assocs., Inc.*, 436 Mass. 118, 127 n.11 (2002) (emphasis added)).) The Supreme Court considered and rejected the same argument in *Chiles*. Although Colorado insisted it was merely prohibiting conduct or speech incidental to conduct, the Supreme Court noted that speech cannot be censored based on such "labels." 146 S. Ct. at 1023, 1025.  The High Court clarified that

---

[6] *Cf. Nat'l Org. for Women, Inc. v. Scheidler*, 968 F.2d 612, 630 (7th Cir. 1992), *rev'd on other grounds*, 510 U.S. 249 (1994) ("rais[ing] funds" and "increasing plaintiffs' costs of doing business" by pregnancy centers (and other pro-life activists) was not sufficient to show "economic motive" under RICO, as was required at that time), *aff'g in relevant part* 765 F. Supp. 937, 944 (N.D. Ill. 1991) ("The economic motive requirement would lose all meaning" if a plaintiff "could meet the economic motive requirement simply by alleging that the defendant sought to receive some voluntary financial support . . . and that the defendant was motivated by the possibility of gaining financially from the voluntary contributions . . . . This result is nonsensical, and the court refuses to adopt it.").

medical speech is inherently not "conduct"; nor can it be deemed "incidental to conduct" unless it is "incident to separate *physical conduct* that would, without the patient's consent, amount to an assault." *Chiles*, 146 S. Ct. at 1028 (cleaned up). But, as a marketing company, Choose Life's speech is not incident to conduct—and Four Women does not allege otherwise.

Accordingly, Choose Life's speech is entitled to full First Amendment protection, even in a commercial context, after *Chiles*.

### C. *Chiles* obliges Four Women to meet "exacting proof requirements"—which it fails to do.

Finally, *Chiles* clarifies the teaching of prior precedents that content-based censorship must be predicated on showings of "exacting proof requirements"—*even in a medical context*—to "provide sufficient breathing room for protected speech." 146 S. Ct. at 1028 (cleaned up). In *Chiles*, Colorado thus needed (and failed) to show the targeted speech caused actual "injury" to the degree required by a "traditional tort malpractice claim." *Id.* In turn, *Chiles* relied on *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 620-21 (2003), which approved content-based restrictions on fundraiser fraud because the government did not target "[f]alse statements alone," but also had to show "[e]xacting proof requirements" like *knowledge* of falsity and *intentional*, *successful* deception, based on clear and convincing evidence. *See Chiles*, 146 S. Ct. at 1028 (citing *Madigan*); *accord Counterman v. Colorado*, 600 U.S. 66, 75-76 (2023) (*mens rea* requirements "provide breathing room for more valuable speech" at the necessary "cost of "shield[ing] otherwise proscribable . . . speech because the State cannot prove what the defendant thought"); *see also Counterman*, 600 U.S. at 76 (*private* defamation suits by public figures must still show *knowledge* of falsity or *reckless disregard* for the truth). Four Women has not met any exacting proof requirements here.

First, Four Women does not even allege that any of Choose Life's targeted communications have caused actual tortious "injury." While Four Women alleges Choose Life's speech has "misled and diverted patients," that is not tortious injury sufficient for a "traditional tort malpractice claim." *Chiles*, 146 S. Ct. at 1028. This alone is fatal under *Chiles*.

Four Women also fails to allege Choose Life has engaged in *knowing* falsities. (*Cf.* Doc. 81 at 9 (disclaiming any need to show knowledge of falsity).) For instance, this Court's Order deemed Choose Life's speech plausibly false in part because Attleboro Women's Health Center (AWHC) is allegedly not a properly "licensed medical facility" under Massachusetts law. (Order at 4.) But Four Women does not dispute that AWHC has actually provided ultrasounds and pregnancy tests via credentialed and licensed healthcare professionals,  including a "self-identified Registered Nurse." (Doc. 59, ¶160.) Even assuming AWHC's licensure status was defective, Four Women does not allege Choose Life had any knowledge at all of such defect. Again, that is fatal under *Chiles* and its progeny.

Furthermore, in *Evergreen,* the Second Circuit observed that the mere fact a "woman . . . mistakenly conclude[s] that pregnancy service centers, which look like medical facilities, are medical facilities," does not mean "the center[s] engage in deception." *Evergreen*, 740 F.3d at 247. So too here—particularly in the absence of knowledge of falsity or tortious injury.[7]

---

[7] The Order incorrectly credits Plaintiff's claims trying to show intent on the part of CLM, including Plaintiff's claims that certain of AWHC webpages and "its other advertising contain no such disclosure" that AWHC does not perform abortions. (Order at 5; *see also id.* at 18 (CLM "omit[ted] the disclaimer from certain webpages").) The record is to the contrary. Plaintiff's website exhibit (Doc. 59-1) was an incomplete printout. Defendants attached as Exhibit B to their motion to dismiss the full archive.org capture of awhc.net from September 9, 2024—the date of service—representing that "All of Attleboro's web pages include the disclaimer" that AWHC does "not provide gynecologic or extended obstetrical care, nor . . . perform or refer for abortion services." Doc. 68 at 4 & n.3 (citing https://web.archive.org/web/20240909202417/https://awhc.net/, and Ex. B, passim); Doc. 86 at 3 n.2 (invoking *Fink v. Time Warner Cable, Inc.*, 714 F.3d 739, 742 (2d Cir. 2013) (a plaintiff

Because Four Women fails to allege the "exacting proof requirements" necessary to judicially censor Choose Life's protected speech based on content, it must meet heightened scrutiny—which it does not. The Court should grant reconsideration for this reason alone.

## II.    Manifest Error and Injustice.

Reconsideration is also appropriate because "the initial decision was clearly erroneous and would work a manifest injustice." *Stonecrest*, 2023 WL 11826595, at *1. Specifically, the Order overlooks Choose Life's Motion to Dismiss Four Women's claim against Defendants' website speech stating that "studies show that abortion increases a woman's risk of breast cancer," and that abortion is dangerous in cases of ectopic pregnancies. (*See* Doc. 68 at 22-23 (citing Doc. 59 at ¶¶106-110).) These are matters of disputed science not within the judicial ken—and *Chiles* itself relied on the same principle. Defendants should not be forced into unnecessarily lengthy discovery and a battle of experts on heavily disputed scientific matters—at massive cost to the parties—especially when Plaintiff cannot allege any actual harm from the alleged statements.

As previously noted, the First Amendment prohibits censoring statements of scientific opinion based on content because "courts are ill-equipped to . . . referee such controversies." (Doc. 68 at 23 (quoting *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013)).) Indeed, "it is the essence of the scientific method that conclusions of empirical science

_____

"may not misquote or misleadingly excerpt" an advertisement and expect dismissal to be avoided)); *see also* dkt. 92 at 29 ("Every single page of the website . . . we put in the archive.org for the Court instead of the printout that plaintiff had. On every page it says, we don't do abortions, everything is free."). The Order likewise credits Plaintiff, despite it providing no ad samples *at all*, and despite Defendants' showing that Google automatically generates the in-ad disclosure "Does not provide abortions" on advertisements placed by certified pregnancy-center advertisers, a feature of Google's abortion-advertiser certification program since 2019. Doc. 68 at 24-25 & n.9 (citing Google, *About abortion certification and disclosures*, https://support.google.com/adspolicy/answer/9274988).

are tentative and subject to revision." *ONY*, 720 F.3d at 496. Statements of legitimately disputed science thus "are more closely akin to matters of opinion," which is per se protected by the First Amendment. *Id.* at 497. The Supreme Court's *Chiles* decision likewise acknowledged as much, holding that Colorado could not censor speech based on so-called "[m]edical consensus," given that such "consensus" "is not static" but "evolv[ing]." *Chiles*, 146 S. Ct. at 1029. As such, "prevailing opinion" is not a legitimate basis to "enforce[] conformity." *Id.*

Here, Four Women brazenly seeks to censor statements of legitimately disputed scientific opinion. As noted, the link between abortion and breast cancer remains vigorously debated. (Doc. 68 at 23.) At least 17 studies worldwide have found a statistically significant link between abortion and breast cancer, as confirmed in a 1996 meta-analysis by researchers at Pennsylvania State University.[8] Four Women points to disagreement by the American Cancer Society alleging that the "best scientific evidence does not support" such a link. (Doc. 59 at ¶110.) But that is exactly the kind of so-called "professional consensus" that no longer justifies censoring medical speech. *Chiles*, 146 S. Ct. at 1029. Indeed, "[l]icensed professionals have a host of good-faith disagreements" within their respective fields—but that is no basis for silencing competing views. *Id.* The same is true here. Four Women's request that this Court censor information *accurately* stating that "studies show that abortion increases a risk of breast cancer" must be rejected.

A similar error infects Four Women's request to censor information "indicating that abortion is dangerous for women with ectopic pregnancies." (Doc. 59 at ¶108.) Four Women alleges such information is "false and dangerous" because the American College of Obstetricians and Gynecologists (ACOG) states that "treatment for ectopic pregnancy requires ending the

---

[8] Angela Lanfranchi, M.D., FACS, "Abortion And Breast Cancer: The Link That Won't Go Away," Secretariat For Pro-Life Activities, United States Conference of Catholic Bishops (2007), https://www.usccb.org/resources/Abortion-and-Breast-Cancer.pdf.

nonviable pregnancy." (*Id.*) But Defendants say nothing to the contrary. The same pamphlet

containing the information Four Women seeks to censor states that "Ectopic pregnancy is very

serious and needs to be treated. A ruptured ectopic pregnancy can cause internal bleeding,

infection, and in some cases lead to death." (Doc. 59, Ex. B.) Meanwhile, the FDA makes clear

that the highly common chemical abortion pill regimen is indeed dangerous for women with

ectopic pregnancies.[9] After *Chiles*, therefore, Four Women cannot rely on ACOG to censor

disputed speech based on a mere "word game." *Chiles*, 146 S. Ct. at 1023. Accordingly, Four

Women's request to censor information about ectopic pregnancies must likewise be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion for

reconsideration.

Respectfully submitted, this 23rd day of April, 2026.

/s/ Peter Breen
Peter Breen†
Michael McHale†
Nathan Loyd†
Thomas More Society
121 W. Wacker Dr.
Suite 650
Chicago, IL 60601
(312) 878-7464
pbreen@thomasmoresociety.org
mmchale@thomasmoresociety.org
nloyd@thomasmoresociety.org
† admitted *pro hac vice*

/s/ Ryan P. McLane
Ryan P. McLane
(BBO# 697464)

---

[9] FDA, Questions and Answers on Mifepristone . . . , Questions 3, 6, 8, 15 (last visited April 22, 2026), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation.

McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

*Attorneys for Defendant Choose Life Marketing, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2026, I served a copy of the foregoing document upon all counsel of record via CM/ECF.

Dated: <u>April 23, 2026</u>          /s/ Peter Breen
                                    Peter Breen
                                    *One of the Attorneys for Defendant*
                                    *Choose Life Marketing, LLC*

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1

The undersigned counsel certifies that he corresponded with Plaintiff's counsel regarding this motion and its substance. Plaintiff's counsel indicated that Plaintiff opposes the relief requested in this motion.

Dated: <u>April 23, 2026</u>          /s/ Peter Breen
                                    Peter Breen
                                    *One of the Attorneys for Defendant*
                                    *Choose Life Marketing, LLC*